IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

(1)  TRACY MOORE,                          )
                                           )
          Plaintiff,                       )
                                           )
v.                                         )     Case No. 20-CV-410-R
                                           )
(1)  STATE FARM FIRE AND                   )
CASUALTY COMPANY,                          )     JURY TRIAL DEMANDED
                                           )
          Defendant.                       )

## DEFENDANT STATE FARM FIRE AND CASUALTY COMPANY'S MOTION TO EXCLUDE EXPERT TESTIMONY OF CHAD T. WILLIAMS AND BRIEF IN SUPPORT

Respectfully submitted,

**ATKINSON, BRITTINGHAM, GLADD, FIASCO, EDMONDS & ANNIS**
A Professional Corporation

John S. Gladd, OBA #12307
J. Andrew Brown, OBA #22504
1500 ParkCentre
525 South Main
Tulsa, OK 74103-4524
Telephone:  (918) 582-8877
Facsimile:  (918) 585-8096
*Attorneys for Defendant SFF&CC*

July 9, 2021

### TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................... ii

I.     INTRODUCTION .................................................................................. 2

II.    STATEMENT OF FACTS .................................................................... 4

    A.     The Subject Loss and State Farm's Inspection Findings ............................ 4

    B.     Chad T. Williams' Expert Report and Deposition ........................................ 6

III.   ARGUMENTS AND AUTHORITIES ............................................... ..11

    A.     The *Daubert* Standard .............................................................................. 11

    B.     Chad Williams' opinions do not include rationales or explanations and are

         unreliable. ..................................................................................................... 13

    C.     Chad Williams' methodology is unreliable and unsupported ................... 19

    D.     The report and testimony are prejudicial and not helpful to the jury ........ 23

III.   CONCLUSION ....................................................................................... 25

# TABLE OF AUTHORITIES

**PAGE**

## CASES

### U.S. Supreme Court

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
    509 U.S. 579 (1993) ..........................................11, 12, 14,17, 19, 20, 23, 24

*General Elec. Co. v. Joiner,*
    522 U.S. 136 (1997) ...............................................................................12

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999) .........................................................................12, 19

### Second Circuit

*Amorgianos v. Nat'l R. R. Passenger Corp.,*
    303 F.3d 256 (2nd Cir. 2002)..............................................................12

### Tenth Circuit

*Bitler v. A.O. Smith Corp.,*
    400 F.3d 1227 (10th Cir. 2004) ............................................................24

*Crew Tile Distribution, Inc. v. Porcelanosa Los Angeles, Inc.,*
    763 Fed. Appx. 787 (10th Cir. 2019) ..............................................22, 23

*Dodge v. Cotter Corp.,*
    328 F.3d 1212 (10th Cir. 2003) .................................................12, 13, 20

*Goebel v. Denver & Rio Grande W. R.R. Co.,*
    215 F.3d 1083 (10th Cir. 2000) ............................................................13

*Heer v. Costco Wholesale Corp.,*
    589 Fed. Appx. 854 (10th Cir. 2014) ...............................................14, 15

*Mitchell v. Gencorp, Inc.*, 165 F.3d 778
    165 F.3d 778 (10th Cir. 1999) .............................................................13

*Norris v. Baxter Healthcare Corp.,*
    397 F.3d 878 (10th Cir. 2005) ................................................................23

*Ralston v. Smith & Nephew Richards, Inc.,*
    275 F.3d 965 (10th Cir. 2001) ................................................................12

*Thompson v. State Farm Fire & Cas. Co.,*
    34 F.3d 932 (10th Cir. 1994) ................................................................24

*U.S. v. Rodriguez-Felix,*
    450 F.2d 1117 (10th Cir. 2006) ................................................13, 14

*Werth v. Makita Elec. Works, Ltd.,*
    950 F.2d 643 (10th Cir. 1991) ................................................12, 23

**Western District of Oklahoma**

*Graves v. Mazda Motor Corp.,*
    675 F. Supp. 2d 1082 (W.D. Okla. 2009) ................................13, 24

*Navarrete v. Wiebe,*
    2014 WL 4716087 (W.D. Okla., Sept. 22, 2014) ................................24

*Okla. Land Holdings v. BMR II, LLC,*
    2020 WL 1236307 (W.D. Okla. Mar. 13, 2020) ................................13

*Thompson v. APS of Okla., LLC,*
    2018 WL 4608505 (W.D. Okla. Sept. 25, 2018) ................................18, 19

*U.S. v. Friesen,*
    2009 WL 764497 (W.D. Okla., Mar. 20, 2009) ................................12

**Northern District of Oklahoma**

*Alexander v. Smith & Nephew, P.L.C.,*
    F. Supp.2d 1287, (N.D. Okla. 2000) ................................................17

*Dean v. Thermwood Corp,*
    2012 WL 90442 (N.D. Okla. Jan. 11, 2012) ................................17, 19, 20

**District of New Mexico**

*Hernandez v. City of Albuquerque*
    2004 WL 7338278 (D. N.M. Jan. 24, 2004)..........................................22

*U.S. v. McCluskey*,
    954 F. Supp.2d 1224 (D. N.M. 2013) ................................................20

*U.S. v. Sanchez*,
    2003 WL 27384953 (D. N.M. Oct. 7, 2003) .......................................22

**Oklahoma**

*Christian v. Gray*,
    65 P.3d 591 (Okla. 2003) .................................................................12

**RULES**

Fed. R. Civ. P. 26 ..................................................................... 13

Fed. R. Evid. 403.......................................................................24

Fed R. Evid. 702..............................................................11, 12, 19

**COMES NOW** the Defendant, State Farm Fire and Casualty Company ("State Farm"), by and through its attorneys of record, John S. Gladd and J. Andrew Brown, of the law firm of Atkinson, Brittingham, Gladd, Fiasco, Edmonds & Annis, and hereby respectfully requests this Court exclude, in whole or in part, the testimony and Rule 26 report of Plaintiff's expert witness, Chad T. Williams, because (1) his report does not include rationales or explanations and is unreliable; (2) his self-authored methodology is unreliable; (3) he did not comply with his protocols for evaluating roof damage; and (4) his testimony would not help the finder of fact and would result in significant prejudice.

