Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA


(1) TRACY MOORE,                    )
                                    )
              Plaintiff,            )
                                    )
vs.                                 )    Case No. 20-CV-410-R
                                    )
(1) STATE FARM FIRE AND             )
CASUALTY COMPANY,                   )
                                    )
              Defendant.            )
_____      )



VIDEO DEPOSITION OF CHAD WILLIAMS

TAKEN ON BEHALF OF THE DEFENDANT

IN TULSA, OKLAHOMA

ON JUNE 21, 2021



APPEARANCES:

ZACHARY K. HOUSEL, Attorney at Law, 204 North Robinson
Avenue, 21st Floor, Oklahoma City, Oklahoma 73102;
appearing on behalf of the Plaintiff.

TIMOTHY S. KITTLE, Attorney at Law, 6660 S. Sheridan,
Suite 250, Tulsa, Oklahoma 74137; appearing on behalf of
the witness.

J. ANDREW BROWN and TREY PURDOM, Attorneys at Law, 525
S. Main, Suite 1500, Tulsa, Oklahoma 74103; appearing on
behalf of the Defendant; and JOHN S. GLADD, Attorney at
Law, appearing by telephone.

VIDEOGRAPHER: Mike Ballard

REPORTED BY: Regina Brantley, CSR RPR  (918) 406-7196

EXHIBIT 2

Page 2

1               S T I P U L A T I O N S

2       It is hereby stipulated and agreed by and between

3   the parties hereto that the deposition is taken pursuant

4   to Federal Rules of Civil Procedure and all objections

5   shall be made in accordance therewith.

6

7

8               I N D E X

9
W I T N E S S                               P A G E

10
CHAD WILLIAMS

11
        Direct Examination by Mr. Brown........   3
12      Cross-Examination by Mr. Housel........ 240

13

14   JURAT....................................... 257
ERRATA SHEET................................ 258
15   REPORTER'S CERTIFICATE...................... 259

16

17

18               E X H I B I T S

NUMBER      DESCRIPTION                 P A G E
19
    1        Calendar....................... 115
20      2        Email.......................... 132
        3        Photo.......................... 203

21

22

23

24

25

Chad Williams  6/21/2021

1    Q.    Is that a yes?

2    **A.    Yes.**

3    Q.    I think your videos actually say that three or

4    four times that your goal is to be objective and honest;

5    correct?

6    **A.    Yes.**

7    Q.    The videos also say you want to review the facts,

8    you want the facts, what kind of damage, weather

9    information, etc.  Is that true?

10    **A.    Yes.**

11    Q.    When you get an assignment, those things are

12    important to you?

13    **A.    It's important to know what we were assigned and**

14    **what we were asked to do.  When we're looking at**

15    **something from a forensic investigation standpoint,**

16    **there's certain information that we'd like to have and**

17    **we want to make sure that we establish.  When we're**

18    **asked to do something different, we have to look at what**

19    **the facts are.  In this particular case, we were asked**

20    **to look at, "Was it feasible to actually complete the**

21    **repair."  So it's very important that you understand**

22    **that we're not asked to do a forensic-level**

23    **investigation of this roof, nor was it required for us**

24    **to be able to do that in order to render this opinion.**

25    **We were able to -- the size of the roof and look at it**

1   A.    That's an open-ended question.  I'm not sure what

2   you're asking.

3   Q.    Okay.  You prepared a report in this case, didn't

4   you?

5   A.    Yes.

6   Q.    What did you -- What documents did you review in

7   preparation of that report, if any?

8   A.    I'm not sure how to answer your question because

9   it's very open ended.  We have many, many things that we

10  review; many, many things that we're knowledgeable of;

11  many, many products that we're aware of.  I don't go

12  read every single paper that I've ever read before I

13  write one report.  So I count on my education,

14  knowledge, and experience to be able to draw these

15  resources together.  We look at many, many things over

16  time.  So to ask that question, we're looking at what do

17  we have as far as the information that's available.  Do

18  we have the photos?  Do we have the information that's

19  here?  We look at our methodology.  We wrote the

20  methodology based on industry standard.  We understand

21  what's here, so if you're asking what did we

22  specifically review, it's the equivalent of saying what

23  law journal did you review 12 years ago.  So we've

24  reviewed numerous documents over our careers to

25  establish our experience.  So there's plenty of things

Chad Williams   6/21/2021

Page 19

1  that we've looked at as far as writing this report.  We

2  look at the facts that are available to this matter.  As

3  far as specifically any -- every resource, I'm not sure

4  how to answer your question.

5  Q.    Okay.  Well, I appreciate your answer.  Maybe it

6  was a bad question.  Did you review any documents

7  specific to this claim in preparation of your report?

8  Estimates, photographs, log notes?

9  A.    I don't think we had those available to us.

10 Q.    Okay.  That's my question.  You don't recall at

11 this point reviewing any materials?

12 A.    I don't know of any external documentation that

13 would have been available to us at that time.  I think

14 that we had gotten some things later on.  I think that

15 there's a -- an estimate from a public adjuster.  We

16 glanced at it.  We're not rendering opinion.  It's not

17 particularly relevant to what we're dealing with here.

18 We're dealing with the fact that we look at a roof, we

19 know that there's areas that are evidently damaged based

20 on the fact that there's a tarp on it, and now we're

21 going, "How can you fix it; can you determine whether or

22 not it's feasible to repair this roof."

23 Q.    Did you ask for any documents before you even went

24 out to the property?

25 A.    I believe we basically asked for a general "what

Chad Williams   6/21/2021

Page 38

1    construction of roofs for many, many years.

2    Q.    And I'm not saying observing.  I mean, I can --

3    people can observe a roof being put on.  I'm talking

4    about actually getting up there, hammer in your hand,

5    nail gun in your hand, putting shingles on.

6    A.    I'm not a roofing contractor in Oklahoma.  That

7    would require me to be a contractor, unless I was doing

8    it for myself.  As I've answered, I'm not a roofing

9    contractor.

10   Q.    I'm just asking if you've ever done it.

11   A.    I have been part of when roofs have been

12   installed.  Have I been the person swinging the hammer

13   as a contractor?  As I've answered, no.  Have I been

14   part of the process of being on the roof?  Yes.

15   Q.    What is part -- being part of the process then?

16   A.    As I've answered, when we're there, we've observed

17   what's being done.  Have I physically been the person

18   putting the shingle on?  No.

19   Q.    Have you ever repaired a roof, made any repairs to

20   a roof?

21   A.    I have observed many, many repairs being made to a

22   roof.  I've been right up in with the repairs being done

23   of many, many types of roofs over the years.

