# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| TRACY MOORE,<br><br>                        Plaintiff,<br><br>v.<br><br>STATE FARM FIRE AND<br>CASUALTY COMPANY,<br><br>                        Defendant. | Case No: 5:20-cv-410-R |

## PLAINTIFF'S RESPONSE AND OBJECTION TO DEFENDANT STATE FARM FIRE AND CASUALTY COMPANY'S MOTION TO EXCLUDE EXPERT TESTIMONY OF CHAD T. WILLIAMS

Steven S. Mansell, OBA #10584
Kenneth G. Cole, OBA #11792
Zachary K. Housel, OBA #32802
**MANSELL ENGEL & COLE**
204 North Robinson Avenue, 21st Floor
Oklahoma City, OK 73102-7001
T: (405) 232-4100 ** F: (405) 232-4140
E-mail:  zhousel@meclaw.net

**ATTORNEYS FOR PLAINTIFF**

July 30, 2021

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT AND AUTHORITY ..................................................................... 5

    I.     MR. WILLIAMS IS QUALIFIED TO TESTIFY AS AN EXPERT ........... 5

    II.    MR. WILLIAM'S TESTIMONY WILL ASSIST THE JURY ................... 8

    III.   MR. WILLIAMS TESTIMONY IS NOT UNFAIRLY PREJUDICIAL ... 10

    IV.   MR. WILLIAM'S TESTIMONY IS RELIABLE ...................................... 12

# TABLE OF AUTHORITIES

## Cases

*Ancho v. Pentek Corp.*,
   157 F.3d 512, 518 (7th Cir. 1998) ................................................................. 14

*Babcock & Wilcox Ebensburg, Power, Inc. v. Zurich Am. Ins. Co.*,
   02-CIVIL 299, 2005 WL 6068838, at *5 (W.D. Pa. Sept. 8, 2005) ............................... 22

*Bales v. Green*,
   16-CV-106-GKF-JFJ, 2018 WL 1470259, at *4 (N.D. Okla. Mar. 26, 2018) .............. 21

*Bitler v. A.O. Smith Corp.*,
   400 F.3d 1227, 1233 (10th Cir. 2004) ............................................................ 14

*Block v. R.H. Macy & Co., Inc.*,
   712 F.2d 1241, 1244 (8th Cir. 1983) ............................................................. 11

*Call v. State Industries*,
   221 F.3d 1351, 2000 WL 1015076 at p. ** 4 (10th Cir. 2000) ....................................... 14

*Cook v. Rockwell Int'l Corp.*,
   580 F.Supp.2d 1071, 1083 (D. Colo. 2006) .................................................... 10

*Crew Tile Distrib., Inc. v. Porcelanosa Los Angeles, Inc.*,
   No. 18-1029, 2019 WL 852293, at *7 (10th Cir. Feb. 21, 2019) .................................... 21

*Curtis v. Okla. City Pub. Schs. Bd. of Educ*,
   147 F.3d 1200, 1218 (10th Cir. 1998) ........................................................... 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. §579 (1993) ............................................................................. 8, 15, 22

*Deters v. Equifax Credit Information Services, Inc.*,
   202 F.3d 1262, 1274 (10th Cir. 2000) ........................................................... 11

*Estes Park Taffy Co., LLC v. Original Taffy Shop, Inc.*,
   15-CV-01697-CBS, 2017 WL 2472149, at *6 (D. Colo. June 8, 2017) ....................... 22

*First Union Nat. Bank v. Benham*,
   423 F.3d 855, 862 (8th Cir. 2005) ............................................................... 22

*Frase v. Henry*,
   444 F.2d 1228, 1231 (10th Cir.1971) ............................................................ 10

*Goebel v. Denver and Rio Grande Western R. Co.,*
346 F.3d 987, 991 (10th Cir.2003) (*Goebel II*) ........................................................ 13, 14

*Gomez v. Martin Marietta Corp.,*
50 F.3d 1511, 1519 (10th Cir.1995) ........................................................ 13, 21

*Goodman v. Pennsylvania Turnpike Commission,*
293 F.3d 655, 670 (3rd Cir. 2002) ........................................................ 12

*Hendrix v. Raybestos-Manhattan, Inc.,*
776 F.2d 1492, 1502 (11th Cir. 1985) ........................................................ 11

*Hill v. Bache Halsey Stuart Shields Inc.,*
790 F.2d 817, 826 (10th Cir. 1986) ........................................................ 23

*Hulmes v. Honda Motor Co. Ltd.,*
960 F.Supp. 844, 865 (D. N.J. 1997) ........................................................ 13

*In re Paoli R.R. Yard PCB Litig.,*
35 F.3d 717, 741 (3d Cir. 1994) ("*Paoli III*") ........................................................ 6

*Kannankeril v. Terminex Int'l, Inc.,*
128 F.3d 802, 809 (3rd Cir. 1997) ........................................................ 14, 22

*Kumho Tire v. Carmichael,*
526 U.S. 137, 150 (1999) ........................................................ 14, 15

*Lauzon v. Senco Products, Inc.,*
270 F.3d 681, 692 (8th Cir. 2001) ........................................................ 16

*Lavespere v. Niagara Mach. & Tool Works, Inc.,*
910 F.2d 167, 176 (5th Cir. 1990) ........................................................ 6

*Little v. Liquid Air Corp.,*
37 F.3d 1069, 1075 n.14 (5th Cir. 1994) ........................................................ 6

*McEwen v. City of Norman, Okl.,*
926 F.2d 1539, 1550 (10th Cir. 1991) ........................................................ 11

*Mitchell v. Gencorp Inc.,*
165 F.3d 778, 781 (10th Cir.1999) ........................................................ 13

*Norris v. Baxter Healthcare Corp.,*
397 F.3d 878, 884, 884 n.2 (10th Cir. 2005) ........................................................ 23

*Paoli R.R. Yard PCB Litig.,* 916 F.2d 829, 855 (3d Cir. 1990) ........................................................ 6

*Peckham v. Cont'l Cas. Ins. Co.*,
    895 F.2d 830, 837 (5th Cir. 1990) ........................................................................ 8

*Peters v. American Income Life Insurance Company*,
    2003 OK CIV APP 62, ¶ 33, 77 P.3d 1090 ...................................................... 9

