```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF OKLAHOMA
 2
     TRACY MOORE,
 3       Plaintiff,

 4   vs.                           Case No. 20-CV-410-R

 5   STATE FARM FIRE AND CASUALTY
     COMPANY,
 6       Defendant.

 7

 8

 9

10             DEPOSITION OF JEFF BROWN
            TAKEN ON BEHALF OF THE DEFENDANT
11           ON APRIL 15, 2021, AT 10:00 AM
               IN OKLAHOMA CITY, OKLAHOMA
12

13                     APPEARANCES

14   On behalf of the PLAINTIFF:
     Zachary K. Housel
15   MANSELL, ENGEL & COLE
     204 North Robinson, 21st Floor
16   Oklahoma City, Oklahoma 73102
     (405) 232-4100
17   zhousel@meclaw.net

18
     On behalf of the DEFENDANT:
19   J. Andrew Brown
      ATKINSON, HASKINS, NELLIS,
20   BRITTINGHAM & GLADD & FIASCO
     1500 ParkCentre
21   525 South Main
     Tulsa, Oklahoma 74103
22   jbrown@ahn-law.com

23

24

25   REPORTED BY:   Karen Dauphin Albert, CSR, RPR
```

**EXHIBIT 1**

1  work history was.
2       A    That's actually the reason I don't have a
3  degree.  I started adjusting.  My first ever few
4  storms were all for State Farm.
5            You know, I was in and out of college.  I
6  started, I want to say, in 2004, and then started
7  chasing adjusting around 2008.  Got onto my first
8  storm in 2010 for State Farm.
9       Q    Were you part of a cat team?
10      A    So the first one in 2000 I was actually an
11 assistant being trained.  State Farm used to have
12 what's called a two-story steep team, and the guy that
13 would be the assistant would typically be an adjuster
14 that's being trained by a more experienced adjuster.
15 And so I did well on that, got good reviews, and they
16 allowed me to work from there.
17      Q    Did you work for State Farm?  Were you a
18 State Farm employee?
19      A    I was an employee, a W-2 employee of
20 E.A. Renfroe.
21      Q    How long did you work at E.A. Renfroe?
22      A    My last storm for them was in the summer of
23 2012.
24      Q    Did you obtain any licenses or
25 certifications during that time?

1   only, they would give me back my daily position
2   whenever I got back home, and I did that until I
3   became a public adjuster.
4        Q    When you say you wanted to start chasing
5   storms to make more money, what do you mean by that?
6   Adjusting more claims?
7        A    Adjusting more claims and, just like we
8   discussed, the higher dollar amount claims.
9        Q    In a closer knit area to you; right?
10       A    Right.  Well, I mean, a lot of times, it's
11  hail damage.  Right?  So it's fast and easy to find
12  the hail damage on a big hailstorm.
13            Typically, you're in a very tight zone so
14  you can do several in a day, and as we said, you know
15  the tier -- it's a tiered schedule for all of the
16  other ones, and so the dollar amount gets higher.  You
17  just end up making more money.
18       Q    When you said you had gone out and either
19  adjusted or written estimates for the 1,000 to 1,500,
20  was that all these companies you just mentioned, or
21  was that just specific to State Farm?
22       A    That was specific to State Farm.
23       Q    Okay.  So over the course of, let say, from
24  2010, roughly, to, you know, when you became a public
25  adjuster, how many claims have you adjusted?

```
 1      A    Flirting with 10,000, but probably not
 2  there.
 3      Q    And from 2000, when you graduated high
 4  school, up until 2010, were you working in that
 5  industry, too?
 6           You may have said that.  I just didn't --
 7      A    No.  Actually, I never -- my first anything
 8  in the industry ever was that State Farm training
 9  storm in 2010.
10      Q    Okay.  So what did you do from 2000 to 2010?
11      A    You know, standard young-man stuff.  I
12  waited tables, bartended, little construction jobs
13  here and there.
14      Q    That was what I was going to ask you.  You
15  got into the adjusting.  Did you have a background in
16  roofing?  Construction?
17      A    I worked for my dad.  My dad owned a
18  construction company.  I did a little bit of steel
19  work.  And I had a friend whose dad was a roofer, and
20  so he would use, you know, us young kids at the time
21  to put on some roofs occasionally.
22      Q    So you had laid some shingles before?
23      A    I've laid some shingles.  I've done a little
24  bit of torch down.
25      Q    Does your dad still have his construction
```

