```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE WESTERN DISTRICT OF OKLAHOMA

 3   TRACY MOORE,                    )
                                     )
 4           PLAINTIFF,               )
                                     )
 5           vs.                      )   CASE NO. 20-CV-410-R
                                     )
 6   STATE FARM FIRE AND CASUALTY    )
     COMPANY,                         )
 7                                    )
             DEFENDANT.               )
 8

 9

10

11

12                        * * * * *

13            REMOTE VIDEOCONFERENCE DEPOSITION OF

14                   MICHAEL DON HOPKINS

15              LOCATED IN SPERRY, OKLAHOMA

16                   ON FEBRUARY 9, 2021

17            COMMENCING AT 10 A.M. CENTRAL TIME

18                        * * * * *

19

20

21                    instaScript, L.L.C.
                     125 Park Avenue, LL
22              Oklahoma City, Oklahoma  73102
                       405.605.6880
23                schedule@instascript.net

24
             REPORTED VIA ZOOM BY DEBRA GARVER, CSR, RPR
25
```

**EXHIBIT 3**

```
 1      Q.   In fact -- and, listen, that's really the point.
 2   If I ask a bad question, which we've all seen that I do, I
 3   want you to be sure to tell me, you know, I don't
 4   understand, that's not dovetailing the way you say it is.
 5      A.   But, yes, to get back to the original question,
 6   yeah, the -- ultimately, the insured or public adjustor
 7   was claiming additional damages that we were not in
 8   agreement with.
 9      Q.   And you did not, in response to that, issue any
10   supplemental payments to Mr. Moore, did you?
11           MR. BROWN:  Object to form.
12           THE WITNESS:  No, we did not.
13      Q.   (By Mr. Housel) State Farm did not agree with and
14   pay the insured's estimate, did it?
15      A.   No, we did not.
16      Q.   But it never did deny the claim, did it?
17      A.   No, I don't believe there was any formal denial
18   that went out.
19      Q.   You've not seen a denial letter in this claim,
20   have you?
21      A.   I don't believe we -- I don't believe there's a
22   denial letter in the file.
23      Q.   Nobody wrote a letter to the insured explaining
24   what State Farm agreed was storm damage and what State
25   Farm disputed was storm damage, did they?
```

```
 1              MR. BROWN:  Object to form.
 2              THE WITNESS:  No, I believe our -- you know, we
 3   typically rely on our damage repair estimate, you know,
 4   for that.
 5       Q.   (By Mr. Housel) And State Farm denies that the
 6   roof was damaged to the extent claimed by the insured.
 7   Right?
 8       A.   That's correct.
 9       Q.   With regard to the claimed damage, disputed by
10   State Farm, does it deny that that damage is covered?
11              MR. BROWN:  Object to form.
12       Go ahead.
13              THE WITNESS:  That is correct.  Yeah, we were
14   in a disagreement with the damage the insured was
15   claiming to be wind damage.
16       Q.   (By Mr. Housel) Mr. Hopkins, would you turn to
17   page 419, please.
18              MR. BROWN:  And that's going to be in the
19   second binder, Mike.
20              THE WITNESS:  Okay.  Yeah, I've got it.  419,
21   yeah.
22       Q.   (By Mr. Housel) What is this document?
23       A.   This is the -- this appears to be the estimate
24   provided by the public adjustor.
25       Q.   Okay.  You've seen this before?
```

```
 1      A.   Yeah, often that can be the case.  I mean,
 2   that's pretty typical evidence of wind damage.
 3      Q.   Sure.  And it's not that State Farm only pays
 4   for shingles that get blown off the roof, is it?
 5           MR. BROWN:  Object to form.
 6           THE WITNESS:  Yeah, there can be other damages
 7   that are caused by wind.
 8      Q.   (By Mr. Housel) Sure.  But shingles blown off the
 9   roof or seen on the ground, that's good evidence of wind
10   speeds high enough to cause damage, isn't it?
11           MR. BROWN:  Object to form.
12           THE WITNESS:  Yeah, I think that would be
13   overall a fair statement.
14      Q.   (By Mr. Housel) Now, the PA had pictures of
15   shingles he claimed were unsealed that were all over the
16   roof, not just on the rear slope.  Isn't that right?
17      A.   Yeah, I believe that's -- that's accurate.
18      Q.   State Farm never wrote Mr. Moore and advised him
19   that some of the shingles claimed by the public adjustor
20   were covered but some were not covered.  Did it?
21           MR. BROWN:  Object to form.
22           THE WITNESS:  I don't recall seeing a letter
23   that specified that.  Again, typically, we were relying
24   on our estimate to reflect the damages that we find.
25      Q.   (By Mr. Housel) So you didn't write Mr. Moore and
```

```
 1   show him the policy language that wear and tear is not
 2   covered?
 3           MR. BROWN:  Object to form.
 4           THE WITNESS:  No, I did not.
 5       Q.  (By Mr. Housel) And nobody else did, did they?
 6       A.  I don't recall seeing any letter referencing
 7   that language, no.
 8       Q.  What about overdriven nails?  Nobody wrote --
 9   excuse me.  Strike that.
10           Nobody wrote Mr. Moore a denial letter and said,
11   Well, these shingles were wind damaged, but these were a
12   product of improper installation and, therefore, that
13   portion of the claim is denied.  Nobody wrote that letter,
14   did they?
15           MR. BROWN:  Object to form.
16           THE WITNESS:  Yeah, I don't recall seeing a
17   letter outlining that.
18       Q.  (By Mr. Housel) Should that be done?
19           MR. BROWN:  Object to form.
20           THE WITNESS:  You know, when I got involved in
21   the claim, we were -- we made the decision to hire an
22   engineer, so at that point in time the claim is still
23   under investigation.
24           So I certainly wasn't thinking about -- you know, I
25   was just waiting for the engineer to complete his task and
```