At issue is whether wind damage to a few shingles justifies a complete replacement of Plaintiff's roof. Contrary to industry standards, multiple previous assessments of the roof and general logic, Plaintiff's expert opines because of a small, localized area of damage, Plaintiff's entire roof must be replaced. Mr. Williams, a professional forensic engineer who has never replaced a roof in his life, is willing to opine that because an unverified roofer damaged four shingles while performing a "Repairability Assessment"— a roof assessment methodology created by Mr. Williams himself—the roof cannot be replaced. His little-known "Repairability Assessment," unused by anyone else in the roofing industry and "peer-reviewed" by two unknown people, ***has always resulted in a finding that the roof is unrepairable*** in the forty times Williams has observed others perform the assessment. Under his "methodology," no roof is repairable. This conclusion defies industry standards, common sense, and logic. Mr. Williams' self-created "methodology" is unreliable and renders his expert opinions in this matter inadmissible.

Assuming this method was based on scientific knowledge, which it is not, he did not even follow it. He repeatedly skipped and modified the prescribed steps of his own methodology to reach his conclusion. His definition of damage includes characteristics which will always occur when removing shingles. He fails to account for how his failure to conform to his method or consider alternative factors affect the reliability of his test, and resorts to pure *ipse dixit* about their significance. Mr. Williams is aware that his assessment ***will not answer the question of whether wind caused any damage to Plaintiff's 18-year-old roof.*** His opinions are so conclusory and unsupported by his own research, that they would be of no assistance to the jury in its determination of whether the small amount of wind damage necessitated a full roof replacement. As his opinions will only unduly prejudice and confuse the jury regarding the issues of the case, State Farm respectfully requests this Court exclude his expert testimony and expert report in their entirety.

## BRIEF IN SUPPORT

### I.      INTRODUCTION

This action arises from Plaintiff's homeowner's claim related to damage to his approximately 17 to 18-year-old roof. Plaintiff reported the claim to State Farm on March 20, 2019, asserting a windstorm caused shingles to fall off his roof on or around March 13, 2019. State Farm immediately began its investigation of Plaintiff's claim. State Farm's initial inspection revealed minimal, repairable wind damage. Because the estimate for the repair did not exceed Plaintiff's deductible, State Farm did not extend payment to Plaintiff under the Policy. The inspection findings and evaluation result were confirmed upon the second inspection by State Farm with Plaintiff's Public Adjuster, PA Brown. PA Brown

disagreed with State Farm's assessments, arguing loose tabs on the roof's shingles were caused by wind. However, none of the shingles pointed out by PA Brown were torn, broken, or missing as would be expected for wind damage. Based on the uniform and zipper-like appearance of the damage, State Farm determined the disputed damage was caused by weathering/wear and tear, an excluded peril under the Policy.[1]

Plaintiff sued State Farm for breach of contract and bad faith. During litigation, Plaintiff designated Chad T. Williams as his expert witness. Mr. Williams' Report consists of a three-page summary of data gathered and his analysis. His summary and analysis are unclear, unsupported, and inadequate. For example, Mr. Williams concludes he observed damage, including the tearing of shingles and the pulling of shingles past fasteners, which precludes localized repairs of the roof's surfaces. However, the report fails to adequately explain or rationalize why the damage necessitates replacing the whole roof. Further, he did not explain how his application of engineering principles and scientific authority led to his belief the alleged damage to the shingles would affect roof repairs. He also failed to account for industry standards or alternative explanations regarding shingle repair.

Further, Mr. Williams' report represented he used a reliable methodology supported by peer review materials. However, he failed to perform multiple steps of his self-authored method. He failed to follow his method by not performing a conventional damage assessment, not verifying whether he was using a licensed and verified roofing contractor

---

[1] Notably, during discovery, PA Brown testified the disputed damage on Plaintiff's roof presented in a zippering pattern. He admitted a zippering pattern of debonding can be mistaken as wind damage. (*See*, Dkt. #32, SOF Nos. 53 and 54).

with experience, and not performing his Repairability Assessment on a damaged section of the roof as prescribed. Thus, he attempts to misapply and extrapolate a modified version of his method not subjected to peer review to justify a full roof replacement. When an expert modifies their methodology to reach a conclusion, the method is no longer reliable.

Finally, Mr. Williams' report and proffered testimony would not be helpful to a finder of fact because it does not fit the issues of this case. At issue is whether the roof replacement is a covered loss under the Policy. Mr. Williams' report does not answer this question. Instead, it broadly concludes Plaintiff's 18-year-old roof requires replacement without any reference to the effect of the storm which triggered the covered loss. All this expert report and testimony would do is confuse the jury on what the issue is in this case. Further, this needlessly cumulative evidence of what Plaintiff's public adjuster already confirmed would serve as a prejudicial rubber stamp against Defendant. For these reasons, Mr. Williams' testimony should be excluded in its entirety.

## II.    STATEMENT OF FACTS

### A.    The Subject Loss and State Farm's Inspection Findings

1.      On or around March 13, 2019, a windstorm occurred causing damage to Plaintiff's roof. (State Farm Claim File No. 36-8111-P16, p. 001, Dkt. 32-1).