24   Q.    And I appreciate what you're telling me, but my

25   question is, have you ever, you yourself, repaired a

1    "Here's what we see," and so that we can present the

2    information, other parties can understand the same

3    information.  All we did was bring together a

4    methodology of how to present the information.

5    Q.     Now, the paper, as I see it, you have simply two

6    sources cited, or references.  Is that it?

7    A.     Yes.

8    Q.     And this Aon, the Weather, Climate, and cata --

9    Catastrophe Insight, that has to do with hail damage in

10   Germany, doesn't it?  The page that you referenced?

11   A.     I don't have the reference in front of me.

12   Q.     You also cite Marshall and Herzog and utilize

13   their DURA equation.  Is that correct?

14   A.     We discuss it.

15   Q.     Is that Tim Marshall?

16   A.     Yes.

17   Q.     Anything that you use besides the dura equation

18   from Marshall and Herzog?

19   A.     Most of what we're using is what is the industry

20   standard.  It's the approach that's been from our

21   education, experience, and training of what is done in

22   the industry.

23   Q.     You reference a specific document --

24   A.     As far as specific --

25   Q.     -- from Herzog; right?

Chad Williams  6/21/2021

Page 54

1   to determine what is damaged."  There wasn't a single
2   way to present the information and say, "This is what we
3   found."  And this is why we reasonably want to be able
4   to do this is so that we can say, "Here's what happened,
5   here's what we found," and be able to present it in a
6   cogent way.
7   Q.    And getting back to my question.  Did you ever
8   perform or demonstrate one of these assessments to
9   anybody before this publication?
10  A.    Yes.  We -- The methodology was used before.
11  Q.    To whom?
12  A.    The methodology -- As far as was it done as a
13  demonstration for someone?
14  Q.    Yes, sir.
15  A.    No.
16  Q.    Had you done a Repairability Assessment, the
17  methodology you had, before this publication?
18  A.    Many times, yes.
19  Q.    Did you keep track of any field studies as a
20  result of your prior Repairability Assessment Methods?
21  A.    That's a fairly open-ended question.  Can you be
22  more specific?
23  Q.    Sure.  Did you keep any statistics of how many
24  times you did it?
25  A.    I don't have a specific number.

Page 62

1   There's no material to be able to do it.  All we're

2   doing is providing a way to present the information in a

3   comprehensive understandable format.  It's all derived

4   from industry standard.

5   Q.    You keep saying "we" and "our" and all those type

6   of things.  Who in the world came up with the number

7   four?  Was that you or was that somebody else?

8           MR. HOUSEL:  Object to the form of the

9   question.

10  A.    It was part of the process to develop the paper.

11  I am the primary author on it.  I was part of the

12  process to be able to do that.  We looked at where we

13  thought we could make repairs successfully occur and

14  whether or not they could be done.  If you look at the

15  parameters that are there, when you're looking at the

16  number of shingles, part of the scoring is based on

17  damage propagation.  Part of it's also based on other

18  factors, well established.  Can you get the materials?

19  Do we have other damage that's gone on?  Do we have a

20  history of repairs that have failed?  All of the things

21  that go into that scoring methodology are all

22  standardized and are all common knowledge in this

23  industry.  I understand you want to infatuate on this,

24  what number is there, but it's based on experience,

25  knowledge, and training of having been involved in this.

Chad Williams    6/21/2021

Page 63

1    Now, as far as what statistical number you want to go

2    to, I can't answer your question because I don't know

3    what you're asking.  You're trying to get to some

4    conclusion about and apply some accuracy or some

5    repeatability of a test.  As I've repeatedly told you

6    and as the paper straight out says, it's not a

7    laboratory test.  The metric that you're trying to apply

8    is not even relevant.  We're saying this is an

9    assessment methodology.  This is a way of garnering

10   information.

11   Q.    (By Mr. Brown)  Again, I appreciate you going on

12   and answering questions I didn't ask.  My question --

13   And I don't have an infatuation of a number.  I'm going

14   off what your report says.  And four is the number when

15   you don't recommend repairs; true?

16   A.    Yes.

17   Q.    Okay.

18   A.    Based on the parameters that go into it.

19   Q.    My question is:  How do we know that that number

20   four is a reliable number?  Is there any science or any

21   data that you know of that backs up that once you get to

22   four out of these eight, then repairs shouldn't be made?

23   Is there any?

24   A.    You're also, again, not paying attention.  And I

25   understand the need for that.  What we are saying to you

Chad Williams   6/21/2021

Page 67

1    **A.**    **I don't remember the exact time frame.**

2    Q.    How many Repairability Assessment Methods have you

3    done to date?

4    **A.**    **That question could be interpreted different ways.**

5    Q.    Okay.  I'll try to clarify.  The methodology

6    that's contained in this paper -- or let's go with --

7    The report you did in this case, you performed the

8    Repairability Assessment Method; correct?

9    **A.**    **Yes.**

10    Q.    How many times have you done that, that

11    methodology?

12    **A.**    **I don't know an exact number.  Probably more than**

13    **-- I would guess more than 40, 50 times, but I don't**

14    **know exactly.**

15    Q.    Have you kept track of how many times you've done

16    it?  Is there --

17    **A.**    **No.**

18    Q.    -- a file?

19    **A.**    **No.**

20    Q.    Are you aware of anybody giving a different of

21    opin -- difference of opinions -- or a different opinion

22    than you on those Repairability Assessment Methods that

23    you've done before?

24    **A.**    **Not as the -- Not as of right now, I'm not.**

25    Q.    When you do these Repairability Assessment

Chad Williams  6/21/2021

Page 128

1   A.    I think what we got was the one -- the one set of

2   documents related to the PA.  I think that's all we got,

3   if that's what's in the file.  And that's the only thing

4   I remember we actually got.

5   Q.    In your experience of doing thousands of these --

6   and you're typically brought in once there's a

7   disagreement of some sort -- did you think that the

8   insurance company had done an estimate too?

9   A.    It would be nice, but I've actually seen cases

10  where they haven't.

11  Q.    Is it pretty common that an insurance company does

12  an estimate?

13  A.    It would be very common for them to do it, but

14  it's also not unusual that that's not available to the

15  other side.

16  Q.    Would you want to see it?

17  A.    I would like to have seen it.

18  Q.    You said you asked for some weather data from

19  Atlas.

20  A.    Yes.

21  Q.    What weather data did you receive?

22  A.    I got a verbal.  I just had them look and go,

23  "Hey, is there any storm event that would have

24  occurred?"  Initially, they came back and said, "No,

25  there wasn't hail."  Well, hail wasn't what I asked them

Chad Williams   6/21/2021

Page 129

1   for anyway.  I asked them about wind.  They came back

2   and they said, "Yeah, there was a long period of wind."