*Robinson v. Geico Gen. Ins. Co.*,
    447 F.3d 1096, 1100 (8th Cir. 2006) ................................................................ 5

*Robinson v. Mo. Pac. R.R. Co.*,
    16 F.3d 1083, 1090 (10th Cir. 1994) ................................................................ 9

*Ruiz-Troche v. Pepsi Cola*,
    161 F.3d 77, 85 (1st Cir. 1998)........................................................................ 15

*Smith v. Ingersoll-Rand Co.*,
    214 F.3d 1235, 1244 (10th Cir. 2000) ............................................................ 14

*Specht v. Jensen*, 853 F.2d 805,
    809 (10th Cir.1988), *cert. den.*, 488 U.S. 1008 (1989).................................. 10

*Storagecraft Tech. Corp. v. Kirby*,
    744 F.3d 1183, 1190 (10th Cir. 2014) ............................................................ 13

*United States v. Anderson*,
    446 F.3d 870, 875 (8th Cir. 2006) .................................................................... 6

*United States v. Gomez*,
    67 F.3d 1515, 1525-26 (10th Cir. 1995) .......................................................... 5

*United States v. Jensen*,
    608 F.2d 1349, 1356 (10th Cir.1979) ............................................................ 10

*United States v. Leonard*,
    439 F.3d 648, 651 (10th Cir. 2006) ................................................................ 23

*United States v. Mahone*,
    453 F.3d 68, 71 (1st Cir. 2006)........................................................................ 6

*United States v. Mendoza-Salgado*,
    964 F.2d 993, 1007 (10th Cir. 1992) .............................................................. 23

*United States v. Velarde*,
    214 F.3d 1204, 1208-1209 (10th Cir. 2000)................................................. 14

*Urethane Antitrust Litig.*,
   768 F.3d 1245, 1263 (10th Cir. 2014) ............................................................ 21

*Wagenmann v. Adams,*
   829 F.2d 196, 217 (1st Cir. 1987) ................................................................... 11

*Werth v. Makita Elec. Works, Ltd.*,
   950 F.2d 643, 648 (10th Cir. 1991) ................................................................... 8

*Wilson v. Muckala,*
   303 F.3d 1207, 1219 (10th Cir. 2002) ............................................................... 9

**Other Authorities**

29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 6265
   (1997 & Supp. 2012) ....................................................................................... 5

37 *Journal of the National Academy of Forensic Engineers* 185 (December 2020) .......... 7

4 Jack B. Weinstein et al., *Weinstein's Federal Evidence* § 702.04[1][a], at 702–50 (supp.
   2019) ........................................................................................................ 5, 21

**Rules**

Fed R. 702 .................................................................................................. 6, 15, 16

Fed. R. Evid. 401 ............................................................................................. 23

Fed. R. Evid. 403 .................................................................................... 10, 11, 12

Plaintiff Tracy Moore respectfully submits the following Response and Objection to the Motion to Exclude Expert Testimony of Chad T. Williams filed herein by Defendant State Farm Fire and Casualty Company ("State Farm"). For the reasons which follow, Mr. Moore respectfully submits that State Farm's Motion to Exclude Chad William's expert testimony should be denied.

## **INTRODUCTION**

On March 13, 2019, the roof of Tracy Moore's home was damaged in a severe windstorm. State Farm admitted that the roof was damaged but refused to pay for anything except the shingles which were blown off the roof. State Farm persisted in its denial although: 1.) Mr. Moore's public adjuster photographed and documented wind damage to hundreds of additional shingles on the roof and provided this information to State Farm;[1] and 2.) Mr. Moore inspected the roof with State Farm adjuster, Jason Smoot, and personally showed him the damage.[2] Mr. Smoot said the damage was not covered because State Farm does not pay for broken seals (i.e., the adhesive bond between shingles), although State Farm's own operation guide states that wind can break the bond between the shingles, and that this is covered damage. State Farm's adjusters are instructed to investigate any and all

---

[1] Mr. Moore's Public Adjuster, Jeff Brown, was trained by State Farm to adjust property claims and adjusted well over a thousand claims on behalf of State Farm before becoming a public adjuster. Brown depo, Ex. 1, pp. 21:2-16; 26:18-22; 27, 46:4-20. In this case, Mr. Brown documented that the shingles which were wind damaged showing "creases, pulled-through nails, and mat transfer" numbered in the hundreds.

[2] According to Mr. Brown, Mr. Smoot's entire inspection of the roof took about five minutes. Brown depo, Ex. 1, pp. 124:17-125:12

loose or unbonded shingles, although no such investigation occurred in this case. Ex. 2, p. MOTR00000135PROD. Nor did State Farm ever investigate the alleged "wear and tear" claim it now attempts to hang its hat on, after first asserting and then disregarding several other purported "explanations" for the damage to Mr. Moore's roof. Alleged "wear and tear" was never communicated to Mr. Moore as a basis for the denial of his claim. And, as State Farm itself admits, the roof was "in very good condition." Defendant's Motion to Exclude (Doc. No. 42) at p. 5. In any event, one thing is certain – State Farm **agrees** that Mr. Moore's roof was damaged in the windstorm.[3] [The only real issue before the Court is whether Mr. Williams can testify as to the repairability of the damage to Mr. Moore's roof.[4]]

In connection with this claim, Mr. Moore hired Chad T. Williams, P.E., to provide expert testimony regarding the repairability of the damage at issue. Mr. Williams is a licensed professional engineer in 20 states – Alabama, Arkansas, Colorado, Florida, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nebraska, New Mexico, North Carolina, Oklahoma, South Carolina, South Dakota, Tennessee, Texas and

---

[3] State Farm admits that it was never able to tell Mr. Moore which of the shingles that remained on the roof were damaged by wind and which were damaged by something else. Hopkins depo, Ex. 3, pp. 75:23-76:15; 98:14-99:17; Brown depo, Ex. 1, pp. 154:16-156:15. State Farm never performed any sort of repairability assessment. It simply said that Mr. Moore's damaged roof could be repaired.