1   that they're being recorded.  They tell you that
2   you're being recorded, and so if we're all consenting
3   to being recorded, we're being recorded.
4        Q    How do you know State Farm records phone
5   calls?
6        A    They typically say that they're recording
7   phone calls, plus I worked for them.
8        Q    You worked as an independent adjuster for
9   them; is that correct?
10       A    That's correct.
11       Q    Did you go through any sort of training,
12  employee training, with State Farm?
13       A    Yes, sir.  You have to turn in a State Farm
14  certification before you're allowed to work for State
15  Farm.
16       Q    Tell me what that is.
17       A    Basic estimatics, which is the Xactimate
18  portion, identification of damage, a policy
19  proficiency test, and identification of construction
20  material.
21       Q    Sure.  They talk a little bit about what
22  you're going to be doing in the estimates and things
23  like that.
24            I'm asking, as far as, like, a new employee,
25  "Hey, this is your badge number.  This is where you --

```
 1        Q    Springer?
 2        A    Andrew Springer basically outright refused
 3   to do anything on the claim until he was told he was
 4   being recorded.  Right?
 5             He basically told me, "Hey, this is what it
 6   is.  That's what it is, and you're just going to have
 7   to wear it," in so many words.
 8             So whenever he found out it was being
 9   recorded, then he decided, "Okay.  Well, then we can
10   have a conversation about it."
11             And then he almost had to be forced to look
12   at the photos that I was providing.  Right?  And then
13   -- so I feel like that's inappropriate.  I feel like
14   the fact that I had to ask for the policy -- I don't
15   know how many times -- was inappropriate.  I feel
16   that --
17             Now, when we talk about evidence, I wasn't
18   -- I didn't record the inspection that I met the
19   adjuster on.  However, that event is what prompted me
20   to start recording everything from that point forward.
21   That guy's lack of wanting to be on the roof at all,
22   he showed up, he got on the roof, he tried to tell me
23   that this was a bad install at the time, 18 years
24   after the roof was installed.  I pointed out to him
25   that this was the left nail only that we had a problem
```

```
 1   with.  Why, if the -- he tried to say that the nails
 2   were overdriven.
 3            So if the nails were overdriven, why is it
 4   only the left nail all the way up and down the roof,
 5   only the left?
 6            He couldn't get off the roof fast enough.
 7   He spent maybe -- maybe he spent five minutes on the
 8   main roof.  Then he tried to leave, and I practically
 9   had to force him to walk around and get on the
10   addition roof.
11            He had no intention of documenting or paying
12   attention to anything at all.
13       Q    We talked about the recording of calls, and
14   that's kind of a standard practice for you?
15       A    Uh-huh.
16       Q    Correct?  Is that a "yes"?
17       A    Yes.
18       Q    Would you describe yourself as aggressive in
19   your work?
20       A    Yes.
21       Q    And I've heard the calls, at least what was
22   recorded.  And I think your testimony was you didn't
23   have it all recorded, but at some point, you recorded
24   it, and that's what you've produced to us, and you
25   don't have anything else.
```

```
 1                THE WITNESS:  It would.
 2       Q    (By Mr. Housel)  You were asked earlier
 3  about what you relied on for your claim that the
 4  shingles that were blown off the roof were as a result
 5  of a wind event.
 6            Do you remember that?
 7       A    I do.
 8       Q    But State Farm admitted that those shingles
 9  were damaged as a result of wind; isn't that right?
10            MR. BROWN:  I object to form.
11            THE WITNESS:  According to their estimate,
12  yes.
13       Q    (By Mr. Housel)  Okay.  And that's a covered
14  loss; right?
15       A    Yes, sir.
16       Q    Okay.  And as it relates to the other
17  shingles, other than the ones that were directly blown
18  off the roof, it's your understanding that State Farm
19  is not extending coverage for those shingles; right?
20       A    That is my understanding.
21       Q    But you don't have any idea what they think
22  damaged those shingles, do you?
23            MR. BROWN:  I object to form.
24            THE WITNESS:  They specifically say "other
25  than storm," and they say they don't know.
```

1     Q    (By Mr. Housel)  Oh, okay.  So as to other
2  causes with regard to these damaged shingles, nobody
3  at State Farm told you what caused the shingles to
4  become unbonded and loose, did they?
5     A    They did not.
6     Q    Nobody at State Farm ever sent a letter to
7  the insured or to you on the insured's behalf
8  explaining what was wind damaged, what wasn't, and
9  then listing policy language as to what certain things
10 are covered and what aren't --
11         MR. BROWN:  I object to form.
12    Q    (By Mr. Housel)  -- did they?
13    A    There was nothing, to my knowledge, that I
14 had seen.
15    Q    You don't have any idea what their position
16 is other than, "We don't know."  Right?
17         MR. BROWN:  I object to the form.
18         THE WITNESS:  Right.
19    Q    (By Mr. Housel)  Just not wind damage, I
20 guess; right?
21    A    That's correct.
22    Q    Okay.  Shouldn't that be done, though?
23 Shouldn't a denial letter include those items?
24         MR. BROWN:  I object to form.
25         THE WITNESS:  In my opinion, yes.

```
 1      Q    (By Mr. Housel)  That's industry standard,
 2  too; right?
 3      A    That is industry standard.
 4      Q    That's not just Mr. Brown's opinion.  That's
 5  what insurance companies do; right?
 6      A    I believe that's a requirement, actually.
 7      Q    It is required of them.  And if they don't
 8  do that, the insured is not able to dispute their
 9  determinations, are they?
10           MR. BROWN:  I object to form.
11           THE WITNESS:  They are not.
12      Q    (By Mr. Housel)  Like Mr. Moore, they're
13  just left in the dark; right?
14           MR. BROWN:  Same objection.
15           THE WITNESS:  Correct.
16      Q    (By Mr. Housel)  You were asked about apples
17  to apples; right?  Do you remember that?
18      A    I do.
19      Q    But you showed up with apples; right?
20      A    I did.
21      Q    You said this was wind damage; this is a
22  covered loss; and this is how much it's going to cost.
23  Right?
24      A    That's correct.
25      Q    Okay.  But State Farm didn't have any other
```