2.      Plaintiff was insured under State Farm Homeowner's Policy No. 36-BJ-L508-5. The Policy provided dwelling coverage of $227,500.00 with a deductible of $1,317.00. (Homeowner's Policy No. 36-BJ-L508-5, Dkt. 32-2); (Dkt. 32-3).

3.      Plaintiff's State Farm policy provided coverage for losses caused by wind but expressly excluded coverage for losses caused by wear and tear/weathering. (Dkt. 32-2, pp. 5, 12, 15, 20).

4.      Plaintiff notified State Farm of the loss on March 20, 2019. According to Plaintiff, a windstorm occurred on March 13, 2019, causing damage to his roof and resulting in shingles in his yard. Plaintiff dated the roof as being installed in 2000-2001. (Dkt. 32-1, pp. 001, 033); (Dkt. 32-9, p. 27:20-24).

5.      On April 3, 2019, State Farm Field Adjuster Ryan Linderman presented to Plaintiff's home to inspect Plaintiff's roof. Upon inspection, FA Linderman noted Plaintiff's roof was a single layer three tab shingle roof with drip underfelt. He also noted the roof was "in very good condition." He found three wind-damaged shingles on the right slope and twelve wind-damaged shingles on the rear slope, all of which he determined were repairable. He also noted wind damage on a torn window screen on the rear elevation. No wind damage was found on the front or left slopes of the roof or the front, right, and left elevations of the home. (Dkt. 32-1, p. 032); (Dkt. 32-4); (Dkt. 32-5).

6.      Approximately four months later, Plaintiff retained Public Adjuster Brown, a close friend, to assist him with the claim. State Farm then scheduled a second inspection of the roof with PA Brown. (Dkt. 32-1, pp. 031, 254), (Dkt. 32-9, 57:13-58:10, 108:13).

7.      On August 26, 2019, FA Smoot performed the second inspection with Plaintiff and PA Brown present. FA Smoot observed "minor wind damage on the back slope" which FA Linderman previously noted. FA Smoot found no missing or broken

shingles, as would be typical for wind damage. Thus, FA Smoot made no changes to State Farm's original estimate. (Dkt. 32-1, pp. 031, 661-671); (Dkt. 32-6).

**B.    Chad T. Williams Expert Report and Deposition**

8.    Chad T. Williams, P.E. of Valor Forensic Engineering Services submitted an expert witness report in this matter on May 6, 2021. (Roof Repairability Assessment-Moore Residence, attached as Exhibit 1).

9.    Mr. Williams noted the scope of his work was to "determine the feasibility of repairing the three-tab-style asphalt composition shingles on the primary roof service of the subject dwelling." (Ex. 1, pp. 1, 5).

10.    Mr. Williams testified he did not perform a forensic level investigation of the roof nor was he asked to offer any opinion as to causation. He did not determine which shingles were wind damaged. (Deposition of Chad Williams, attached as Exhibit 2, 16:20-24, 129:25-130:8, 240:25-241:5).

11.    To prepare his report, Mr. Williams quickly reviewed PA Brown's estimate, but not State Farm's estimate. (Ex. 2, 146:15-21, 147:9-148:13). Instead, he relied on his education, knowledge, and experience. (Ex. 2, 18:11-15, 19:9-17, 49:19-21, 252:23-25).

12.    Mr. Williams has never repaired or replaced a roof in his career but has observed "many repairs" of "many types of roofs over the years." (Ex. 2, 38:10-14, 19-23).

13.    On April 27, 2021, Mr. Williams conducted a Repairability Assessment in "general conformation (sic)" with the Repairability Assessment methodology included in his own paper 'Use of the Repairability Assessment for Evaluating Asphalt-Composition Shingle Roof Repairs.'" (Ex. 1, pp. 3-4).

14.    In "Use of the Repairability Assessment for Evaluating Asphalt-Composition Shingle Roof Repairs," Mr. Williams notes the following:

> One note of caution, however. The repairability assessment is intended to supplement a damage assessment of these surfaces and is not to be used in place of a conventional damage evaluation. Only by conducting a damage assessment will the evaluator be able to confirm existence of actual wind, hail, or other damage to the roof surface to know if a repair assessment is necessary.

(Chad T. Williams, Use of the Repairability Assessment Method for Evaluating Asphalt-Composition Shingle Roof Repairs, 37 J. of the Nat'l Acad. of Forensic Eng'rs 185 (2020), attached as Exhibit 3). Mr. Williams never performed a demonstration of the Repairability Assessment for anyone else before publication. (Ex. 2, 54:7-15).

15.    The Repairability Assessment requires a licensed and insured roofing contractor to remove and replace the individual shingles in a careful and workmanlike manner and an independent and knowledgeable evaluator, such as a qualified forensic engineer. (Ex. 1, p. 185). Mr. Williams retained Jose Cruz of Valle Roofing and his unnamed helper, neither of whom he had met before or had ever performed a Repairability Assessment. Mr. Williams made no verification of either Mr. Cruz or his helper's licensure and is unsure of whether Mr. Cruz or his unnamed helper performed the removal of the shingles. (Ex. 2, 149:25-152:23).

16.    Further, Mr. Williams states when performing the Repairability Assessment, "[i]n order to remove and replace [a] shingle, approximately eight other shingles surrounding this one would be impacted." In specific, he notes there will be:

    a.  damage to shingles when prying the shingles' sealants loose.

    b.  damage during the nail removal process because the nails often strip through

        the shingle material, leaving tears and unsealed holes.

(Ex. 3, pp. 184-85).

    17.    Mr. Williams' publication further states "the location of the test area should

be established on a section of the roof that is most representative of where the repairs are

to be performed." The chosen assessment shingle should be full length and uncut, two rows

above any eaves, and a full shingle length from any rakes or hips. (Ex. 3, pp. 185-86).