3   And they basically just did a very quick, cursory

4   evaluation.  I was just looking to see if there was

5   anything to substantiate what had been said.

6   Q.   Did you do any searches yourself for weather?

7   A.   I think at one point in time I looked at weather

8   data looking for, just, confirmation.

9   Q.   Do you agree with me, sir, there's nothing in your

10  file that has to do with weather data?

11  A.   No, there's not because we weren't using that and

12  we didn't rely on it.  It's not relevant to what we did.

13  We were simply looking for information.

14  Q.   So weather data is not relevant when you go out

15  for a Repairability Assessment?

16         MR. HOUSEL:  Object to the form.

17  A.   Historic weather data from an event is not.  Now,

18  if you're asking about weather data, do we look at the

19  weather data, what is the forecast, then yes; what are

20  the conditions we're expecting on that day, then yes.

21  But there's -- as we've said multiple times now, there's

22  a very big difference between doing a forensic-level

23  investigation of a failure and a Repairability

24  Assessment.

25  Q.   (By Mr. Brown)  Is it true, sir, yes or no, that

Chad Williams  6/21/2021

Page 130

1   on your videos, on your website, that you say one of the

2   most important factors is whether -- or to gather as

3   much information possible as possible?

4   A.    Yes.  And as I've repeatedly answered you on this,

5   if it was salient, if it was relevant, if we were doing

6   a forensic-level investigation of the roof for

7   causation, it would be.  But when we're dealing with a

8   situation that is dealing with repairability, it's not.

9   Q.    You don't utilize your training as a forensic

10  engineer in your Repairability Assessment?

11  A.    The knowledge --

12        MR. HOUSEL:  Object to the form of the

13  question.

14  A.    The knowledge and experience that I have as a

15  forensic engineer goes into the Repairability

16  Assessment.

17  Q.    (By Mr. Brown)  Okay.  Did you ask if the roof had

18  been damaged prior to the event that was at issue?

19  A.    I had asked, and I was told that it had not been.

20  There was no specific history of repairs.

21  Q.    Is all -- All these communications you're having,

22  are these verbal communications?

23  A.    Yes.

24  Q.    Did you ask about any prior claims or prior

25  repairs to the roof?

Chad Williams  6/21/2021

Page 143

1   Q.   Do you know who Jeff Brown is?

2   **A.   No.**

3   Q.   Do you understand now -- obviously it's material;

4   it's in your file -- that he's plaintiff's public

5   adjuster, Mr. Moore's public adjuster?

6   **A.   Okay.  I recognize the name.  I don't know him.**

7   Q.   Never met him?

8   **A.   I don't think so.**

9   Q.   Do you know what his qualifications are?

10   **A.   I do not.**

11   Q.   Reputation?

12   **A.   I do not.**

13   Q.   Knowledge and expertise?

14   **A.   I do not.**

15   Q.   Education, training?

16   **A.   No.**

17   Q.   Have you ever met him face to face or talked to

18   him?

19   **A.   Not that I recall.**

20   Q.   Do you know why his estimate of approximately

21   $36,000 is in your file?

22   **A.   We were provided that as some of the relevant --**

23   **the, quote, relevant information.**

24   Q.   It is relevant?

25   **A.   It would be something we looked at mainly just to**

Chad Williams   6/21/2021

Page 144

1   see what the photos were.

2   Q.    Was it relevant to your opinions?

3   A.    Not particularly.

4   Q.    Did you rely on it in your opinions?

5   A.    No, I did not.

6   Q.    Same thing with the photos.  Did you rely on his

7   photos?

8   A.    I think we just used them as screening to say,

9   "Hey, there's something here."

10  Q.    Do you know whether or not you had this stuff

11  before you went out initially?

12  A.    I don't remember one way or the other.

13  Q.    Did you rely on any part of his photographs,

14  estimate, anything that he provided in preparing your

15  opinions?

16  A.    No.

17  Q.    Do you know if the estimate in your file is his

18  final estimate?

19  A.    I do not.

20  Q.    Do you know how many estimates he prepared?

21  A.    I do not.

22  Q.    Do you know whether or not he got on Plaintiff's

23  roof?

24  A.    I do not.

25  Q.    Do you believe his estimate is accurate?

Page 146

1    when I've told you I don't have his deposition, I don't

2    have any particular review of that, and we're not

3    offering anything dealing with the estimate is largely

4    pointless because I've told you I don't have the

5    information relevant to his estimate.

6    Q.    Sir, you may think my questions are pointless, but

7    this is my chance to ask you questions, and his estimate

8    is in your file, so I'm going to ask you questions about

9    it.  If you tell me you didn't catch that or didn't see

10   it, then you can answer you didn't catch it or didn't

11   see it.  I'm just asking if you did, whether you think

12   it's pointless or not.  So did you see in his estimate

13   where there's any reference to --

14   A.    I did not read it, as I've --

15   Q.    -- different -- Hold on.  Hold on.  Did you see

16   any reference to different states that are not even

17   applicable to Mr. Moore in his estimate?

18   A.    As I have said, I mainly looked at his photos.  I

19   probably quickly glanced at the estimate.  I did not

20   review it in depth.  I did not review it in detail.  As

21   such, I can offer you no comment to the substance on it.

22   Q.    Well, you can offer a comment.  Either you

23   remember it or you don't.  I understand you didn't look

24   at it in full detail.  I'm asking if you remember seeing

25   that or you don't.

Page 147

1   A.    That's not the -- I did not do what you're asking.

2   I did a quick review of the document.  I did not review

3   it in depth as you've asked and answered multiple times.

4   I have no specific knowledge about his estimate because

5   I didn't review it in depth.  I can't help you in that

6   and I can't offer you any further comments.

7           MR. BROWN:  I'll move to strike as non-

8   responsive.

9   Q.    (By Mr. Brown)  Sir, were you aware that State

10  Farm had prepared estimates?

11  A.    I have no information one way or the other of what

12  State Farm did or didn't do.

13  Q.    Do you know how many times State Farm inpected Mr.

14  Moore's house?

15  A.    No, I do not.

16  Q.    I take it you don't know what State Farm's

17  estimates were then.

18  A.    No, I do not.

19  Q.    Do you know what State Farm's position was as it

20  relates to the wind damage on Mr. Moore's roof?

21  A.    I do not.

22  Q.    Did you review any photograph from State Farm?

23  A.    I have no information from State Farm.

24  Q.    So is that a no?

25  A.    I have no information from State Farm, so, no, I

Chad Williams   6/21/2021

Page 148

1   could not have reviewed what I don't have.