[4] Mr. Moore's neighbors on either side of his home testified that they have lived at their homes next to Mr. Moore's home for approximately twenty (20) years. The neighbors testified that since the storm, the damage to Mr. Moore's roof is observable from the ground. Each of them stated that the shingles were obviously unbonded and loose and that the observable damage was not present before the 2019 windstorm.

Wyoming. Among other things, he is a member of numerous professional engineering societies, has presented a number of continuing engineering courses, and has written a peer-reviewed article entitled "Use of Repairability Assessment Method for Evaluating Asphalt Composition Shingle Roof Repairs" which was published in 37 *Journal of the National Academy of Forensic Engineers*, 185 (December 2020).[5]

The essence of Mr. Williams' peer-reviewed article relates to an established engineering concept known as damage propagation. Roof shingles overlap each other. In essence, a roof shingle is considered repairable when individual shingles can be removed and replaced without causing additional damage to the surrounding/overlapping shingles. However, if the surrounding/overlapping shingles are weakened or unable to maintain their integrity during the repair process, the attempted repair will simply continue to propagate additional damage to those shingles as well. In simple terms, the more you try to fix the roof, the more you end up damaging it. In this case, Mr. Williams did not recommend an attempt to repair the eighteen (18) year-old roof due to damage propagation concerns. As Mr. Williams summarized the situation:

> When you start to look at it in this particular situation, propagation of damages is the issue. When you got to remove and replace one shingle and you start causing damage to additional shingles, that damage is going to continue to propagate. When you take the wind damage at the top corner of this roof, you're going to have to get into solid shingles. You're going to have a propagation of damage. That damage is going to continue to propagate. You also look at it and you go – you've got felt that underneath this roof. If you look at – I believe its Detail 6 of the NRCA Asphalt Composition Manual – I can't remember the exact name of the journal – or the publication – you've got felts that go up and over the top, so you're going to be getting into adjoining shingles, you're going to be

---

[5] Mr. Williams' peer-reviewed article is attached to State Farm's Motion to Exclude Mr. Williams (Doc. No. 42-1) as Exhibit 1.

getting into adjoining slopes, you're going to be getting to a damage propagation issue.  In this particular roof, damage propagation is the issue.  I don't recommend, when you're in that situation, that you continue to try to do that.  If you have one shingle damaged and now you're damaging four more, as you continue to do that, its going to get larger and larger and larger.  [Williams depo, Ex. 4, pp. 58:16-59;13].[6]

State Farm has now filed a Motion to Exclude Mr. William's testimony, variously claiming that he violated his own published protocol by failing to perform a "conventional damage assessment" (which was unnecessary since, as previously noted, State Farm admitted that there was wind damage to the roof, the determination of which is the very purpose of a damage assessment); that he failed to perform his repairability analysis at the site of the damage admitted to exist by State Farm;[7] and that his peer-reviewed article, which essentially summarizes a combination of well-known and longstanding principles, each of which is a well-accepted industry standard in its own right, is somehow deficient when the total is the sum of its admittedly well-accepted parts.  *See* Williams depo, Ex. 4, pp. 18:8-19:4;  46:18-48:21;  60:9-18;  61:19-63:10;  215:12-216:25;  249:5-21.   There is nothing new or novel about Mr. Williams' methodology.

---

[6] *See also* Williams depo, Ex. 4 at pp. 224:8-226:15; 228:6-229:22; 244:9-246:20; 249:23-251:13, explaining why the roof was not repairable.  In Mr. Moore's case, four (4) of the eight (8) shingles surrounding the subject assessment shingle were damaged during the removal and resetting of the assessment shingle.  Based upon Mr. Williams' repairability assessment, the four damaged shingles plus the age of the roof (roughly 18 years old), equaled a score of 5.  When the repairability assessment yields a score of four or more, repairability is limited and localized repair is not recommended.

[7] As set forth in Mr. William's report, the area of Mr. Moore's roof which State Farm admits was damaged was tarped in order to prevent water from intruding from the roof into the interior of his home.  Mr. Williams performed his repairability assessment directly below the tarped area.

Last, State Farm claims that Mr. William's testimony would not be helpful to the trier of fact – a curious position given that State Farm has endorsed its own expert, Michael Berryman – a general contractor who <u>always</u> testifies for insurance companies – to provide essentially the same general testimony from the defense side. For the reasons which follow, Mr. Moore respectfully submits that State Farm's Motion to Exclude Chad Williams, P.E., should be denied.

## ARGUMENT AND AUTHORITY

### I.    MR. WILLIAMS IS QUALIFIED TO TESTIFY AS AN EXPERT

Fed. R. Evid. 702 sets a "liberal standard" for qualifying a witness as an expert. *United States v. Gomez*, 67 F.3d 1515, 1525-26 (10th Cir. 1995); 4 Jack B. Weinstein et al., *Weinstein's Federal Evidence* § 702.04[1][a], at 702–50 (supp. 2019). "Rule 702 only requires that an expert possess 'knowledge, skill, experience, training, or education' sufficient to 'assist' the trier of fact, which is 'satisfied where expert testimony advances the trier of fact's understanding **to any degree**.'" *Robinson v. Geico Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (emphasis added) (internal quotation marks omitted). "[O]nly a relatively modest degree of specialized knowledge" is necessary. 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 6265 (1997 & Supp. 2012).

It is an abuse of discretion to exclude a witness as an expert if the witness is "generally qualified." 4 Weinstein et al., *supra*, § 702.04[1][a], at 702–52 n.6. A witness who "lacks expertise in specialized areas that are directly pertinent to the issues in question" is qualified "if the witness has educational and experiential qualifications in a

general field related to the subject matter of the issue in question." *Id.* § 702.04[1][a], at 702–51; *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) ("*Paoli III*") ("We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications.").

"It is not required that experts be 'blue-ribbon practitioners' with optimal qualifications." *United States v. Mahone*, 453 F.3d 68, 71 (1st Cir. 2006) (citation omitted). To be qualified as an expert, a witness need not have the particular degree or training which the court believes would be the most appropriate. *Id.* § 702.04[1][a], at 702–51; *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 855 (3d Cir. 1990) (finding trial court abused its discretion by excluding testimony regarding the cause of a plaintiff's physical and emotional injuries on the ground that the witness lacked a degree in medicine or chemistry—the witness was adequately qualified by extensive research in toxicology).