    18.    Mr. Williams' publication further outlines how to assess for roof repairs as

follows:

    a.  The evaluator must mark the subject assessment shingle with an X. Next, the
        evaluator must mark and document any preexisting damage to the asphalt-
        composition shingles.

    b.  The evaluator must then use either a flat pry bar, crowbar, "five-in-one"
        painter tool to gently pry open the seal strips securing the subject assessment
        shingle to access its nails and fasteners.

    c.  Then, using the flat pry bar or similar tool, using a flat pry bar (or similar
        tool), remove the nails, securing both the middle of shingle X as well as the
        nails in the middle of shingles 5 and 6 that are also penetrating through the
        top of shingle X.

    d.  Following the removal, the evaluator must visually assess the damage and
        note any shingle which sustained damages during the removal process. The
        evaluator should visually assess the exposed underlayment for indications of
        damage as well.

    e.  The evaluator must then insert and secure a new asphalt-composition shingle.
        The new shingle X will first require a series of nails in the manufacturer-
        specified nail strip. Next, shingles 5 and 6 will need to be secured with nails
        in their nail strip area as well. The nails from this action should also penetrate
        through the top portion of the new shingle X. In addition, it will likely be
        necessary to supplement the now weakened seal strips on all the disturbed
        shingles with additional adhesives.

      f.  Any additional damage that occurs during the installation of the new asphalt-composition shingle and the placement of the fasteners should be documented.

(Ex. 3, p. 186-87).

19.    His publication notes a roof surface is repairable when individual damaged shingles can be removed and replaced without causing additional damage to the surrounding shingles. (Ex. 3, pp. 186-87).

20.    Mr. Williams estimates he has done his Repairability Assessment "more than 40-50 times" but has not kept a file summarizing his data. **He has never completed a Repairability Assessment and recommended repair**. **He concludes that no roof is repairable.** (Ex. 2, 67:10-19, 209:23-210:1, 229:23-230:12).

21.    Williams further notes "while beyond the scope of this paper," other considerations must be taken into account when deciding if a roof is repairable including "deterioration related to age or materials." (Ex. 3, pp. 190-91).

22.    In determining a Repairability Assessment Score, Mr. Williams provides a guide for calculating the total repairability score between 1 and 8. His guide states an additional point should be added for each shingle damaged during the replacement efforts. An additional point should be added if the shingles demonstrate deterioration related to age/materials, among other facts. (Ex. 3, p. 191).

23.    If the Repairability Score is 4+, repairability is limited, and localized repair is not recommended. If the Repairability Score is 2-4, repairability is limited but may be feasible on a case-by-case situation depending on the availability of suitable materials. If

the Repairability score is 0-2, then localized repair may be feasible depending on the overall conditions present and the availability of suitable materials. (Ex. 3, p. 191). No other publication or authority has ever used this Assessment or considered it authoritative. (Ex. 2, 227:10-19).

24.    Regarding his scoring system and why a 4+ precludes a roof replacement recommendation, Mr. Williams testified as follows:

> **Attorney Brown**: You keep saying "we" and "our" and all those type of things. Who in the world came up with the number four? Was that you or somebody else?
>
> * * *
>
> **Mr. Williams**: I understand you want to infatuate on this, what number is there, but it's based on experience, knowledge, and training of having been involved in this. Now as far as what statistical number you want to go to, I can't answer your question because I don't know what you're asking. You're trying to get to some conclusion about and apply some accuracy or some repeatability of a test. As I've repeatedly told you and as the paper straight out says, it's not a laboratory test. The metric that you're applying is not even relevant. We're saying this is an assessment methodology. This is a way of garnering information.

(Ex. 2, 62:5-7, 62:25-63:10).

25.    For his April 27, 2021 assessment of the Moore Residence, the Total Repairability Assessment Points score was 5, which Mr. Williams noted as "Repairability is limited, and localized repair is not recommended." Mr. Williams attributed 4 points to shingles damaged during field replacement efforts and added another point due to deterioration related to age and materials. He noted "four damaged shingles for the single shingle repaired would indicate the number of shingles damaged during a given repair would significantly expand the necessary scope of repairs." (Ex. 1, p. 6).

26.    Mr. Williams noted two types of damage from his Repairability Assessment:

     a. Damage from shingles pulling past the fasteners during the removal process for the subject assessment shingle.

     b. Multiple torn shingles at both assessment locations.

According to Mr. Williams, these both represent a "limitation to the overall repairability of the roof surfaces." (Ex. 1, pp. 6, 7).

    27.    Mr. Williams summarized his data and analysis into the following conclusion:

> **A repairability assessment was completed near the middle of the south second floor roof slope of the residence. Damage, including the tearing of shingles and pulling shingles past fasteners, indicated that the propagation of damage/expansion of scopes of repair were probable. Based on the conditions observed, the repair of existing three-tab-style asphalt-composition shingle roof surfaces would not be recommended. As such, the completion of localized repairs of the subject roof surfaces was not determined to be feasible or advisable.**

(Ex. 1, pp. 1, 8).

    28.    Mr. Williams did not assess the north, west, or east side of the roof. However, his recommendation is to replace the entire roof even though he did not inspect or investigate those areas. (Ex. 2, 167:11-168:1).