2   Q.     If those photographs existed, would that be

3   important to you to gather those before you go out?

4   A.     I would love to have the opportunity to review

5   those documents if they're available.  I can only review

6   what's made available to us.

7   Q.     Were you told those documents weren't available,

8   sir?

9   A.     They were not provided to us.  I have no

10  information of whether they existed or not.

11  Q.     Either way, State Farm's photographs and estimates

12  are not part of your file; true?

13  A.     We do not have them, no.

14  Q.     Does that seem objective to you to only have one

15  side?

16  A.     We request the information that's made available

17  to us.  We can only go with the information that is

18  available to us.  If some other side or if somebody else

19  wants to offer additional information, happy to look at

20  it, review it, and see if there's any merit to it.  But

21  we can only go with the information that is relevant at

22  the time.  Now, my understanding is that they had --

23  that damage been identified to the roof, particularly

24  dealing with the south slope.  At that point, the

25  question is really, "What can be done to repair it."

Chad Williams   6/21/2021

Page 149

1    Q.    It is your testimony that you asked for this

2    information from Mr. Housel's office and --

3    **A.    I asked for any relevant information that we could**

4    **have.**

5    Q.    You've gone out and prepared or done estimates or

6    observations on behalf of State Farm before; true?

7    **A.    I've done forensic investigations before.**

8    Q.    Familiar with its processes?

9    **A.    The processes of many years ago.  I think the last**

10   **time it was several years ago that I worked for State**

11   **Farm.**

12   Q.    I show the second inspection when the actual

13   assessment occurred was April 27th, 2021.  Do you know

14   why that day was chosen in particular?

15   **A.    It was a schedule availability.**

16   Q.    It's about two weeks later, give or take?

17   **A.    Give or take.**

18   Q.    Do you recall how long you were present on that

19   day at Mr. Moore's residence?

20   **A.    I don't remember exactly.**

21   Q.    Do these things -- these assessments --

22   Repairability Assessments, how long do they generally

23   take?

24   **A.    Anywhere from 45 minutes to two hours.**

25   Q.    Who was there with you on this second inspection?

Chad Williams   6/21/2021

Page 150

1   A.      Drew Jamison was present and then a roofing

2   contractor.   I don't remember his name, but it's in the

3   invoices.

4   Q.      Jose Cruz?

5   A.      That sounds right.

6   Q.      With Valle Roofing?

7   A.      Yeah.   Yes.

8   Q.      I think your report also says there was another

9   roofer there that you didn't know the name.

10  A.      He had a helper.

11  Q.      So it was you, Mr. Cruz, Mr. Jamison, and another

12  unidentified roofer with Valle?

13  A.      Yes.

14  Q.      Do you know Mr. Cruz?

15  A.      No.   I believe that was the first time I'd ever

16  met him.

17  Q.      How did it come about Mr. Cruz was there the same

18  day you were?

19  A.      We had retained him.

20  Q.      You as in Valor?

21  A.      Yes.

22  Q.      Why did you choose Mr. Cruz or how did you choose

23  Mr. Cruz?

24  A.      Drew knew him.

25  Q.      What did he know about him?

Chad Williams  6/21/2021

Page 151

1   A.   He had worked with him in the past.

2   Q.   In what capacity?

3   A.   I don't know the ins and outs.

4   Q.   Had Mr. Cruz ever been involved in a repair

5   assessment before?

6   A.   I don't know.

7   Q.   According to your paper, it's supposed to be the

8   roofing contractor who does the removal and replacement

9   of shingles; correct?

10  A.   Yes.

11  Q.   Did Mr. Cruz do that?

12  A.   I believe he and his helper did.  I don't remember

13  who exactly did which part of it.

14  Q.   Is Mr. Cruz licensed?

15  A.   As far as I know, yes.

16  Q.   Did you check to see if he's licensed?

17  A.   I believe I asked Drew to check on it and he came

18  back and said he was, but I personally did not.

19  Q.   You didn't personally vet that out yourself?

20       MR. HOUSEL:  Object to the form.

21  A.   I personally did not, no.

22  Q.   (By Mr. Brown)  Do you know if Mr. Cruz was

23  insured?

24  A.   That's part of what I asked Drew to verify.  I

25  don't have the specifics on that.

Chad Williams   6/21/2021

Page 152

1   Q.   Same kind of thing; you don't know?

2   A.   I asked if -- You know, Drew is the contractor who

3   leads -- or is a roofing contractor.  He leads Valiant.

4   I went to him and I said, "This is what we need to have

5   happen.  Make this happen."

6   Q.   Well, your publication says it's necessary that

7   the roofing contractor is licensed and insured to

8   perform the assessment; correct?

9   A.   Yes.

10   Q.   Well, wouldn't you want to make for sure that that

11   is the case?

12   A.   When I asked, "Has this been done," with a party

13   that I know and trust and he says yes, am I going to go

14   back in and fact check and verify every single thing?

15   Q.   I'm asking you.  I don't know.

16   A.   Just basically you're saying this, and I'm going,

17   "I asked the question and I was told that he was."

18   Q.   Do you know what Mr. Cruz or his assistant's

19   experience was in roofing?

20   A.   He'd been a residential roofer for an extended

21   period of time.  I don't know the ins and outs of it.

22   Q.   What about their training, reputation?

23   A.   I don't have specific information.

24   Q.   Anything about their qualifications, skill

25   level --

Chad Williams   6/21/2021

Page 153

1   A.    I would defer to Drew Jamison on that.

2   Q.    Are you the owner of Valor or is Drew Jamison the

3   owner?

4   A.    I own Valor.

5   Q.    Is this report written by you?

6   A.    It's written by me.

7   Q.    You're signing your name to it.

8   A.    Yes.

9   Q.    And it's being done through Valor; correct?

10  A.    Yes.

11  Q.    Are you responsible for the contents of that

12  report?

13  A.    Yes.

14  Q.    Do you know whether or not Mr. Cruz has read your

15  publication about the Repair Assessment Method?

16  A.    I led him through it when we were on site.

17  Q.    Do you know if he's read your publication?

18  A.    I don't know.

19  Q.    When you led him through it on your site, what do

20  you mean?

21  A.    We walked through, "Here's how it's laid out,

22  here's what needs to happen, here's what we need to do.

23  We're going to use these tools, we're going to remove

24  and replace this shingle, and we're going to document

25  it.  Anytime we have something happen, we're going to

Chad Williams  6/21/2021

Page 155

1  A.    They were both involved in it.

2  Q.    What tools did they use to do the assessment?

3  A.    I believe they used a flat crow bar was the

4  primary tool and they used a hammer.

5  Q.    Is there a reason that your report doesn't

6  indicate what tools they used?