As indicated by the use of the disjunctive "or" in Rule 702, **any one** of the five bases listed in the Rule may be sufficient to qualify a witness as an expert: "knowledge, skill, experience, training, or education." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 176 (5th Cir. 1990), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 n.14 (5th Cir. 1994); 4 Weinstein et al., *supra*, § 702.04[1][c], at 702–57; 29 Wright & Gold, *supra*, § 6265. None of the bases is essential, and none is ranked more highly than another. *United States v. Anderson*, 446 F.3d 870, 875 (8th Cir. 2006). Thus, a lack of practical experience does not prevent a witness from qualifying as an expert. The focus is on whether the witness has sufficient expertise to assist the finder of fact. 4 Weinstein et al., *supra*, § 702.04[1][d]. Accordingly, "[g]aps in an expert witness's

qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." *Robinson*, 447 F.3d at 1100 (internal quotation marks omitted).

In this case, as previously discussed, Mr. Williams is a licensed professional engineer in 20 states – Alabama, Arkansas, Colorado, Florida, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nebraska, New Mexico, North Carolina, Oklahoma, South Carolina, South Dakota, Tennessee, Texas and Wyoming. He has been a licensed professional engineer for fourteen (14) years, with a primary emphasis in forensic engineering. He is a member of numerous professional engineering societies, is the incoming president of the Oklahoma Society of Professional Engineers, has presented a number of continuing engineering courses, and has written a peer-reviewed article entitled "Use of Repairability Assessment Method for Evaluating Asphalt Composition Shingle Roof Repairs" which was published in 37 *Journal of the National Academy of Forensic Engineers* 185 (December 2020). Mr. Williams also possesses an EFI/Vale Advanced Roofing Certification ("EVS/R™).[8] Over the course of his career, Mr. Williams has performed thousands of damage evaluations. Williams depo, Ex. 4, pp. 36:14-37:9.

---

[8] The EFI/Vale program is an advanced level course specific to roofing issues. Applicants must meet strict requirements to become EVS/R™ certified. These requirements include specific levels of education and experience, high ethical standards, successful completion of the 4-day EVS/R™ classroom course and a satisfactory score on the exam. Applicants must meet a minimum level of years of roof inspection experience or industry related education to qualify for admission to the course, which provides technical content and instruction with detailed information on steep and low slope roofs, including construction, coverings, storm damage assessment, damage estimating, product identification and repair methods. For hands-on experience, this course also includes simulated hail mockups to illustrate impact dynamics on different roofing systems. Following the course, participants must successfully pass a three (3) hour, 50 question multiple-choice exam to become EVS/R™ certified.

Indeed, State Farm itself has previously retained Mr. Williams to provide expert engineering testimony regarding damage evaluations.  Williams depo, Ex. 4, p. 37:10-13; 149:5-11.  As a professional engineer with an EFI/Vale Advanced Roofing Certification, Mr. Williams is qualified to testify as an expert in this case by training, education and experience in this roof damage case.[9]

## II.    MR. WILLIAM'S TESTIMONY WILL ASSIST THE JURY

Under Fed. R. Evid. 702, the use of expert testimony is appropriate if it "will assist the trier of fact to understand the evidence or to determine a fact in issue...."  That requirement is primarily one of relevance.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. §579 (1993).  As the Tenth Circuit has noted, "the 'touchstone' of admissibility is helpfulness to the trier of fact."  *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991).

As the Court recognized in *Peckham v. Cont'l Cas. Ins. Co.,* 895 F.2d 830, 837 (5th Cir. 1990) "[i]Insurance is a complicated subject in the industry and, over time, has developed a patina of custom and usage.  Arcana abounds.  Defendant's proffered experts could reasonably be expected to shed some light in a shadowy domain."  *See also Peters*

---

[9] Although State Farm at p. 2 of its Motion (Doc. No. 42) states that Mr. Williams' assessment "will not answer the question of whether wind caused any damage to Plaintiff's 18-year-old roof," whether there is wind damage to Mr. Moore's roof has <u>never</u> been the question.  In that regard, State Farm has long been aware that a causation analysis was not within the scope of Mr. Williams' retention as an expert.  *See* Williams depo, Ex. 4, pp. 16:20-24; 240:25-241:5.  A damage causation analysis was wholly unnecessary because State Farm has repeatedly **admitted** that a windstorm caused damage to the roof of Mr. Moore's home.  *See, e.g*., State Farm's Motion (Doc. No. 42) at pp. 1, 2, 4, 5.  *See also* Williams depo, Ex. 4, pp. 16:13-17:4; 139:17-140:20; 142:13-25; 148:16-25; 168:18-170:25; 172:8-174:6; 241:6-11.

*v. American Income Life Insurance Company,* 2003 OK CIV APP 62, ¶ 33, 77 P.3d 1090 (the inner workings and procedures of an insurance company, or lack thereof, are not matters generally known to the average person).

Not even State Farm can seriously argue that jurors are so familiar with insurance, construction and roofing issues that expert testimony about those issues would not be helpful. Indeed, any such claim by State Farm is substantially undercut by the fact that it hired its own construction/roofing expert, Michael Berryman, to testify about precisely those same issues. Under Fed. R. Evid. 702, helpful expert testimony is admissible, subject to the other conditions set forth in the rule, all of which are met here.

In this case, as is reflected by the fact that State Farm hired its own construction expert to testify regarding the repairability of the damage to Mr. Moore's roof, it simply cannot be said that information regarding roof construction and damage is a matter within the common knowledge of an ordinary lay person.

The 'touchstone' of admissibility of expert testimony is its helpfulness to the trier of fact." *Wilson v. Muckala,* 303 F.3d 1207, 1219 (10th Cir. 2002). "Expert testimony is appropriate when it relates to issues that are beyond the ken of people of ordinary intelligence." *Curtis v. Okla. City Pub. Schs. Bd. of Educ,* 147 F.3d 1200, 1218 (10th Cir. 1998) (quotation omitted). "The Tenth Circuit takes a liberal approach to the question of whether proffered expert testimony will assist the jury. "Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions." *Robinson v. Mo. Pac. R.R. Co.*, 16 F.3d 1083, 1090 (10th Cir. 1994); *Cook*

9

*v. Rockwell Int'l Corp.,* 580 F.Supp.2d 1071, 1083 (D. Colo. 2006) (same statement).