    29.    Mr. Williams agrees the damage to the roof was due to age. (Ex. 2, 253:13-254:13).

## III.   ARGUMENTS AND AUTHORITY

### A.   The *Daubert* Standard

Before expert testimony can be admitted, Federal Rule of Evidence 702 requires the district court to ensure any expert testimony or evidence to be admitted is not only relevant but also reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113

S. Ct. 2786 (1993). The ultimate object of the court's gate-keeping role under Rule 702 is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167 (1999). The flexible *Daubert* inquiry gives the district court the discretion needed to ensure the courtroom door remains closed to unreliable expert testimony while admitting reliable expert testimony that will assist the trier of fact. *Amorgianos v. Nat'l R. R. Passenger Corp.*, 303 F.3d 256, 267 (2nd Cir. 2002).

The Supreme Court in *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512 (1997) recognized "conclusions and methodology are not entirely distinct from one another." *Id.* at 146. Therefore, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* (stating "nothing in either *Daubert* or the Federal Rules of Evidence requir[es] the admission of opinion evidence connected to existing data only by the *ipse dixit* of the expert."). Under *Daubert* and its progeny, any step rendering the analysis unreliable also renders the expert's testimony inadmissible. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

The proponent of the disputed expert's testimony bears the burden of establishing the admissibility of such testimony. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, n. 4 (10th Cir. 2001). Trial courts have broad discretion in deciding whether to admit or exclude expert testimony. *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 647 (10th Cir. 1991). A trial court's decision to exclude the testimony of an expert will not be overturned absent a clear abuse of discretion. *Christian v. Gray*, 65 P.3d 591 (Okla. 2003)

**B.**    **Chad Williams' opinions do not include rationales or explanations and are unreliable.**

In determining whether expert testimony is reliable, the trial court must "assess the reasoning and methodology underlying the expert's opinion." *Cotter Corp.*, 328 F.3d at 1221. The expert's scientific testimony must come from scientific knowledge, grounded in scientific procedures based on actual knowledge and not subjective belief or unsupported speculation. *U.S. v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006). "It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000). Under the Fed. R. Civ. P. 26(a)(2)(B)(I)-(II), the expert's report must contain the "basis and reasons" and the "data or other information considered by the witness is forming them" for every opinion the expert will express.

The lack of rationales and explanations in Williams' opinion mandates exclusion of his testimony at trial. Proffered testimony lacking in sufficient objective support through testing or independent literature invites close scrutiny in determining the admissibility of an expert's opinion. *Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d 1082, 1103 (W.D. Okla. 2009). "At a minimum, the expert testimony should include a description of the method used to arrive at the level of exposure and scientific data supporting the determination. The expert's assurance that the methodology and supporting data [are] reliable will not suffice." *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 781 (10th Cir.1999). Where the expert hastily prepares and fails to account for any alternatives, his testimony indicates a lack of reliability. *Okla. Land Holdings v. BMR II, LLC*, 2020 WL 1236307, at *6 (W.D.

Okla, Mar. 13, 2020). The *Daubert* requirements are "not satisfied by casual mention of a few scientific studies, which fail to demonstrate that an expert's conclusions are grounded in established research, recognized in the scientific community, or otherwise accepted as scientific knowledge." *Rodriguez-Felix*, 450 F.3d at 1126.

Williams' report concludes Plaintiff's asphalt composition roof cannot be repaired. However, he does not define what caused the issues requiring repair nor does he segregate whether those needs have arisen from wind, wear and tear/weathering, or age. (Ex. 2, 240:25-241:5). Additionally, the only wind damaged area is the roof's south slope in a relatively small area featured in the expert report's photographs. Both the expert report and Williams' testimony fail to justify the full roof replacement, as shown here:

> **Attorney Brown**: What is your recommendation
> **Chad Williams**: I don't recommend trying to repair his roof.
> **Attorney Brown**: Any slope?
> **Chad Williams**: No I don't.
> **Attorney Brown**: Even though you didn't look at them?
> **Chad Williams**: Based on what I see. I think you're going to have a problem.
> It's 18 years old on a three tab that's approaching the end of its service life.
>
> * * *
>
> **Attorney Brown**: Well, you said the entire roof, so is this something –
> **Chad Williams**: We're referring to the primary roof.

(Ex. 2, 167:11-168:1).

In *Heer v. Costco Wholesale Corp.*, the court excluded an expert report concluding a defective step stool caused the plaintiff to fall for multiple reasons, including failure to apply engineering principles to his causation theory, discuss any industry standards, or

mention any scientific authority supporting his theory. 589 Fed. Appx. 854, 861 (10th Cir. 2014). The *Heer* Court reasoned as follows:

> In this case, Mr. Stolz claims he applied generally accepted scientific principles to reach the conclusion that a section of tubular steel through which a hole has been drilled is not as strong as a section of tubular steel that is intact. But he then leaped to the conclusion that the stool was rendered defective as a result of the hole, and this defect caused it to collapse during Ms. Heer's normal use of it. Mr. Stolz's opinion as to causation is unsupported by anything other than speculation, and it ignores completely the fact the step stool design complied with applicable industry standards. And unlike cases in which the expert's opinion relies on established scientific principles, see id., Mr. Stolz failed to explain the scientific principles upon which his theory of causation was based. Instead, Mr. Stolz advanced a theory which appeared novel in that it contradicted the outcome of standard industry tests.

*Id.*

Similarly, Mr. Williams' report and testimony justify the need for a roof replacement based on the shingles pulling past the fasteners during the removal process and tearing of the shingles. However, the fasteners need to be removed to accomplish the repair of the roof. The nail's removal will leave a naturally occurring hole and some marring around the nail shaft. Williams believes this constitutes damage:

> **Attorney Brown**: And let's say, for instance, you remove a shingle, it doesn't pull past the fastener, but you got the nail out.
> **Chad Williams**: Uh Huh
> **Attorney Brown**: Okay, there's still a hole in it. There's no other damage to the shingle. When it goes back on, according to your assessment method, does the roofer put a new nail back in the old hole or make a new hole? How does that –
> **Chad Williams**: They typically make a new hole.
> **Attorney Brown**: What happens to the old hole?
> **Chad Williams**: They typically try to fill it with some kind of sealant.
> **Attorney Brown**: Is that considered damage, to you?
> **Chad Williams**: It's not putting it back in the pre-condition, no, it's not.
> **Attorney Brown**: So would you say it's damage.
> **Chad Williams**: It is not putting it back in the condition it was beforehand.