7  A.    I don't know that it's ever been something we were

8  specifically asked.

9  Q.    Well, your paper talks about carefully removing

10  shingles, and you actually list tools to use that -- to

11  try to alleviate damaging the shingles; true?

12  A.    Yes.

13  Q.    And my question was, don't you think it's

14  important that if they use a tool, that you document

15  that, how they did it or what tool they used?

16  A.    I believe it's in the photos, but I -- No one has

17  ever specifically asked.  I probably will add that in

18  the future just to close the issue.  I know that,

19  basically, Berryman made a comment about not wanting to

20  use a, quote, flat crow bar because he had a preference

21  for a name-brand tool rather than a generic tool.  But

22  basically you're taking a flat piece of steel that's

23  been stamped and now it's made into a curve, what

24  amounts to being a crow bar, and that's what I believe

25  that they were using on that site.

Chad Williams   6/21/2021

Page 159

1   pulling past the nail can create a point where water

2   goes under the shingle and causes damage to the

3   underlying roof; correct?

4   A.   Yes.

5   Q.   Isn't it true that any nail exposed to water could

6   potentially cause that damage?

7   A.   It could.  But now you have a situation where you

8   don't even have a shaft that can fill it.  Now you've

9   got a larger hole.  So the likelihood of it leaking is

10  much greater.

11  Q.   And let's say, for instance, you remove a shingle,

12  it doesn't pull past the fastener, but you got the nail

13  out.

14  A.   Uh-huh.

15  Q.   Okay?  There's still a hole in it.  There's no

16  other damage to the shingle.  When it goes back on,

17  according to your assessment method, does the roofer put

18  a new nail back in the old hole or make a new hole?  How

19  does that --

20  A.   They typically make a new hole.

21  Q.   What happens to the old hole?

22  A.   They typically try to fill it with some kind of

23  sealant.

24  Q.   Is that considered damage, to you?

25  A.   It is not putting it back in the pre-condition,

Chad Williams   6/21/2021

Page 160

1    no, it's not.

2    Q.    So would you say it's damage?

3    A.    It is not putting it back in the condition it was

4    beforehand.

5    Q.    Does that mean it's damaged?

6    A.    As I've answered your question, it's putting it

7    back not in the condition that it was beforehand.

8    Q.    Was it damaged beforehand?

9    A.    By creating another hole, you are creating another

10   penetration in the shingle.  It is a necessary part of

11   the process.  It is not putting it back in the pre-

12   condition that it was.

13   Q.    I understand that.

14   A.    And that's what I've answered.

15   Q.    I understand it's a different condition.  I'm

16   asking your opinion.  Is that damage, to you, or just a

17   different --

18   A.    It's --

19   Q.    -- condition?

20   A.    There is a difference between having a second

21   penetration and having a shingle tear.  When you have a

22   shingle tear past a fastener, it is different than

23   simply having the penetration.

24   Q.    Did you get on Plaintiff's roof this second time,

25   Mr. Moore's roof this second time?

Chad Williams    6/21/2021

Page 163

1   **A.     No.**

2   Q.     Did you notice whether or not Mr. Cruz or his

3   assistant, if they were careful in their approach --

4   **A.     Yes.**

5   Q.     -- of removing the shingles?  Did you have any

6   criticism of how they did it?

7   **A.     I did not.  And if I felt that there was any**

8   **reason to stop because they were not doing what they**

9   **were supposed to do or they were aggressive, I would.**

10  Q.     Do you think it was important for you to get on

11  the roof to do the assessment, like walk around on it,

12  touch it, feel it?

13  **A.     I'm standing right there laying out these chalk**

14  **lanes.**

15  Q.     On a ladder.

16  **A.     I've got my hand on this roof surface right now**

17  **being able to assess what's going on.**

18  Q.     Besides the obvious area of damage -- which

19  there's a tarp there; we see that -- did you make any

20  other determinations whether or not this roof had wind

21  damage?

22  **A.     I did not.**

23  Q.     Did you ever get on the north side of the roof?

24  **A.     I did not.**

25  Q.     The west side of the roof?

Chad Williams   6/21/2021

Page 164

1   A.   I did not.

2   Q.   The east side of the roof?

3   A.   I did not.

4   Q.   Did you see any zig-zag patterns in the shingles?

5   A.   **Can you -- For clarification, what do you mean by**

6   **zig-zag pattern?**

7   Q.   Do you recall some of the photographs that were

8   provided to you from Mr. Brown?

9   A.   **(No response.)**

10  Q.   Do you recall that?

11  A.   **That's what I was asking, what you're referring to**

12  **as a zig-zag pattern.**

13  Q.   Are you familiar with zig-zag and how it relates

14  to the left tab lifting up?

15  A.   **That's why I was asking for clarification of what**

16  **you are referring to because the zig-zag had referred to**

17  **different things and that's why I asking you for**

18  **clarification.**

19  Q.   Well, you put it in your report, didn't you?

20  A.   **That's why I was asking you what you're referring**

21  **to.  I'm just asking you to define the term of what you**

22  **do -- what you're trying to ask.**

23  Q.   Well, what are you trying to identify in your

24  report when you mention it?

25  A.   **I believe we were talking about the fact that you**

1  Q.   I understand that, sir.  My question is, did you

2  check those other slopes?

3  A.   **As I've repeatedly said, we worked within our**

4  **scope.  It was not in our scope.**

5           MR. BROWN:  I'll move to strike as

6  nonresponsive.

7  Q.   (By Mr. Brown)  Do you recommend repairs to all

8  four slopes of his roof?

9  A.   **I do not recommend trying to replace the shingles.**

10 **I didn't make any recommendations beyond that.**

11 Q.   What is your recommendation?

12 A.   **I don't recommend trying to repair this roof.**

13 Q.   Any slope?

14 A.   **No, I don't.**

15 Q.   Even though you didn't look at them?

16 A.   **Based on what I see, I think you're going to have**

17 **a problem.  It's 18 years old on a three-tab that's**

18 **approaching the end of its service life.**

19 Q.   Did you understand the roof you were standing on

20 was not 18 years old, it was newer?

21 A.   **I did.**

22 Q.   But it needs to be replaced too?

23 A.   **I did not form any opinion one way or the other.**

24 Q.   Well, you said the entire roof, so is this

25 something --

Chad Williams   6/21/2021

Page 168

1   **A.     We're referring to the primary roof.**

2   Q.    So is this -- The part where you were standing on

3   when you were doing your assessment, is that roof okay?