Here, Mr. Williams' testimony will be helpful, and it relates to issues beyond the ken

of people of ordinary intelligence.

Mr. Williams' testimony will assist the jury in understanding how the roof at issue

was built, the damage it sustained, the methodology behind his repairability assessment,

and the conclusions he reached regarding the repairability of the roof.  Using long

established industry standard repairability assessments for shingles, he can assist the jury

in understanding why he does not recommend attempting to repair Mr. Moore's roof – i.e.,

that any such attempted repairs will only cause further damage to the roof.  Mr. Williams

is qualified to render such testimony, his testimony is not an inappropriate comment on the

law, and State Farm's retention of its own expert to testify regarding those same issues

belies any claim that those issues are improper subjects for expert testimony.[10]  Under Fed.

R. Evid. 702, helpful expert testimony is admissible, subject to the other conditions set

forth in the rule, all of which are met here.  Therefore, Mr. Moore respectfully submits that

Mr. Williams testimony should be admitted as an aid to the jury in the trial of this case.

## III.    MR. WILLIAMS TESTIMONY IS NOT UNFAIRLY PREJUDICIAL

State Farm next makes a cursory claim that Mr. William's testimony should be

excluded under Fed. R. Evid. 403.  However, Mr. Moore submits that State Farm has not

---

[10] An expert may not state legal conclusions drawn by applying the law to the facts.  *United States v. Jensen,* 608 F.2d 1349, 1356 (10th Cir.1979); *Frase v. Henry,* 444 F.2d 1228, 1231 (10th Cir.1971). However, an expert may refer to the law in expressing his opinion. *Specht v. Jensen,* 853 F.2d 805, 809 (10th Cir.1988), *cert. den.*, 488 U.S. 1008 (1989).

even begun to make the showing of unfair prejudice required to exclude evidence or testimony pursuant to Rule 403.

"Evidence should be excluded under Rule 403 only if the probative value of the evidence is substantially outweighed by unfair prejudice." *Deters v. Equifax Credit Information Services, Inc.*, 202 F.3d 1262, 1274 (10th Cir. 2000). Rule 403 "favors admissibility of relevant evidence and should be invoked very sparingly to bar its admission." *Hendrix v. Raybestos-Manhattan, Inc.,* 776 F.2d 1492, 1502 (11th Cir. 1985) (citations omitted). *See also*, *Block v. R.H. Macy & Co., Inc.*, 712 F.2d 1241, 1244 (8th Cir. 1983) ("Consistent with the requirement that the overbalance must be substantial, we have said: 'In weighing the probative value of evidence against the dangers and considerations enumerated in Rule 403, the general rule is that the balance should be struck in favor of admission'") (internal citations omitted). In performing the 403 balancing, the Court should "'give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'" *Deters*, 202 F.3d at 1274 (quoting 1 J. Weinstein & M. Burger, *Weinstein's Evidence* ¶ 403[3], at 403-25 to 403-26 (1982)).

"Rule 403 does not protect a party from all prejudice, only unfair prejudice." *Deters,* 202 F.3d at 1274. *See also*, *McEwen v. City of Norman, Okl.*, 926 F.2d 1539, 1550 (10th Cir. 1991) ("The "unfair prejudice" stated in Rule 403 cannot be equated with testimony which is simply unfavorable to a party. It must be unfair in the sense that it would be misleading and not aid and assist the jury in making a material determination in the case"); *Wagenmann v. Adams,* 829 F.2d 196, 217 (1st Cir. 1987) ("[T]he . . . prejudice against which the law guards [is] . . . *unfair* prejudice . . . prejudice of the sort which

cloud[s] impartial scrutiny and reasoned evaluation of the facts, which inhibit[s] neutral application of principles of law to the facts as found") (emphasis added). "[P]rejudice does not simply mean damage to the opponent's cause." *Goodman v. Pennsylvania Turnpike Commission*, 293 F.3d 655, 670 (3rd Cir. 2002) (citing 1 *McCormick on Evidence* § 185 at 645 (John W. Strong, et al. eds., 5th ed.1999). If it did, most relevant evidence would be deemed "prejudicial." *Id.* However, the fact that probative evidence helps one side prove its case obviously is not grounds for excluding it under Rule 403. *Id.* Excluded evidence must be unfairly prejudicial, not just prejudicial. *Id.*

State Farm has not shown that it will suffer any **unfair** prejudice arising from Mr. Williams' testimony regarding the repairability of the damage to the roof of the Moore's home, much less that the probative value of his testimony is substantially outweighed by the danger of unfair prejudice. Mr. Williams is qualified to testify on the matters upon which he is offered and State Farm itself has listed a purported construction contractor as an expert witness to testify about those same areas. State Farm has not shown entitlement to exclusion of Williams' testimony under Fed. R. Evid. 403, and, for that reason, Mr. Moore respectfully submits that its motion to exclude his testimony should be denied.

## IV.    MR. WILLIAM'S TESTIMONY IS RELIABLE

Under Fed. R. Evid. 702, an expert with the necessary qualifications in the relevant field may give expert testimony if (i) the testimony is based upon sufficient facts or data, (ii) the testimony is the product of reliable principles and methods, and (iii) the witness has applied the principles and methods reliably to the facts of the case. Rule 702, Fed. R. Evid. *See, generally, Goebel v. Denver and Rio Grande Western R. Co.,* 346 F.3d 987, 991 (10th

Cir.2003) (*Goebel II*).  Exclusion of expert testimony under Rule 702 "is the exception rather than the rule." Fed. R. Evid. 702 advisory committee notes (2000).  While expert opinions "must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation, ... absolute certainty is not required." *Gomez v. Martin Marietta Corp.,* 50 F.3d 1511, 1519 (10th Cir.1995) (quotation omitted). "The plaintiff need not prove that the expert is indisputably correct or that the expert's theory is 'generally accepted' in the scientific community."  *Mitchell v. Gencorp Inc.,* 165 F.3d 778, 781 (10th Cir.1999).  Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements.  *Id.*[11]