15

(Ex. 2, 159:11-160:3). Williams opines repairing is not possible even though industry standards demonstrate a flaw in his logic and conclusion. Despite Williams' implication, this is not an unexpected condition resulting from the repair process. He opines the "shingles pulling the fasteners during the removal process…can create a point where water running under the shingle can seep into the roof system." (Ex. 1, p. 7). Williams fails to consider any shingle nail exposed to water has the potential to allow seepage, regardless of whether the roof is new or being repaired.

Williams' expert report justifies a total roof repair due to damage to four shingles during his assessment. However, as Williams' research acknowledges, asphalt composite shingles overlap and interweave into each other. (Ex. 3, p. 180). When removing one shingle, all eight shingles are likely to be impacted and damaged. (Ex. 3, p. 184). Specifically, the sealant of the surrounding nails will be pried open and removal of the nail will leave holes, which constitute damage. (Ex. 3, p. 180). Thus, according to Williams, because you must remove a nail and break the seal to remove the shingle, Plaintiff's roof requires replacement. This logic permeates Mr. Williams' expert opinion. Per Williams' assessment, one damaged shingle will require an entire roof replacement. However, re-sealing of shingles is an important and typical roof maintenance step, as seal strips naturally break due to age and wear and tear/weathering. Common industry practice dictates broken seals should be re-sealed by hand. Mr. Williams testified in the 40 to 50 times he has performed the Repairability Assessment, he has never recommended repair of a roof. (Ex. 2, 209:23-210:1, 229:23-230:12). Zero percent of his assessments allow for roof repairs.

At a minimum, the expert should describe the method he used in reaching his determination. *Alexander v. Smith & Nephew, P.L.C.*, 98 F. Supp.2d 1287, 1293 (N.D. Okla. 2000). The Repairability Assessment is a process where Williams removes and replaces individual shingles while observing the roof surface for damage. Another issue regarding his methodology is it does not describe how to perform the labor steps of the Repairability Assessment consistently. For example, Williams does not explain if a flat pry bar, crowbar, or five-in-one painter tool mentioned in his publication were used in his Repairability Assessment for Plaintiff's home. Williams acknowledges the importance of using proper tools and would not recommend certain widely accepted roofing tools known to minimize damage. (Ex. 2, 181:1-23). Yet, he did not document or remember which tool was used for Plaintiff's Repairability Assessment, nor has he ever kept track of what tools work better than others in any other Repairability Assessment. (Ex. 2, 181:1-23, 190:2-12). Mr. Williams even acknowledged he should note what tools are used in the future. (Ex. 2, 155:13-18). This is important because it can lead to inconsistencies in how the labor steps should be and were performed during the Assessment. It is also further relevant considering a thinner, lighter gauge straight putty knife will unseal the shingles with less blunt force and avoid shingle tears. Similarly, for nail removal, a wonder bar will be more conducive to removing nails without damaging an individual shingle.

Importantly, Williams fails to define the best practice labor steps and guidelines for effectuating a repair without damaging shingles. A workman's technique, patience, and skill are likely to have a great impact on the success of individual shingle removal and replacement. (Ex. 2, 190:13-191:7). Williams does not know and could not testify to the

skill or technique of the unverified roofing contractor and unnamed helper who performed the Repairability Assessment for the first time on Plaintiff's roof. (Ex. 2, 149:25-152:23). Williams has not contemplated the effect of an unnamed helper with no verifiable experience performing the Repairability Assessment in his analysis.

This omission is one of many examples of Williams' failure to consider alternative factors in his repairability method. Additionally, he failed to consider weather data, pre-existing damage to the shingles, and State Farm's estimate in preparation of his opinion. (Ex. 2, 128:21-129:24, 147:9-147:23, 177:9-177:17). He states his Repairability Assessment can be performed in 40 to 90 degree weather, but fails to consider the effects of this dramatic temperature difference on the pliability of asphalt shingles. When asked why damage to four out of eight shingles justifies his unrepairable roof recommendation, Mr. Williams failed to answer the question, instead referring to his knowledge, training and experience as his basis for the scoring method. (Ex. 2, 63:23-63:25). Experience alone is not a methodology because "methodology is the process by which the expert relates his experience to the facts at hand in order to reach an expert opinion." *Dean v. Thermwood Corp*, 2012 WL 90442, at *7 (N.D. Okla., Jan 11. 2012). Experience based expert testimony is admissible where the expert considers "a fixed galaxy of potential causes, ruled out all but one based on objective criteria, and arrived at a conclusion." *Thompson v. APS of Okla., LLC*, 2018 WL 4608508, at *9 (W.D. Okla., Sept. 25, 2018). As Williams admits, he did not consider any alternative factors, or State Farm's estimate and only reviewed PA Brown's estimate in forming his opinion. (Ex. 2, 143:20-144:9). Therefore, Williams' assessment and opinions are unreliable.