4   **A.    I have no opinion on -- expressed on that roof.**

5   Q.    Sir, your Repairability Assessment explicitly

6   states that, quote, "One note of caution, however.  The

7   Repairability Assessment is intended to supplement a

8   damage assessment of these surfaces and is not to be

9   used in place of a conventional damage estimate."

10  Correct?

11  **A.     Yes.  And then it provides a little bit of**

12  **clarification of what that is.  What we --**

13  Q.    I don't have a question yet.  I just wanted to

14  know if I read that off right.  I'll let you answer if I

15  have a question.  But you went as far as to caution the

16  reader to that issue; true?

17  **A.     Yes.**

18  Q.    And you didn't perform a damage estimate -- a

19  conventional damage estimate.  We've already said that;

20  right?

21  **A.     We did not do a forensic assessment, no.  But**

22  **there's a difference between your two terms that you're**

23  **trying to cross.  What we are referring to is we want to**

24  **be able to say, "Hey, there is damage to this roof,"**

25  **before we even look at it.  If there's no damage to it,**

Chad Williams  6/21/2021

1  utilize storm-damaged shingles, testing should be

2  performed on the slope where the damage has been

3  identified."

4  Q.   (By Mr. Brown)  And in this case, you were aware

5  of where wind damage was already identified --

6  A.   Correct.

7  Q.   -- by virtue of the tarp; correct?

8  A.   Yes.

9  Q.   Your report has -- and, obviously, we have

10  pictures of it.  Why didn't you do your assessment

11  there?

12  A.   In order to do that, we'd have to remove the tarp.

13  We'd have to find a way to find solid shingles away from

14  the area where the damage is at.  By the time we did

15  that, we were going to be outside of where it's tarped

16  pretty much regardless anyway.  So it's like, "Okay.

17  Where can we do this that we can get into solid

18  material?"  This area was just as representative as the

19  other part of the slope.  It should be noted that it's

20  just slightly downhill from where the tarp was placed.

21  Q.   Yeah.  It's not all that far away.  That's why I

22  was questioning why you just do it where the tarp was

23  at.

24  A.   Because the shingles in that area, with their

25  damage by wind, you're going to have issues.  And the

Chad Williams   6/21/2021

Page 177

1   advisable place to go.  We wanted to get to a sound

2   place away from the shingles.

3   Q.    Do you believe that's following your protocol?

4   A.    I do.

5   Q.    Your publication also recommends identifying

6   preexisting damage to the shingles in the assessment

7   area.

8   A.    Yes.

9   Q.    Did you record anything about preexisting damage

10  to the shingles in your report?

11  A.    I don't think there was anything remarkable.  If

12  there was anything in there, it would have been listed

13  in the field notes.

14  Q.    Do you think it would have been important to note

15  there's no damage?

16  A.    If it's there, it's going to be in the field

17  notes.

18  Q.    Do you know whether or not you had anything about

19  it in the --

20  A.    I don't remember seeing anything in it.

21  Q.    Just so the record's clear, we're looking at your

22  -- the actual report.

23  A.    Correct.  We (unintelligible) that on several of

24  them the granule surface was cracked.

25          THE REPORTER:  I didn't understand that.

Chad Williams   6/21/2021

Page 181

1   Q.    So what about your -- Do you have an opinion one

2   way or the other about it, if it's better or --

3   A.    **It's not a product I would recommend using.**

4   Q.    Could you use a putty knife to break seals versus

5   a crow bar?

6   A.    **I don't recommend using a putty knife.  It has to**

7   **do with the stress.  Because your putty knife is going**

8   **to create a very thin cutting motion more likely to cut**

9   **the edge of the shingle.  I would recommend using at**

10  **least a five-in-one because it's a thicker blade and**

11  **less likely to cut into the shingle versus a putty**

12  **knife.**

13  Q.    So you don't think the putty knife or a roof snake

14  are better tools than the ones you've written about?

15  A.    **I don't believe so.  I understand that some people**

16  **like them, but my experience is that there are issues**

17  **with them.**

18  Q.    But your report -- we don't know what was used as

19  far as your report because it wasn't documented; true?

20  A.    **I'd have to go back and look at the photos.  I**

21  **don't recall off the top of my head.  My recollection**

22  **was it was a flat crow bar, basically like a Wonder Bar,**

23  **but I'd have to look at the photos to verify that.**

24  Q.    Okay.  Going back to your publication, this

25  brittleness test, what is a brittleness test, for the

Chad Williams   6/21/2021

Page 190

1    installation.

2    Q.    The roofers that you've utilized in the past for

3    these repair assessment methods, did they use different

4    tools?

5    A.    I believe they generally use the same tools.  I

6    can't remember every single instance though.

7    Q.    Did you ever track what they've done?

8    A.    No.

9    Q.    Did you ever determine one as better than the

10   other?

11   A.    I never particularly looked at that other than

12   that I know the issue with the use of a putty knife.

13   Q.    Would you agree with me that those roofers could

14   have different motivations?

15   A.    They can.  And that's why, to the extent possible,

16   we don't recommend using a roofer that's under contract

17   for the roof.  We try to get a party that's not

18   involved.

19   Q.    Agree they might have different levels of patience

20   to, quote, "carefully remove," end quote, shingles?

21             MR. HOUSEL:  Object to the form of the

22   question.

23   A.    They're human beings.

24   Q.    (By Mr. Brown)  The same thing can go for a

25   professional engineer; correct?  Or whomever else is

Chad Williams  6/21/2021

Page 191

1  involved in this assessment?

2  **A.    We're all human.**

3  Q.    With varying skills?

4  **A.    Uh-huh.**

5  Q.    Varying experiences?

6  **A.    There is always going to be some variability**

7  **between individuals.**

8  Q.    Varying motivations?

9        MR. HOUSEL:  Object to the form.

10  **A.    I can't speak to motivation.**

11  Q.    (By Mr. Brown)  You don't think professional

12  engineers can have different motivations?

13  **A.    I can't speak to a motivation of an individual.**

14  Q.    When you say, "The Repairability Assessment

15  typically requires two personnel; a licensed and insured

16  roofing contractor and an independent and knowledgeable

17  evaluator," you don't even say it needs to be a

18  professional engineer; correct?

19  **A.    Such as is listed.**

20  Q.    Such as?

21  **A.    Yeah.**

22  Q.    Who else would be independent and knowledgeable,

23  according to you, that would be qualified to do this?

24  **A.    I think a forensic engineer is a qualified**

25  **individual.  I'm not saying exclusively there couldn't**

Chad Williams  6/21/2021

Page 209

1    case-by-case basis when it's between two and four.  I

2    don't know how exactly we phrased it.

3    Q.    (By Mr. Brown)  I think you say it means repairs

4    may be feasible.