"[A] district court does [not] have to discuss ... all of the reliability factors" in every case; "[a] district court's gate-keeping function is more flexible than that, requiring the court to focus its attention on the specific factors implicated by the circumstances at hand." *Storagecraft Tech. Corp. v. Kirby*, 744 F.3d 1183, 1190 (10th Cir. 2014).  "[O]ther things equal, more complicated challenges demand lengthier discussions while less complicated challenges require less discussion."  *Id.*  District courts applying *Daubert* have broad discretion "in both deciding how to assess an expert's reliability, including what procedures

---

[11] *See also*, *Hulmes v. Honda Motor Co. Ltd.*, 960 F.Supp. 844, 865 (D. N.J. 1997), *aff'd*, 141 F.3d 1154 (3rd. Cir. 1998), *cert. den.*, 525 U.S. 814 (1998) (burden of proving by preponderance of the evidence that expert testimony is reliable, and thus admissible under *Daubert* standard is not meant to be an onerous one; rather, *Daubert* requires district court to determine whether novel or untested methodologies are sufficiently reliable that conclusions based upon them can be of some use to the jury).

to utilize in making that assessment, as well as in making the ultimate determination of reliability." *United States v. Velarde*, 214 F.3d 1204, 1208-1209 (10th Cir. 2000).

When faced with a challenge to the admissibility of expert testimony, "the district court need not 'recite the *Daubert* standard as though it were some magical incantation,' *Ancho v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir. 1998), or apply all of the reliability factors suggested in *Daubert* and *Kumho*." *Goebel v. Denver and Rio Grande Western Railroad Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000), *later appeal*, 346 F.3d 987 (10th Cir. 2003). "[T]he gatekeeper inquiry under Rule 702 is ultimately a flexible determination." *Id.* (citing *Kumho Tire v. Carmichael*, 526 U.S. 137, 150 (1999)). Indeed, as *Kumho Tire* itself notes, the reliability factors set forth in *Daubert* "may or may not be pertinent" to the particular expertise at issue. *Id.*[12]

In determining the reliability of proffered expert testimony, "firsthand knowledge is not requisite to the admissibility of an expert opinion." *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1244 (10th Cir. 2000). Moreover, the requirement that testimony must be reliable does **not** mean that the party offering such testimony must prove "that the expert is indisputably correct." *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004) (quoting *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999)) (emphasis added).

---

[12] *See also*, *Call v. State Industries*, 221 F.3d 1351, 2000 WL 1015076 at p. ** 4 (10th Cir. 2000) ("Establishing a precise 'rate of error' and demonstrating that the experts' results were 'subjected to peer review and publication' are not, as State Industries suggests, prerequisites to a finding of reliability in all instances," quoting *Kumho Tire* and stating that the *Daubert* factors "do not constitute a definitive checklist or test") (citation omitted); *Kannankeril v. Terminex Int'l, Inc.*, 128 F.3d 802, 809 (3rd Cir. 1997) (lack of peer review was not dispositive where expert's opinion was supported by "widely accepted scientific knowledge").

Rather, the party need only prove that "the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements." *Id.* As noted by the Advisory Committee Notes to the 2000 amendments to Fed. R. Evid. 702, "proponents 'do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable . . .. The evidentiary requirement of reliability is lower than the merits standard of correctness.'" (internal citations omitted). Indeed, the Advisory Committee has further noted that "the emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." *See also*, *Ruiz-Troche v. Pepsi Cola,* 161 F.3d 77, 85 (1st Cir. 1998) ("*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance."). Accord Advisory Committee 2000 amendments Notes to Fed. R. Evid 702, as amended in response to *Daubert* and *Kumho*, stating:

> A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule. *Daubert* did not work a "seachange over federal evidence law," and "the trial court's rule as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1196). As the Court in *Daubert* stated: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 595. Likewise, this amendment is not intended to provide an excuse for an automatic challenge to the testimony of

15

every expert. [Advisory Committee Notes to 2000 Amendments to Fed. R. Evid. 702].

That an expert testifies based on research he has conducted independent of litigation provides important, objective proof that the research comports with the dictates of good science." *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 692 (8th Cir. 2001) (internal citations omitted).  Of course, that is precisely the situation here.  An expert's finding that flows from research independent of litigation is less likely to be biased and the expert is limited to "the degree to which he can tailor his testimony to serve a party's interests." *Id.* (citing *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995)). Similarly, scientific reliability can be shown "by proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication." *Lauzon,* 270 F.3d at 693 (citing *Daubert,* 43 F.3d at 1318).[13]  Once again, Mr. Williams' article setting forth his repairability assessment has been subjected to peer-review and publication in the *Journal of the National Academy of Forensic Engineers*.

Nonetheless, State Farm lodges a wide variety of complaints against Mr. Williams' methodology and opinions, all of which at best relate to the weight to be given them, in an effort to completely exclude his testimony.  First, it challenges the reliability of Mr.

---

[13] Although the failure to exclude other possible causes is also a factor for consideration, that factor should not be taken to "a quixotic extreme." *Lauzon,* 270 F.3d at 693.  Indeed, that factor's significance most commonly arises in cases concerning medical diagnoses. *Id.* at fn. 7.  The possibility of other causes typically affects the weight but not the admissibility of expert testimony.  *Id.* at 694.

Williams' peer reviewed Repairability Assessment, which is simply an amalgamation of well-established industry standards that have long existed,[14] because he did not first perform a "conventional damage assessment."  However, as Mr. Williams repeatedly explained, there was no need.  Rather obviously, if there is admitted damage to the roof of a structure, there is no need to perform a repairability assessment.  Indeed, the very purpose of a "conventional damage assessment" is to determine if damage to the roof exists. Williams depo, Ex. 4, pp. 168:19-170:25; 241:21-242:6.  Here, State Farm **admitted** that there was wind damage to the roof of Mr. Moore's home, so it was unnecessary to perform a conventional damage assessment.[15]  The only real question is and has been whether the admittedly damaged roof is repairable.

State Farm next criticizes the reliability of Mr. Williams' methodology because, although his peer-reviewed paper suggests the use of a flat pry bar, a crowbar, a five-in-one painter tool, or a similar tool, his report does not indicate which type of tool was used in this case.[16]  To the extent that is even a criticism at all, Mr. Moore respectfully that is a matter that goes to the weight to be given Mr. Williams' testimony, not its admissibility.[17]

---

[14] *See* Williams depo, Ex. 4 at pp. 46:18-49:4; 54:16-57:1; 60:6-18; 248:18-21.