During his Repairability Assessment, Mr. Williams noted damaged shingles arose from the shingles pulling past the fasteners during the removal process and tearing. He then made an analytical leap to conclude the roof is irreparably damaged because this damage *is also necessary for effectuating **any** repair of shingles.* He failed to explain how the principles of his Reliability Assessment limit the overall repairability of roof surfaces and helped him reach his conclusion. In doing so, Mr. Williams advanced a conclusion which contradicted generally accepted industry practices. He did not contemplate the effect of alternative factors on Plaintiff's roof nor any potential rate of error on his assessment beyond casual references to his self-authored work. Therefore, this Court should exclude Williams' expert report and testimony as conclusory and unreliable.

C.    **Chad Williams' methodology is unreliable and unsupported.**

To determine whether expert testimony is admissible under *Daubert* and Fed. R. Evid. 702, the Court must examine the methodology and reliability of the expert's process in reaching his conclusions. *Thermwood Corp*, 2012 WL 90442, at *4. The following factors should be considered in determining whether opinions are derived from a sound methodology: (1) whether the theory offered by the expert has been tested, (2) whether it has been subjected to peer review, or analysis by other experts in the field, (3) whether the theory has a "known or potential rate of error," and (4) whether the theory has been generally accepted by others in the field. *Daubert*, 509 U.S. at 593-94. These factors are not a definitive test and "the gatekeeping inquiry must be tied to the particular facts" depending on "the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho*, 526 U.S. at 150. "Under *Daubert*, any step in the expert's

19

methodology that renders the analysis unreliable renders expert's testimony inadmissible, whether the step completely changes a reliable methodology or merely misapplies that methodology." *Cotter Corp.*, 328 F.3d at 1222. A flaw in the methodology used renders an expert's testimony inadmissible where it is a major flaw which undermines the entire analysis. *U.S. v. McCluskey*, 954 F. Supp.2d 1224, 1248 (D. N.M. 2013).

The primary peer-reviewed material used by Mr. Williams in making his expert findings regarding roof replacement was his publication "Use of the Repairability Assessment Method for Evaluating Asphalt-Composition Shingle Roof Repairs." Mr. Williams claims his site assessment "was completed in general conformation (sic)" with his publication. (Ex. 1, p. 3). According to his publication:

> The repairability assessment is intended to supplement a damage assessment of these surfaces and is not to be used in place of a conventional damage evaluation. Only by conducting a damage assessment will the evaluator be able to confirm existence of actual wind, hail, or other damage to the roof surface to know if a repair assessment is necessary.

(Ex. 3, p. 185). There is no definition of what procedures are necessary for a conventional damage assessment in Mr. Williams' research or report, but his testimony defined it as:

> **Attorney Brown:** And you didn't perform a damage estimate- a conventional damage estimate. We've already said that; right?
> **Mr. Williams**: We did not do a forensic assessment, no. But there's a difference between your two terms that you're trying to cross. What we are referring to is we want to be able to say, "Hey, there is damage to this roof," before we even look at it.

(Ex. 2, 168:18-168:25). Here, Mr. Williams' report is void of any investigation parameters, techniques, observations, or photography evidencing wind damage or any conventional damage assessment because he intended, from the start, to find the roof was unrepairable.

Specifically, Mr. Williams cites no evidence of creased, cracked, folded back, or ripped shingles blown off the roof by wind activity.

Mr. Williams' "Use of Repairability" publication also includes the following directive:

> When possible, the repairability assessment should be performed on shingles where wind and/or hail damage has already been identified. In cases where it is not possible to utilize storm damaged shingles, the testing should be performed on the slopes where damage has been identified.

(Ex. 3, p. 186). Again, Mr. Williams failed to follow his self-styled protocol. State Farm repeatedly identified wind-damaged shingles on the south roof slope. Williams included photography and discussion of this known wind-damaged area in his report. Yet, he deliberately chose an alternate examination area without identified damage, a few feet from the known wind damaged area because it was "solid material" and "just as representative as the other part of the slope." (Ex. 2, 175:9-19).

Williams' publication notes that his Repairability Assessment requires a licensed and insured roofing contractor to remove and replace the individual shingles in a careful manner and an independent and knowledgeable evaluator to assess the damage. (Ex. 1, p. 186). However, Williams retained Jose Cruz of Valle Roofing, a man he had never met who had never performed a Repairability Assessment before. Williams performed no verification of his licensure and is unsure of whether Mr. Cruz or his unnamed helper actually performed the removal of the shingles. (Ex. 2, 149:25-152:23). Mr. Williams believes "general conformation (sic)" with his method exists even where he has no idea whether the person performing the labor steps of the Repairability Assessment has repaired

a roof before. Further, Mr. Williams would presumably classify himself as the independent evaluator, when he was retained as an expert by Plaintiff.

The Tenth Circuit requires reliability in the expert's methodology and reliable conclusions concerning the specific purpose for which they are offered. *Hernandez v. City of Albuquerque*, 2004 WL 7338278 (D. N.M. Jan. 24, 2004). "An expert cannot use sound scientific methodology to support unscientific and speculative conclusions." *U.S. v. Sanchez*, 2003 WL 27384953 at *4 (D. N.M. Oct. 7, 2003). In *Hernandez*, the expert used a test with ample support of its general reliability in assessing whether a patient was malingering. 2004 WL 7338278, at *3. The expert then diagnosed him with Anti-Social Personality Disorder based on the test results. *Id.* However, the expert did not provide the court with any reason to extrapolate the results of the test to reach conclusions about whether the patient had Anti-Social Personality Disorder. *Id.* Here, Mr. Williams is attempting to apply his methodology performed on the roof's newer south slope to the entire roof, despite not evaluating the entire roof. (Ex. 2, 163:18-164:3). As in *Hernandez*, Mr. Williams similarly failed to provide this Court with any reason to permit him to extrapolate the results of his limited assessment of the roof's newer slope to reach conclusions about the roof's overall repairability.