5    A.    May be feasible.  So it's acknowledging that you

6    have a limitation.  But it's not saying you can't; it's

7    acknowledging that you have a limitation.

8    Q.    Do you believe any roof can be repaired with

9    asphalt shingles?

10   A.    I believe some can, but I believe that the

11   universal idea that they can all be repaired is false.

12   Q.    And I'm not saying "all."  I'm saying "any."  The

13   opposite of that spectrum.

14   A.    I believe there are some that can.

15   Q.    What percentage?

16         MR. HOUSEL:  Object to the form of the

17   question.

18   A.    I don't have a number.

19   Q.    (By Mr. Brown)  Is it five percent?

20         MR. HOUSEL:  Object to the form of the

21   question.

22   A.    I don't have a number.

23   Q.    (By Mr. Brown)  You've done this 40 or 50 times

24   and not found one that you thought you would recommend

25   repair; true?

Chad Williams   6/21/2021

1  A.    That's true.

2  Q.    So it's zero percent on what your assessments have

3  shown.

4  A.    But the problem that you're going -- to what

5  you're asking is you're asking have I assessed every

6  shingle everywhere every time.  I've seen roofs that I

7  believe could be repaired.  Have I done a Repairability

8  Assessment on roofs that I think need to be repaired?

9  No, I have not.  Or excuse me.  Let me rephrase that.

10  Have I done a Repairability Assessment on roofs that I

11  felt that the shingles could be removed and replaced on?

12  I haven't.  But when we start looking at it and we start

13  going, "We're already on the downhill side of the

14  curve," I start looking at it and going, "Yes, we can."

15  Now, to that end, we have been studying some of the

16  newer shingles because we've been having the issue come

17  up of the roofers can't get the seal strips to come

18  apart without tearing the shingles.  And so we have done

19  this on newer roofs and we are seeing the issue of the

20  aggressive seal strips not coming apart.  So there is a

21  window.  Is it 20 percent?  Is it 50 percent?  I don't

22  have a quantified number on that.

23  Q.    If the color of a shingle can't be matched

24  exactly, is it your opinion that that roof is

25  unrepairable?

Chad Williams   6/21/2021

Page 222

1  that detail that someone did."  And the question

2  becomes, is that materially a departure or not.

3  Q.     (By Mr. Brown)  Well -- And I completely agree

4  with you, we're all human.  I'm talking about as it

5  relates to your assessment method.  If one doesn't

6  follow the steps as you've outlined to get to the end

7  result and make your determination, is that reliable?

8  And I think your answer was -- Without putting words in

9  your mouth, I think your answer was, "Depends on what it

10 was.  If it was a minor departure, perhaps it's still

11 reliable.  If it's a major wholesale departure, maybe

12 not."

13 A.     That would be fair.

14 Q.     And my question is, isn't that subjective for you

15 to decide what is a minor departure or what is a

16 wholesale departure?  Would you agree with me that

17 that's --

18        MR. HOUSEL:  Object to the form of the

19 question.

20 A.     If you were to take any laboratory test anywhere

21 that's being done, there is a potential for there to be

22 a minor issue that may or may not undermine it.  That's

23 where you have to look at it and you would go, "Is this

24 a significant departure or not?"  If someone were to

25 find a significant departure, then I would personally

Chad Williams   6/21/2021

Page 223

1   disqualify it and I would say I don't believe that

2   that's been done.  Now, if you're following a general

3   conformance with the standard, then you're good.  If you

4   find that you're going way off, then, you know, you've

5   got to look at what's going on.

6   Q.    Would you agree with me, sir, that the word

7   "significant" itself is subjective?  What's significant

8   to you might not be significant to me.  Would you agree

9   that that's subjective?

10         MR. HOUSEL:  Object to the form of the

11   question.

12   A.    You're going to have to look at what any departure

13   would be and whether or not it has a significant result.

14   And I understand you're asking "what is significant,"

15   but the same thing holds with any laboratory test, any

16   test assessment that's been done.  You can have someone

17   go out and do a perfect evaluation and someone say "I

18   don't like that you did or didn't do this facet."  When

19   that occurs, you have to look at, did it materially

20   cause a problem.  And I've asked you this repeat -- and

21   I've answered you repeatedly on this.  Because it's a

22   matter of understanding what kind of a departure it is.

23   Is it incidental?  Is it gross?  What is it?  And then

24   you have to look at it, you have to understand the

25   consequences of it, and if it is significant, then it

Chad Williams    6/21/2021

Page 227

1    designation with this journal?

2    A.    No.    I am an associate member of the National

3    Academy of Forensic Engineers.    I have been for several

4    years.

5    Q.    Outside of this one paper that was published

6    December of 2020, is there any other publication or

7    authoritative source that's quoted your theory or your

8    assessment as being reliable, scientific, or

9    authoritative?

10   A.    Not that I'm aware of at this time.

11   Q.    Other than National Academy of Forensic Engineers,

12   has there been any other publication or authoritative

13   source quoted that your theory or assessment, as it

14   relates to your score card, specifically the number four

15   being the --

16   A.    No.

17   Q.    -- the magic number, been held as reliable,

18   scientific, or authoritative?

19   A.    Not that I'm aware of.

20   Q.    Has there been any Court in the United States of

21   America that has allowed you to bring in evidence of

22   this Repairability Assessment Method?

23   A.    Not as of date.

24   Q.    Is this the first time you're utilizing this in a

25   court proceeding as an expert witness?

Chad Williams   6/21/2021

Page 229

1  and valleys and things of that nature?

2  A.    We were retained to deal with a very finite issue.

3  Q.    I understand.

4  A.    And what we have said is we do not recommend

5  repairs be done on this roof.  Recognizing that, to the

6  homeowner, I would -- if they asked me directly, I would

7  say "I don't recommend you try to repair this roof.  I

8  believe you're going to have problems."  When we're

9  talking about it, we're talking about the roof of the

10  primary dwelling.  We've offered no opinion about the

11  lower slope and the second -- that's newer on the back.

12  I would recommend not doing that.  When you get into the

13  standard of understanding the industry and you say,

14  "Okay.  Well, we're only going to take the south slope

15  off," you have to understand how that integrates with

16  everything else on the roof.  When you're dealing with

17  the underlayments, when you're dealing with the

18  manufacturer's quire, when you're dealing with these

19  various standards, you wind up in a situation where

20  you're not going to be able to comply with

21  manufacturer's spec and standard practice in that

22  situation.

23  Q.    Every one of these that you've done thus far have

24  come back with a zero percent repairability outcome;

25  true?

Chad Williams   6/21/2021

Page 230

1    A.     I don't know what you mean by zero percent.

2    Q.     That is that every one you've done you have

3    recommended not repairing, regardless of the number that

4    was derived.