[15] Mr. Williams also visually observed the presence of damage to Mr. Moore's roof. Williams depo, Ex. 4, pp. 241:21-242:25.

[16] Mr. Williams testified he believed the primary tool used was a flat pry bar and that a hammer was also used at Mr. Moore's residence.  Williams depo, Ex. 4, pp.155:2-4.  A flat pry bar is effectively the same thing as what the defense expert calls a wonder bar.  *Id.* at pp. 178:25-179:9.

[17] Contrary to State Farm's suggestion at p. 17 of its brief, Mr. Williams testified that he did not recommend use of a putty knife to unseal shingles because it would create a thin

State Farm also complains about the fact that Mr. Williams says that his repairability assessment can be performed in 40-to-90-degree weather, asserting that this "fails to consider the effects of this dramatic temperature difference on the pliability of asphalt shingles."  State Farm's Motion (Doc. No. 42) at p. 18.  However, precisely the opposite is actually true.  Indeed, as noted in Mr. Williams' article:

> As previously mentioned, removal and replacement of asphalt-composition shingles are ideally undertaken in environmental conditions that allow the shingle to flex without damage during the assessment and subsequent repair. Therefore, air temperatures should be between 40ºF and 90ºF.  While the lower temperatures are not ideal when performing a repairability assessment, the 40-degree lower threshold is based on the minimum temperatures commonly present in manufacturer installation instructions.  During periods of cooler weather, it is recommended the shingles to be used for the assessment are on roof slopes that have been exposed directly to sunlight for at least two hours.

> The 90ºF upper limit is also based on manufacturer recommendations regarding the maximum temperature for installing asphalt composition shingles.  This higher threshold is due to the potential for marring of the shingles.  As shingles soften with the increase in temperature, they become more susceptible to scratches, or the sliding or moving of granules on the singles' surface.  This type of damage can happen when the roof is walked upon or tools/other equipment are placed on the softened shingles.  Evaluators should take care during these higher temperatures to avoid further damaging the roof beyond what is necessary as part of the repairability assessment.  [Defendant's Ex. 1 at pp. 185-186 of the article.] [emphasis added].

State Farm, of course, fails to explain how following the shingle manufacturer's own instructions regarding the maximum and minimum temperatures for shingle installation is somehow an unreliable methodology.

State Farm's next complaint regarding Mr. Williams' methodology relates to the

---

cutting motion that would be more likely to cut the edge of a shingle than a thicker blade would be.  Williams depo, Ex. 4, pp. 181:4-17.

area of the roof where he performed his damage assessment – which was slightly below the area of the roof where the shingles were clearly damaged and the tarp was nailed to the roof to prevent water from intruding into the home.[18] Evidently, according to State Farm, Mr. Williams should have removed the tarp and then performed his repairability analysis directly upon the area of the damaged shingles. However, as Mr. Williams explained:

Q.  (By Mr. Brown)  And in this case, you were aware of where wind damage was already identified –

A.  Correct.

Q.  – by virtue of the tarp, correct?

A.  Yes.

Q.  … Why didn't you do your assessment there?

A.  In order to do that, we'd have to remove the tarp.  We'd have to find a way to find solid shingles away from the area where the damage is at.  By the time we did that, we were going to be outside of where it's tarped pretty much regardless anyway.  So it's like "Okay.  Where can we do this that we can get into solid material?"  This area was just as representative as the other part of the slope.  It should be noted that it's just slightly downhill from where the tarp was placed.

Q.  Yeah, It's not all that far away.  That's why I was questioning why you just do it where the tarp was at.

A.  Because the shingles in that area, with their damage by wind, you're going to have issues.  And the problem is, you've got to get outside of where the damage is because what you're trying to establish is what, you know, are the tie-in conditions.  So you're not going to do it right here; you're going to be, at a minimum, around it.

Q.  I guess I'm confused then when it says "It should be performed on shingles where wind or hail damage has already been identified."  Is there areas around that where wind damage has been identified?

A.  What we're referring to in this case is, if we had a tab pull off and we had one tab that we could get into and this material around it was still solid, we would use that location, if it was something we could get do [sic].  When we

_____

[18] There was also black material beneath the tarp, which Mr. Williams believed also represented an attempt to limit water intrusion into the residence.

have a situation where we've got tarps and things like that, we're going to get outside the tarp.  We're not going to want to do something that's inside here.  We're going to want to get out here where we actually have solid material.  You're going to be replacing the shingles out here.  You're going to be replacing the shingles here.  We're going to be wanting to get outside of this, outside the influence of where that tarp is.

Q.    So is it your opinion that that wasn't accessible for the purpose of your assessment?

A.    I don't believe that this would have been the advisable place to go.  We wanted to get to a sound place away from the shingles.

Q.    Do you believe that's following your protocol?

A.    I do.  [Williams depo, Ex. 4 at pp. 175:4-177:4].[19]

Yet another criticism of Mr. William's methodology is that he allegedly failed to verify that the roofing contractor hired to assist with the repairability assessment, Jose Cruz of Valle Roofing, was licensed and insured.  That claim, at best, is misleading and disingenuous.  The actual testimony was that Mr. Williams had an assistant, Drew Jamison, who assisted Mr. Williams on this project.  Williams depo, Ex. 4, pp. 149:25-150:3; 152:2-5; 154:12-22.  Mr. Williams asked Mr. Jamison to retain a roofing contractor to assist in the repairability assessment.  Williams depo, Ex. 4, p. 152:2-5.  Mr. Jamison knew Mr. Cruz, who had been a residential roofer for an extended period of time.  Mr. Jamison had worked with him previously and he therefore retained Mr. Cruz.  Williams depo, Ex. 4, pp. 150:17-151:1; 152-18-21.  Mr. Williams asked Mr. Jamison to make sure that Mr. Cruz was licensed and insured and was assured by Mr. Jamison that he was.  Williams depo, Ex. 4, pp. 151:14-152:17.  Mr. Williams led Mr. Cruz and his helper through the steps of his

_____

[19] Mr. Williams also identified pre-existing damage to several shingles in that they suffered from generalized granule loss and that the granule surface was cracked.  *Id*. at pp. 178:3-5.

repairability assessment and had no criticisms of the manner in which they performed the assessment. Williams depo, Ex. 4, pp. 153:14-154:9; 162:1-163-17. Ultimately, due to damage propagation concerns, Mr. Williams determined that he would not recommend repairing the roof.