In *Crew Tile Distrib., Inc. v. Porcelanosa Los Angeles, Inc.,* the expert report noted the purported methodology and the four steps the expert planned to follow. 763 Fed. Appx. 787, 796 (10th Cir. 2019). However, the expert did not complete the final verification step of her methodology before completing the report. *Id.* at 796-97. The district court initially admitted her testimony, reasoning she skipped a less significant step in her method. *Id.* The

22

Tenth Circuit reversed, finding since the expert deviated from the identified methodology in her expert report, she completely changed a previously reliable method. *Id.*

Here, Williams did not just skip two steps of his methodology by failing to perform a conventional damage evaluation before his repairability assessment and verifying whether a licensed roofing contractor would perform the labor steps of his method carefully. Williams' protocol states "the repairability assessment should be performed on shingles where wind and/or hail damage has already been identified." State Farm identified wind-damaged shingles on the south roof slope just a few feet above Williams' assessment. However, Williams included photography and discussion of this known damage area, yet chose an alternative non-wind damaged examination area to perform his repairability assessment. Regarding his various departures from his method, Williams testified only "significant" departures would challenge the reliability of his method but failed to define what constituted "significant." (Ex. 2, 222:24-223:1). Considering these modifications and testimony, the assessment Mr. Williams utilized for Plaintiff's roof is different than any theory he has tested or subjected to peer review and is unreliable.

**D.    The report and testimony are prejudicial and not helpful to the jury**

The fact-finder will be capable of evaluating Plaintiff's claim without injecting confusing and duplicative testimony from Mr. Williams. For the *Daubert* Standard, the expert's opinion is admissible only if it will assist the trier of fact "to understand the evidence or determine a fact in issue." Fed. R. Evid. 702; *Werth v. Makita Elec. Works, Ltd.,* 950 F.2d 643, 648 (10th Cir. 1991). The Court must evaluate whether the proffered testimony "logically advances a material aspect of the case." *Norris v. Baxter Healthcare*

*Corp.*, 397 F.3d 878, 884 n.4 (10th Cir. 2005). An essential component of the relevance determination is whether the proposed expert testimony fits the issues of the case. *Graves v. Mazda Motor Corp.*, 675 F. Supp 2d at 1091. "Even where an expert's proffered evidence is scientifically valid and follows appropriately reliable methodologies, it might not have sufficient bearing on the issue at hand to warrant a determination it has relevant 'fit.'" *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir. 2004). If an expert does not provide special skill, knowledge, or expertise to help the jury draw conclusions, then the expert is merely prejudicial. *Navarrete v. Wiebe*, 2014 WL 4716087 (W.D. Okla., Sept. 22, 2014). "Where expert testimony is offered on an issue that a jury is capable of assessing itself," the trial courts may exclude such evidence "because it would not even marginally 'assist the trier of fact.'" *Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932, 941 (10th Cir. 1994). Further, testimony is inadmissible where its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, wasting time, or needlessly presenting cumulative evidence. *See* Fed. R. Evid. 403.

    The Complaint alleges State Farm breached the insurance contract and committed bad faith in part because it refused to cover the full amount of Plaintiff's loss. The issue for which Mr. Williams' testimony could be beneficial is whether the roof requires total replacement based on the localized damage from the March 13, 2019 storm. However, Mr. Williams testified he was not asked to offer any opinion regarding causation and made no determination of which shingles were wind-damaged. (Ex. 2, 16:20-24, 129:25-130:8, 240:25-241:5). He even acknowledged the repair issues with Plaintiff's 18-year-old roof were likely due to age. (Ex. 2, 253:14-254:13). As shown in Defendant's Motion for

24

Summary Judgment, this is merely a legitimate dispute as to the value of the claim as coverage does not include a full roof replacement due to the wear and tear/weathering exclusion under the Policy. Since it is not bad faith to have a difference in opinion regarding a claim's value, Mr. Williams' testimony will solely serve as cumulative evidence of the claims made by Plaintiff's public adjuster and will confuse the jury regarding the legal issues of this case.

Moreover, Williams' expert opinion states "this type of damage would also limit the overall repairability of the roof surfaces" and "these conditions also represented limitations relative to the overall repairability of the roof surfaces." (Ex. 1, p. 7). However, because his conclusion does not explain *why* this damage will limit the ability to repair a roof, it will not assist any jury member in determining whether the March 13, 2019 storm damaged the roof beyond repair. As Plaintiff and Mr. Williams have inferred, his roof requires repairs because of age and weathering/wear and tear, not wind. (Dkt. 32-1, p. 32) (Ex. 2, 253:14-254:13). Instead of determining the facts in issue, Mr. Williams' needlessly cumulative testimony and expert report are likely to confuse and mislead the jury.

## III.    CONCLUSION

The opinions offered by Mr. Williams are without a proper foundation, unreliable, prejudicial, and will confuse and mislead the jury. Consequently, Mr. Williams should be entirely precluded from testifying at trial.

Respectfully submitted,

**ATKINSON, BRITTINGHAM, GLADD, FIASCO, EDMONDS & ANNIS**

A PROFESSIONAL CORPORATION

\s\   J. Andrew Brown
John S. Gladd, OBA #12307
J. Andrew Brown, OBA #22504
1500 ParkCentre
525 South Main
Tulsa, OK 74103-4524
Telephone:  (918) 582-8877
Facsimile:  (918) 585-8096
***Attorneys for Defendant SFF&CC***

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of July, 2021, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Steven S. Mansell
Kenneth G. Cole
Zachary K. Housel
MANSELL, ENGEL & COLE
204 North Robinson Avenue, 21st Floor
Oklahoma City, OK 73102
*Attorneys for the Plaintiff*

\s\    J. Andrew Brown