5    A.     I cannot recall one where we said that everything

6    was fine.

7    Q.     Can you recall any that were less than a four?

8    A.     I don't recall one way or the other.  I don't

9    think -- I don't think we've recommended it.  I think

10   there may be one or two that were borderline, but I

11   don't recall the specifics.  I don't have the

12   information in front of me.

13   Q.     You mentioned earlier about -- I think when we

14   were talking about your calendar -- being harassed.  Who

15   were you harassed by?

16          · MR. HOUSEL:  Object to the form of the

17   question.

18   A.     We have had certain law firms that have been

19   belligerent and very difficult to deal with, and they

20   have engaged in behavior that we consider to be

21   unprofessional.  And for that reason, we've had to take

22   certain measures for self protection.

23   Q.     (By Mr. Brown)  Have you been threatened by

24   someone?

25          · MR. HOUSEL:  Object to the form of the

Chad Williams  6/21/2021

Page 240

1  deposition, then you employed counsel; isn't that

2  correct?

3  **A.    No.  We were in the process of employing counsel**

4  **prior to this because of some of the conduct of certain**

5  **law firms.**

6  Q.    Have you ever been arrested, sir?

7  **A.    No.**

8  Q.    Have you ever had any disciplinary actions as a

9  professional engineer?

10 **A.    No.**

11 Q.    Ever had your license suspended or revoked?

12 **A.    No.**

13        MR. HOUSEL:  You doing okay, Chad?

14        THE WITNESS:  Uh-huh.

15        MR. HOUSEL:  Okay.

16        MR. BROWN:  I think that's all I've got.

17        MR. HOUSEL:  I've got a couple of questions.

18 Are you okay?  Do you want to take a break?

19        THE WITNESS:  Let's take a break first.

20                    (Recess taken.)

21        THE VIDEOGRAPHER:  Back on the record.  Go

22 ahead.

23                  CROSS-EXAMINATION

24 BY MR. HOUSEL:

25 Q.    Mr. Williams, is it your understanding that you

Page 241

1   were retained to offer any opinion as to causation?

2   A.    I was not.

3   Q.    You didn't go out and figure out what shingles

4   were damaged by wind and which weren't; right?

5   A.    I was not asked to do that.

6   Q.    It's your understanding that a wind event

7   occurred; true?

8   A.    Yes.

9   Q.    And you understand State Farm admits that wind

10  damaged some of the shingles on this roof; right?

11  A.    That is my understanding.

12  Q.    Mr. Moore, on the other hand, claims the wind

13  damaged more shingles than State Farm admits; right?

14        MR. BROWN:   Object to form.

15  A.    I don't know specifically what Mr. Moore claims.

16  Q.    (By Mr. Housel)  Okay.  You read Mr. Berryman's

17  report, did you not?

18  A.    Yes, sir, I did.

19  Q.    He's got criticisms of your method; right?

20  A.    Yes.

21  Q.    Okay.  Let's talk about those.  So, first of all,

22  he says that you did not perform a conventional damage

23  evaluation.  Can you remind me how you defined

24  conventional damage evaluation?

25  A.    What I was looking at in the terms of that report

Chad Williams  6/21/2021

Page 252

1    Q.     It could fail?

2    A.     Yeah.  And more than likely, it will.  You're

3    going to continue to see the propagation continue.  And

4    if someone tries to prevent it from happening here,

5    they're going to wind up moving the damage that moves

6    over, and it winds up in a situation where you simply

7    propagate damage.

8    Q.     There's been some talk about what counsel has

9    referred to as the magic number; right?  Do you remember

10   that?

11   A.     Yes.

12   Q.     What's the magic number?

13   A.     It says four.

14   Q.     Four.  Okay.  And you didn't rely on any data

15   coming up with the number four; right?

16   A.     No.  We looked at, what are the totality of facts,

17   and at what point are we going to go to a tipping point

18   where we go, as engineers, "I just can't do that."

19   Q.     It's not a magic number.

20   A.     No.  It's a matter of we look through all the

21   factors and we go, "When we have things adding up to

22   this point, we can't recommend repairing anymore."

23   Q.     You're just relying on your own experience,

24   education, expertise; isn't that right?

25   A.     Yes.

Chad Williams   6/21/2021

Page 253

 1              MR. BROWN:  Object to form.

 2    Q.    (By Mr. Housel)  That's not controversial, is it?

 3    **A.    No.**

 4    Q.    Okay.  One can pop a seal strip on a shingle

 5    without causing further damage to the shingle; right?

 6    **A.    Yes.**

 7    Q.    I'm saying "further" because there was some --

 8    maybe some discussion about whether that damages it, and

 9    I don't want to get in those weeds.  Okay.  So you can

10    pop that seal without causing any further damage --

11    **A.    Yes.**

12    Q.    -- on a hypothetical --

13    **A.    On a theoretical roof, yes.**

14    Q.    Right.  That won't be the case with an old -- That

15    may not be the case with an old brittle shingle; isn't

16    that right?

17              MR. BROWN:  Object to form.

18    **A.    An older shingle is less likely to be able to have**

19    **that happen.**

20    Q.    (By Mr. Housel)  The older the shingle, the more

21    likely it is to happen; right?

22    **A.    By "it happen," if you are asking about an older**

23    **shingle, "is it more likely to take secondary damage**

24    **from the breaking of a seal strip," --**

25    Q.    Yes.

Chad Williams   6/21/2021

Page 254

1   **A.**      **-- yes.**

2   Q.      Right.  And the older it gets, the more likely

3   that --

4   **A.**      **Yes.**

5   Q.      -- is to be the case; right?  The older it is, the

6   more likely you will rip or crease or hinge the shingle

7   as you attempt a repair; right?

8   **A.**      **Yes.**

9   Q.      That's the case with Mr. Moore's roof, isn't it?

10  **A.**      **Yes.**

11          MR. BROWN:  Object to form.

12  Q.      (By Mr. Housel)  That's your opinion?

13  **A.**      **Yes.**

14  Q.      Do you remember -- We talked a little bit about

15  zig-zags.  I think you referred to it as zippering.

16  **A.**      **Yes.**

17  Q.      Tell me one more time what zippering is.

18  **A.      Zippering is represented as a series of shingles**

19  **that have a left-side failure.  They typically do come**

20  **up at an angle -- a linear angle on a roof.  They tend**

21  **to be on the left-hand side if it's a left-handed**

22  **roofer, but they can also be on the right-hand side --**

23  Q.      Sure.

24  **A.      -- depending on the individual roof.**

25  Q.      Looks like a zig-zag or a zipper?