The goal of a trial court's assessment of an expert's opinion is to make a preliminary determination whether (1) the reasoning or methodology underlying the witness's testimony is valid, and (2) the reasoning or methodology can be properly applied to the evidence or facts at issue. 4 Jack B. Weinstein et al., *Weinstein's Federal Evidence* § 702.05[2][a] (supp. 2019) (citing *Daubert*, 509 U.S. at 592–93). "Generally, the district court should focus on an expert's methodology rather than the conclusions it generates." *Crew Tile Distrib., Inc. v. Porcelanosa Los Angeles, Inc.*, No. 18-1029, 2019 WL 852293, at *7 (10th Cir. Feb. 21, 2019) (quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003)). "[A] district court must admit expert testimony as long as it is based on a reliable methodology. It is then for the jury to evaluate the reliability of the underlying data, assumptions, and conclusions." *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1263 (10th Cir. 2014).

"The factual basis for an expert's opinions and the weight to be provided to same is the proper subject of cross-examination, not exclusion." *Bales v. Green*, 16-CV-106-GKF-JFJ, 2018 WL 1470259, at *4 (N.D. Okla. Mar. 26, 2018) (citations omitted). A party's dispute with the data upon which an expert did or did not rely goes to the weight of their testimony. *E.g.*, *Gomez,* 50 F.3d at 1519 ("[T]he weaknesses in the data upon which [the] expert relied go to the weight the jury should have given her opinions, they did not render

her testimony too speculative as a matter of law."). "[A] flaw in methodology does not automatically disqualify an expert opinion; the flaw must be of such substance as to create a lack of 'good grounds' for the expert's conclusions." *Estes Park Taffy Co., LLC v. Original Taffy Shop, Inc.*, 15-CV-01697-CBS, 2017 WL 2472149, at *6 (D. Colo. June 8, 2017). Similarly, "[w]hether ... [an] expert might have done a better job is not the test [under Rule 702]." *Kannankeril v. Terminex Intern'l, Inc.,* 128 F.3d 802 (3d Cir.1997). Indeed, "a court may determine that 'good grounds' exist for the expert opinion to be offered, even though the judge may believe 'better grounds' exist for an alternate conclusion or that a somewhat flawed methodology, if fixed, would lead to a different conclusion." *Babcock & Wilcox Ebensburg, Power, Inc. v. Zurich Am. Ins. Co.*, 02-CIVIL 299, 2005 WL 6068838, at *5 (W.D. Pa. Sept. 8, 2005) (citing *Paoli III*). "A judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate." *Id.* at *9 (citing *Paoli III* at 744-745). Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the [trier of fact] must such testimony be excluded. *First Union Nat. Bank v. Benham*, 423 F.3d 855, 862 (8th Cir. 2005) (quoting *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-930 (8th Cir. 2001)). Not every issue raised about an expert's opinion requires the testimony to be excluded. Many of those concerns can be addressed through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

Here, Mr. Williams first obtained and reviewed real property data relevant to Mr. Moore's residence. Based upon the **<u>admitted</u>** fact that the roof of Mr. Moore's home had

suffered wind damage, and his own visual confirmation of that fact, there was no need for Mr. Williams to perform a "conventional damage assessment" determine if the roof was damaged.  Nor is there anything new or novel about the peer-reviewed repairability assessment methodology that Mr. Williams followed.  Proper tools were used to perform the assessment, an appropriate roofing contractor was employed, and Mr. Williams himself oversaw the entire assessment process.  Mr. Williams performed his repairability assessment in conformity with the methodology set forth in his article and based his repairability conclusions upon the results of that methodology, in conjunction with his experience, education and expertise as a professional forensic engineer.  Williams depo, Ex. 4, pp. 172:1-8; 220:21-224:3; 242:7-243:22; 251:23-253:3.  To the extent that they have any validity at all, State Farm's criticisms of his methodology go to the weight to be given his testimony, not to its admissibility.

Mr. Williams' proposed testimony regarding the repairability of the Moore's roof "fits" the issue on which he proposes to testify and is sufficiently "relevant to the task at hand," such that it "logically advances a material aspect of the case."  *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884, 884 n.2 (10th Cir. 2005).  Because it is relevant to the issue of whether the roof is repairable – one of the principal issues in the case,[20] and is

---

[20] Under Fed. R. Evid. 401, "[e]vidence is relevant if it has "*any* tendency to make the existence of *any* fact that is of consequence to the determination of the action *more probable or less probable* than it would be without the evidence."  *Hill v. Bache Halsey Stuart Shields Inc.*, 790 F.2d 817, 826 (10th Cir. 1986) (emphasis in original).  "Rule 401 is a liberal standard," and '[e]xcept for certain well-defined instances, all relevant evidence is admissible."  *United States v. Leonard*, 439 F.3d 648, 651 (10th Cir. 2006); *United States v. Mendoza-Salgado*, 964 F.2d 993, 1007 (10th Cir. 1992) (citing Fed. R. Evid. 402).

not based upon speculation, Mr. Moore respectfully submits that his testimony should be admitted as an aid to the jury in deciding this case and that State Farm's Motion to Exclude Mr. Williams' testimony should be denied.

Respectfully submitted,

By:    s/ Zachary K. Housel
       Steven S. Mansell, OBA #10584
       Kenneth G. Cole, OBA #11792
       Zachary K. Housel, OBA #32802
       **MANSELL ENGEL & COLE, P.C.**
       204 North Robinson Avenue, 21st Floor
       Oklahoma City, OK 73102-7001
       T: (405) 232-4100 ** F: (405) 232-4140
       E-mail:  zhousel@meclaw.net

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2021, I filed the attached document with the Clerk of Court.  Based on the records currently on file in this case, the Clerk of Court will transmit a Notice of Electronic Filing to those registered participants of the Electronic Case Filing System.

s/ Zachary K. Housel

24