1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF OKLAHOMA

3

4   (1) TRACY MOORE,                )
                                     )
5                 Plaintiff,         )
                                     )
6   vs.                             )        Case No. 20-CV-410-R
                                     )
7   (1) STATE FARM FIRE AND          )
    CASUALTY COMPANY,                )
8                                    )
                  Defendant.         )
9   _____    )

10

11          VIDEO DEPOSITION OF CHAD WILLIAMS

12          TAKEN ON BEHALF OF THE DEFENDANT

13              IN TULSA, OKLAHOMA

14              ON JUNE 21, 2021

15

16

APPEARANCES:
17
ZACHARY K. HOUSEL, Attorney at Law, 204 North Robinson
18  Avenue, 21st Floor, Oklahoma City, Oklahoma 73102;
    appearing on behalf of the Plaintiff.
19
    TIMOTHY S. KITTLE, Attorney at Law, 6660 S. Sheridan,
20  Suite 250, Tulsa, Oklahoma 74137; appearing on behalf of
    the witness.
21
    J. ANDREW BROWN and TREY PURDOM, Attorneys at Law, 525
22  S. Main, Suite 1500, Tulsa, Oklahoma 74103; appearing on
    behalf of the Defendant; and JOHN S. GLADD, Attorney at
23  Law, appearing by telephone.

24  VIDEOGRAPHER:  Mike Ballard

25  REPORTED BY:  Regina Brantley, CSR RPR  (918) 406-7196

**EXHIBIT 4**

16

1   Q.    Is that a yes?

2   A.    Yes.

3   Q.    I think your videos actually say that three or

4   four times that your goal is to be objective and honest;

5   correct?

6   A.    Yes.

7   Q.    The videos also say you want to review the facts,

8   you want the facts, what kind of damage, weather

9   information, etc.  Is that true?

10  A.    Yes.

11  Q.    When you get an assignment, those things are

12  important to you?

13  A.    It's important to know what we were assigned and

14  what we were asked to do.  When we're looking at

15  something from a forensic investigation standpoint,

16  there's certain information that we'd like to have and

17  we want to make sure that we establish.  When we're

18  asked to do something different, we have to look at what

19  the facts are.  In this particular case, we were asked

20  to look at, "Was it feasible to actually complete the

21  repair."  So it's very important that you understand

22  that we're not asked to do a forensic-level

23  investigation of this roof, nor was it required for us

24  to be able to do that in order to render this opinion.

25  We were able to -- the size of the roof and look at it

**BRANTLEY REPORTING**

17

1    and determine that damage had already been present on

2    the roof.  Then we were able to look at "could the

3    repairs be completed," and it's very important that you

4    understand the scope of what the work was.

5    Q.    And I appreciate that.  And we'll get into the

6    scope and your assignment.  But I'm saying, as far as

7    what you advocate on your website, the information you

8    want when a claim comes in or an assignment comes in,

9    are those things important to you; the facts, what kind

10   of damage --

11   A.    The facts were important.  We've already addressed

12   that.

13         MR. HOUSEL:  Make sure you let him finish.

14   Slow down a little bit.

15   Q.    (By Mr. Brown)  You indicated weather information

16   was important to you.  Is that true?

17   A.    Yes.

18   Q.    Okay.  Did you do all that in this case?

19   A.    No.  Because as I've already said, I've already

20   explained, that was not what we were asked to do.  We

21   were not asked to do a forensic-level investigation on

22   this roof; we were asked to determine whether repairs

23   were feasible.

24   Q.    In preparation for your report, what did you

25   review, if anything?

18

1    A.     That's an open-ended question.  I'm not sure what

2    you're asking.

3    Q.     Okay.  You prepared a report in this case, didn't

4    you?

5    A.     Yes.

6    Q.     What did you -- What documents did you review in

7    preparation of that report, if any?

8    A.     I'm not sure how to answer your question because

9    it's very open ended.  We have many, many things that we

10   review; many, many things that we're knowledgeable of;

11   many, many products that we're aware of.  I don't go

12   read every single paper that I've ever read before I

13   write one report.  So I count on my education,

14   knowledge, and experience to be able to draw these

15   resources together.  We look at many, many things over

16   time.  So to ask that question, we're looking at what do

17   we have as far as the information that's available.  Do

18   we have the photos?  Do we have the information that's

19   here?  We look at our methodology.  We wrote the

20   methodology based on industry standard.  We understand

21   what's here, so if you're asking what did we

22   specifically review, it's the equivalent of saying what

23   law journal did you review 12 years ago.  So we've

24   reviewed numerous documents over our careers to

25   establish our experience.  So there's plenty of things

19

1   that we've looked at as far as writing this report.  We
2   look at the facts that are available to this matter.  As
3   far as specifically any -- every resource, I'm not sure
4   how to answer your question.
5   Q.    Okay.  Well, I appreciate your answer.  Maybe it
6   was a bad question.  Did you review any documents
7   specific to this claim in preparation of your report?
8   Estimates, photographs, log notes?
9   A.    I don't think we had those available to us.
10  Q.    Okay.  That's my question.  You don't recall at
11  this point reviewing any materials?
12  A.    I don't know of any external documentation that
13  would have been available to us at that time.  I think
14  that we had gotten some things later on.  I think that
15  there's a -- an estimate from a public adjuster.  We
16  glanced at it.  We're not rendering opinion.  It's not
17  particularly relevant to what we're dealing with here.
18  We're dealing with the fact that we look at a roof, we
19  know that there's areas that are evidently damaged based
20  on the fact that there's a tarp on it, and now we're
21  going, "How can you fix it; can you determine whether or
22  not it's feasible to repair this roof."
23  Q.    Did you ask for any documents before you even went
24  out to the property?
25  A.    I believe we basically asked for a general "what

36

```
 1    A.    I believe it was about five months.  I don't

 2    remember exactly.

 3    Q.    Prior to that you were at Rimkus?

 4    A.    Yes.

 5    Q.    About four years as a consultant?

 6    A.    Started as a consultant; finished as a senior

 7    consultant.

 8    Q.    Were you doing the same type of work you're doing

 9    now?

10    A.    Yes.

11    Q.    Why did you leave Rimkus?

12    A.    There were better opportunities that I had to

13    pursue -- to consider.

14    Q.    What type of work would you typically do at

15    Rimkus?

16    A.    Typically, it would be damage evaluations.

17    Q.    You'd get a call from an insurance company,

18    generally?

19    A.    Generally, yes.

20    Q.    And they would say, "Hey, go out and look at this

21    property," and you'd go out there, make some

22    observations, and prepare a report?

23    A.    Correct.

24    Q.    In a nutshell?

25    A.    Correct.
```

37

1   Q.    Have you done that many, many times?

2   A.    Thousands of times.  I don't know the exact

3   number.

4   Q.    Does that include number you said earlier about

5   your --

6   A.    I know it's in excess of a thousand, but I don't

7   know exactly.

8   Q.    Did you do the same type of thing at EFI?

9   A.    Yes.

10  Q.    You've actually done work for State Farm through

11  those companies; is that correct?

12  A.    I know that I did at Rimkus.  I'm not certain

13  whether we ever did anything for State Farm at EFI.

14  Q.    Have you ever had any disciplinary issues at any

15  of these places?

16  A.    No.

17  Q.    Do you have any roofing experience as far as

18  roofing a house?

19  A.    Have I personally been a roofing contractor?

20  Q.    Yes, sir.

21  A.    I am not a roofing contractor.

22  Q.    Have you ever laid shingles on a house?

23  A.    I've been involved with placement of shingles in

24  the past, yes.  And I've been involved with observing

25  the construction and watching what's been done with

46

```
 1    that you got attorneys involved, engineers involved,
 2    various people.  Were those things that you did on your
 3    own, or was that something that was done through the
 4    academy?
 5    A.    That was done by me before we even -- to get to
 6    the academy.
 7    Q.    Did you keep a list of all these people that you
 8    talked to?
 9    A.    I did not.
10    Q.    Did you keep notes of what feedback you were
11    getting from these people?
12    A.    No.  We just basically modified it if we needed
13    to, what things we needed to include.
14    Q.    Do you recall modifying things?
15    A.    We wouldn't -- By "modify", most of the time it
16    would be making things clear to understand, make the
17    language easier to understand.
18    Q.    Sure.  And I assume that at some point you got an
19    editor involved and they helped formulate the structures
20    of the sentences and things like that.  But as far as
21    the guts of it, what your process is, what your
22    methodology is, did anyone besides you come up with that
23    piece?
24    A.    Most of what is in there is already based on
25    what's industry standard.  The definitions of damage
```

47

1  were already industry standard.  If we have a shingle

2  that's been ripped off of a roof and it's pulled past

3  the fastener, that's already industry standard.  That's

4  a damaged product.  All we really did in preparing this

5  was take a lot of concepts and bring them together

6  that were already industry standard.  There were papers

7  and there were various discussions in the past that, if

8  you have a disagreement about whether a roof can be

9  repaired, you can resolve it by removing and replacing a

10  shingle.  But there was nothing that specifically said,

11  "How do you do that."  So what we did is we took

12  industry standard practice and brought it together and

13  said, "Here's what this looks like and here's what we

14  would suggest doing based on what's already in industry

15  practice."

16  Q.    Is it your testimony that your methodology is

17  industry standard?

18  A.    It is my testimony that what we have in our method

19  is derived from industry standard.

20  Q.    Sure.  There's some pieces that you reference in

21  here that are accepted in the industry; true?

22  A.    Yes.

23  Q.    But the methodology that you have put forth in

24  this paper, do you believe that that's accepted by the

25  industry as standard?

48

1          MR. HOUSEL:  Object to the form of the

2     question.

3          THE WITNESS:  Would you like to clarify the

4     question?

5     Q.    (By Mr. Brown)  I can, if you don't understand it.

6     The methodology itself, the testing that you do, the

7     Repairability Assessment Method -- I think that's how

8     you titled it -- do you believe that that is an accepted

9     industry standard?

10          MR. HOUSEL:  Object to the form of the

11     question.

12     A.    To be clear, it's not a laboratory test.  It even

13     states it in the text.  This is an assessment

14     methodology.  Anything that we do in forensic

15     engineering is based on a methodology and an assessment.

16     Everything that we are doing here is derived from

17     industry standard.  There's nothing in here that is

18     remarkably novel, remarkably different from what was

19     already being done.  All we've done is take the various

20     ideas, bring them together, and say, "We want to have a

21     standard in which we can talk."

22     Q.    Why did you write this paper?

23     A.    Because we didn't have a single standard that we

24     could all talk to as engineers.  We wanted to be able to

25     take these various ideas, bring them together, and say,

49

1    "Here's what we see," and so that we can present the

2    information, other parties can understand the same

3    information.  All we did was bring together a

4    methodology of how to present the information.

5    Q.    Now, the paper, as I see it, you have simply two

6    sources cited, or references.  Is that it?

7    A.    Yes.

8    Q.    And this Aon, the Weather, Climate, and cata --

9    Catastrophe Insight, that has to do with hail damage in

10   Germany, doesn't it?  The page that you referenced?

11   A.    I don't have the reference in front of me.

12   Q.    You also cite Marshall and Herzog and utilize

13   their DURA equation.  Is that correct?

14   A.    We discuss it.

15   Q.    Is that Tim Marshall?

16   A.    Yes.

17   Q.    Anything that you use besides the dura equation

18   from Marshall and Herzog?

19   A.    Most of what we're using is what is the industry

20   standard.  It's the approach that's been from our

21   education, experience, and training of what is done in

22   the industry.

23   Q.    You reference a specific document --

24   A.    As far as specific --

25   Q.    -- from Herzog; right?

54

1   to determine what is damaged."  There wasn't a single

2   way to present the information and say, "This is what we

3   found."  And this is why we reasonably want to be able

4   to do this is so that we can say, "Here's what happened,

5   here's what we found," and be able to present it in a

6   cogent way.

7   Q.     And getting back to my question.  Did you ever

8   perform or demonstrate one of these assessments to

9   anybody before this publication?

10  A.     Yes.  We -- The methodology was used before.

11  Q.     To whom?

12  A.     The methodology -- As far as was it done as a

13  demonstration for someone?

14  Q.     Yes, sir.

15  A.     No.

16  Q.     Had you done a Repairability Assessment, the

17  methodology you had, before this publication?

18  A.     Many times, yes.

19  Q.     Did you keep track of any field studies as a

20  result of your prior Repairability Assessment Methods?

21  A.     That's a fairly open-ended question.  Can you be

22  more specific?

23  Q.     Sure.  Did you keep any statistics of how many

24  times you did it?

25  A.     I don't have a specific number.

55

```
1    Q.    How long had you been doing this methodology

2    before it was published?

3    A.    Approximately a year and a half to two years.  I

4    don't remember exactly.

5    Q.    Did you ever do it while working for another

6    entity that you didn't own?

7    A.    No.

8    Q.    Why not?

9    A.    The issue came to a head a couple of years ago

10   when we were seeing cases where roof repairs had been

11   made and then the repairs failed and we got sent back

12   out to ask "Why did these repairs fail," because there

13   would be a subsequent claim.  We started studying why

14   these repairs failed, and we started understanding that

15   the full circumstances of what's going on was not really

16   being established.  We would have people default to a,

17   "You can remove and replace shingles based on standard

18   methodology," without comprehending the consequences of

19   what the condition of the roof was.  So we were looking

20   at it, and we would have discussions and we would say,

21   as other engineers, "Hey, we don't think this can be

22   done."  And we'd go, "Okay.  We can remove and replace a

23   shingle."  With that, we'd go in and we'd do that, and

24   then there would be discussion about what happened.  And

25   we were looking at a way to present the information in a
```

56

1   comprehensive way that people can comprehend and

2   understand.

3   Q.    Based on your opinion.

4   A.    The damage that we have identified in that paper

5   is basically standard for what's there.  If you're going

6   to pull past a fastener, that's going to be a shingle

7   that would be condemned if it was on wind.  If you have

8   a shingle that's torn, based on wind, it's going to be

9   condemned.  If you have to rip out and take chunks out

10  of the seal strip on it from wind, it's going to be a

11  failed and condemned shingle.  There's not anything

12  novel here.  This is all pretty much the same thing;

13  it's just basically saying that now you're having the

14  damage occur because you're repairing a shingle rather

15  than having it happen and originate from a wind.  And

16  it's very important to understand that because, if

17  you're going to just say, "Hey, I'm going to replace a

18  shingle," without comprehending the proper context,

19  you're setting a building up to fail.  And as an

20  engineer, my -- part of my duty is to safeguard

21  property.  And if that's a repair that cannot be

22  recommended, then we can't be doing it.  And this is

23  where we come in we go, "Look.  These conditions are

24  present."  We have a way to present these conditions.

25  We, as engineers, can look at this and go, "We have an

57

1    issue here."

2    Q.    And, sir, we'll get into your methodologies.  My

3    questions are not even getting into that point yet.  I'm

4    asking about when you started this, why you were doing

5    it, if you kept any sort of statistics on what was being

6    done, when you started it, things of that nature.  And I

7    think my last question to you was something along the

8    lines of, "Did you ever use this before at your other

9    companies you didn't own, and why," and then you gave

10   your answer as you did.  Did you do any research to back

11   up what your claims are on your methodology?

12   A.    I don't know that there's any specific claim in

13   the methodology.

14   Q.    How is it that you determine that if four out of

15   these eight shingles are damaged, then the house is

16   unrepairable?

17   A.    I need to make very clear what you just said.  You

18   twisted and changed what the report actually says.  It

19   says repairs are not recommended.  The report says

20   repairs are not recommended.  It's not saying that

21   something can't be done; it's saying that it's not

22   recommended to do it.

23   Q.    Why would you not recommend it if it could be

24   done?

25   A.    I can go out right now, break a window on that

58

1    car, go buy an inferior piece of glass and put it in

2    there and be done and say, "Oh, it's repaired."  But

3    that doesn't mean that the seals didn't break.  That

4    doesn't mean that the glass is durable.  That doesn't

5    mean that, what you're saying, a repair can be done;

6    it's that a repair is going to be durable and lasting.

7    Q.    And you, in this case, were recommending that the

8    repairs were not to be done; right?

9    A.    I said I don't recommend repairing this roof.

10   Q.    And my question is:  When you determine that four

11   out of eight shingles are damaged, what is this -- what

12   is the background on what's -- How is four magic?

13   A.    When you --

14          MR. HOUSEL:  Object to the form of the

15   question.

16   A.    When you start to look at it in this particular

17   situation, propagation of damage is the issue.  When you

18   go to remove and replace one shingle and you start

19   causing damage to addition shingles, that damage is

20   going to continue to propagate.  When you take the wind

21   damage at the top corner of this roof, you're going to

22   have to get into solid shingles.  You're going to have a

23   propagation of damage.  That damage is going to continue

24   to propagate.  You also look at it and you go -- you've

25   got a felt that's underneath this roof.  If you look at

59

1    -- I believe it's Detail 6 of the NRCA Asphalt

2    Composition Manual -- I can't remember the exact name of

3    the journal -- or the publication -- you've got felts

4    that go up and over the top, so you're going to be

5    getting into adjoining shingles, you're going to be

6    getting into adjoining slopes, you're going to be

7    getting into a damage propagation issue.  In this

8    particular roof, damage propagation is the issue.  I

9    don't recommend, when you're in that situation, that you

10   try to continue to do that.  If you have one shingle

11   damaged and now you're damaging four more, as you

12   continue to do that, it's going to get larger and larger

13   and larger.

14   Q.    (By Mr. Brown)  Since you've been doing this

15   methodology for the past year and a half -- Is that the

16   time frame?

17   A.    Give or take.

18   Q.    --- have you kept any studies, kept track of

19   anything about your methodology, how reliable it is, any

20   research done on it, anything to back up the claims?

21   A.    I -- You keep referring to a claim.  We are simply

22   presenting information that is there.

23   Q.    To back up your report.

24   A.    We have provided you with this information.  We've

25   said these are the conditions that are present.  You

60

```
1    keep trying to twist this into something that it's not.
2    Q.    And my intention is not to twist anything.  My
3    intention is to understand what you're saying and
4    whether or not you --
5    A.    You --
6    Q.    Hold on.  -- whether or you not you compiled any
7    data that shows that your methodology is somewhat
8    reliable.
9    A.    My methodology effectively is the same thing
10   that's been industry standard for a very long time.
11   These are the same types of damage that would be
12   identified for wind.  These are the same types of damage
13   that you would identify in doing an engineering
14   assessment that's been standard in the industry for
15   decades.  All we are doing is presenting that
16   information in a format that is concise and saying,
17   "These are the factors that, when we did this, this is
18   what we found."
19   Q.    Does anyone else you know of have this scoring
20   system that if four out of the eight shingles are
21   damaged that recommendation for repair is not --
22   A.    Would you ask, as an engineer, and turn it around
23   -- and I think it's important to do -- if by damaging
24   one shingle, by doing a Repairability Assessment, it
25   results -- or excuse me -- by removing one shingle that
```

61

1  is damaged, as part of a Repairability Assessment, it

2  causes four additional shingles damage, would you

3  continue to say that that is a repair that's feasible?

4  You can't say that there's any way to do that.

5  Q.   Sir, my question was, are you aware of anyone else

6  that uses this scoring system that you've put in place?

7  A.   The paper's in use nationally.  I don't know who

8  has or hasn't used it.  It's been published for six

9  months now.

10  Q.   Your number of four being the magic number or the

11  number where you wouldn't recommend repairs, that's

12  subjective, is it not?

13         MR. HOUSEL:  Object to the form of the

14  question.

15         THE WITNESS:  What do you mean by subjective?

16  Q.   (By Mr. Brown)  You made it up.

17         MR. HOUSEL:  Object to the form of the

18  question.

19  A.   Based on our experience from what we see of total

20  score points there, we're looking at various factors and

21  saying we see these matters, these factors, these points

22  coming into play.  There is direct damage and there are

23  other factors that come into play.  When you start

24  looking at things like it's material that's obsolete --

25  If it's material that's obsolete, you can't replace it.

62

1    There's no material to be able to do it.  All we're

2    doing is providing a way to present the information in a

3    comprehensive understandable format.  It's all derived

4    from industry standard.

5    Q.    You keep saying "we" and "our" and all those type

6    of things.  Who in the world came up with the number

7    four?  Was that you or was that somebody else?

8              MR. HOUSEL:  Object to the form of the

9    question.

10   A.    It was part of the process to develop the paper.

11   I am the primary author on it.  I was part of the

12   process to be able to do that.  We looked at where we

13   thought we could make repairs successfully occur and

14   whether or not they could be done.  If you look at the

15   parameters that are there, when you're looking at the

16   number of shingles, part of the scoring is based on

17   damage propagation.  Part of it's also based on other

18   factors, well established.  Can you get the materials?

19   Do we have other damage that's gone on?  Do we have a

20   history of repairs that have failed?  All of the things

21   that go into that scoring methodology are all

22   standardized and are all common knowledge in this

23   industry.  I understand you want to infatuate on this,

24   what number is there, but it's based on experience,

25   knowledge, and training of having been involved in this.

63

1    Now, as far as what statistical number you want to go

2    to, I can't answer your question because I don't know

3    what you're asking.  You're trying to get to some

4    conclusion about and apply some accuracy or some

5    repeatability of a test.  As I've repeatedly told you

6    and as the paper straight out says, it's not a

7    laboratory test.  The metric that you're trying to apply

8    is not even relevant.  We're saying this is an

9    assessment methodology.  This is a way of garnering

10   information.

11   Q.    (By Mr. Brown)  Again, I appreciate you going on

12   and answering questions I didn't ask.  My question --

13   And I don't have an infatuation of a number.  I'm going

14   off what your report says.  And four is the number when

15   you don't recommend repairs; true?

16   A.    Yes.

17   Q.    Okay.

18   A.    Based on the parameters that go into it.

19   Q.    My question is:  How do we know that that number

20   four is a reliable number?  Is there any science or any

21   data that you know of that backs up that once you get to

22   four out of these eight, then repairs shouldn't be made?

23   Is there any?

24   A.    You're also, again, not paying attention.  And I

25   understand the need for that.  What we are saying to you

139

1    anything -- and just answer the question I ask.  You've

2    told me that Drew was there to get on the roof and take

3    pictures; true?

4    A.    Yes.

5    Q.    What else was he there to do?

6    A.    Fly a drone.

7    Q.    Okay.  And then I asked if he'd prepared a damage

8    estimate.  You said no; correct?

9    A.    Right.

10   Q.    Among other things, he wasn't asked to do that --

11   A.    Right.

12   Q.    -- that I didn't say.  But is he qualified to do

13   that?  Has he done that before?

14   A.    I would defer to him.  I don't have him doing

15   that.  I don't know what he's capable of doing or not

16   doing in that regard.

17   Q.    Did anyone make a determination about whether or

18   not the roof had wind damage?

19   A.    We simply made an observation that there was an

20   area that had been tarped to indicate that there was

21   damage.

22   Q.    And you made a decision from the ground looking up

23   at a tarp that there was wind damage to that roof; is

24   that true?

25              MR. HOUSEL:  Object to the form of the

140

1   question.

2   A.    All we made the determination of was that there

3   was damage present.  We never did the forensic

4   evaluation to qualify our quantify what was there.

5   Q.    (By Mr. Brown)  The only thing that you determined

6   at that time is there was a tarp on his roof; true?

7   A.    That there is damage to the roof, yes.

8   Q.    What damage did you see or observe?

9   A.    What I saw was that there was a tarp on the roof

10  and, at a minimum, there are nails securing that tarp to

11  the shingles.

12  Q.    Any other damage you observed?

13  A.    All I observed was the tarp and the nailing, and

14  there was also a section of the shingles on the roof

15  that was torn.

16  Q.    How did you know that?  From pictures?

17  A.    I could see it from the ground.

18  Q.    And that tarp was on the second story of the south

19  slope; correct?

20  A.    Yes.

21  Q.    Is Drew Jamison the one that took pictures that

22  day?

23  A.    He is the one who took the pictures from the roof.

24  I took pictures on the ground, I believe.

25  Q.    I don't recall.  Is Drew still with you?

142

1    A.    We are observing the conditions that are present.

2    Simply observing the conditions that are present.

3    Q.    (By Mr. Brown)  Did it have anything to do with

4    what you were there to do?

5    A.    We're simply documenting the site for what's

6    present.

7    Q.    Did any of those things that I just read off to

8    you have any influence on your Repairability Testing

9    Method?

10   A.    Again, it's not a test; it's an assessment.  But

11   no.  It's simply a matter of the factors that were

12   there.  Simply a matter of conditions that are present.

13   Q.    Then based on your observations on this first

14   visit, did you then determine that a Repairability

15   Assessment was warranted?

16   A.    I did.

17   Q.    And that was based off what, specifically?

18   A.    There actually is damage present to the roof.

19   There actually is something there to have a debate and

20   question about.

21   Q.    And that was based on your observation of the

22   tarp; correct?

23   A.    Yes.

24   Q.    Anything else?

25   A.    Not particularly.

148

```
1    could not have reviewed what I don't have.
2    Q.    If those photographs existed, would that be
3    important to you to gather those before you go out?
4    A.    I would love to have the opportunity to review
5    those documents if they're available.  I can only review
6    what's made available to us.
7    Q.    Were you told those documents weren't available,
8    sir?
9    A.    They were not provided to us.  I have no
10   information of whether they existed or not.
11   Q.    Either way, State Farm's photographs and estimates
12   are not part of your file; true?
13   A.    We do not have them, no.
14   Q.    Does that seem objective to you to only have one
15   side?
16   A.    We request the information that's made available
17   to us.  We can only go with the information that is
18   available to us.  If some other side or if somebody else
19   wants to offer additional information, happy to look at
20   it, review it, and see if there's any merit to it.  But
21   we can only go with the information that is relevant at
22   the time.  Now, my understanding is that they had --
23   that damage been identified to the roof, particularly
24   dealing with the south slope.  At that point, the
25   question is really, "What can be done to repair it."
```

149

```
 1    Q.    It is your testimony that you asked for this

 2    information from Mr. Housel's office and --

 3    A.    I asked for any relevant information that we could

 4    have.

 5    Q.    You've gone out and prepared or done estimates or

 6    observations on behalf of State Farm before; true?

 7    A.    I've done forensic investigations before.

 8    Q.    Familiar with its processes?

 9    A.    The processes of many years ago.  I think the last

10    time it was several years ago that I worked for State

11    Farm.

12    Q.    I show the second inspection when the actual

13    assessment occurred was April 27th, 2021.  Do you know

14    why that day was chosen in particular?

15    A.    It was a schedule availability.

16    Q.    It's about two weeks later, give or take?

17    A.    Give or take.

18    Q.    Do you recall how long you were present on that

19    day at Mr. Moore's residence?

20    A.    I don't remember exactly.

21    Q.    Do these things -- these assessments --

22    Repairability Assessments, how long do they generally

23    take?

24    A.    Anywhere from 45 minutes to two hours.

25    Q.    Who was there with you on this second inspection?
```

150

```
 1   A.    Drew Jamison was present and then a roofing

 2   contractor.  I don't remember his name, but it's in the

 3   invoices.

 4   Q.    Jose Cruz?

 5   A.    That sounds right.

 6   Q.    With Valle Roofing?

 7   A.    Yeah.  Yes.

 8   Q.    I think your report also says there was another

 9   roofer there that you didn't know the name.

10   A.    He had a helper.

11   Q.    So it was you, Mr. Cruz, Mr. Jamison, and another

12   unidentified roofer with Valle?

13   A.    Yes.

14   Q.    Do you know Mr. Cruz?

15   A.    No.  I believe that was the first time I'd ever

16   met him.

17   Q.    How did it come about Mr. Cruz was there the same

18   day you were?

19   A.    We had retained him.

20   Q.    You as in Valor?

21   A.    Yes.

22   Q.    Why did you choose Mr. Cruz or how did you choose

23   Mr. Cruz?

24   A.    Drew knew him.

25   Q.    What did he know about him?
```

151

```
1    A.    He had worked with him in the past.

2    Q.    In what capacity?

3    A.    I don't know the ins and outs.

4    Q.    Had Mr. Cruz ever been involved in a repair

5    assessment before?

6    A.    I don't know.

7    Q.    According to your paper, it's supposed to be the

8    roofing contractor who does the removal and replacement

9    of shingles; correct?

10   A.    Yes.

11   Q.    Did Mr. Cruz do that?

12   A.    I believe he and his helper did.  I don't remember

13   who exactly did which part of it.

14   Q.    Is Mr. Cruz licensed?

15   A.    As far as I know, yes.

16   Q.    Did you check to see if he's licensed?

17   A.    I believe I asked Drew to check on it and he came

18   back and said he was, but I personally did not.

19   Q.    You didn't personally vet that out yourself?

20         MR. HOUSEL:  Object to the form.

21   A.    I personally did not, no.

22   Q.    (By Mr. Brown)  Do you know if Mr. Cruz was

23   insured?

24   A.    That's part of what I asked Drew to verify.  I

25   don't have the specifics on that.
```

152

```
1   Q.    Same kind of thing; you don't know?

2   A.    I asked if -- You know, Drew is the contractor who

3   leads -- or is a roofing contractor.  He leads Valiant.

4   I went to him and I said, "This is what we need to have

5   happen.  Make this happen."

6   Q.    Well, your publication says it's necessary that

7   the roofing contractor is licensed and insured to

8   perform the assessment; correct?

9   A.    Yes.

10  Q.    Well, wouldn't you want to make for sure that that

11  is the case?

12  A.    When I asked, "Has this been done," with a party

13  that I know and trust and he says yes, am I going to go

14  back in and fact check and verify every single thing?

15  Q.    I'm asking you.  I don't know.

16  A.    Just basically you're saying this, and I'm going,

17  "I asked the question and I was told that he was."

18  Q.    Do you know what Mr. Cruz or his assistant's

19  experience was in roofing?

20  A.    He'd been a residential roofer for an extended

21  period of time.  I don't know the ins and outs of it.

22  Q.    What about their training, reputation?

23  A.    I don't have specific information.

24  Q.    Anything about their qualifications, skill

25  level --
```

153

```
 1   A.     I would defer to Drew Jamison on that.
 2   Q.     Are you the owner of Valor or is Drew Jamison the
 3   owner?
 4   A.     I own Valor.
 5   Q.     Is this report written by you?
 6   A.     It's written by me.
 7   Q.     You're signing your name to it.
 8   A.     Yes.
 9   Q.     And it's being done through Valor; correct?
10   A.     Yes.
11   Q.     Are you responsible for the contents of that
12   report?
13   A.     Yes.
14   Q.     Do you know whether or not Mr. Cruz has read your
15   publication about the Repair Assessment Method?
16   A.     I led him through it when we were on site.
17   Q.     Do you know if he's read your publication?
18   A.     I don't know.
19   Q.     When you led him through it on your site, what do
20   you mean?
21   A.     We walked through, "Here's how it's laid out,
22   here's what needs to happen, here's what we need to do.
23   We're going to use these tools, we're going to remove
24   and replace this shingle, and we're going to document
25   it.  Anytime we have something happen, we're going to
```

154

```
1    stop, we're going to take pictures of it, we're going to
2    cross out the shingle should anything happen, and we're
3    going to put it back."
4    Q.    So you basically kind of walked him through the
5    process verbally on the site; --
6    A.    Yes.
7    Q.    -- true?
8    A.    Yes.  That's what I do with any contractor, even
9    if they've done it many times before.
10   Q.    Had he ever done a repair assessment?
11   A.    I have no knowledge of what he has or hasn't done.
12   Q.    Why wouldn't you use somebody that's done it with
13   you before that kind of knows how to do it?  Is there a
14   reason you don't use the same people?
15   A.    I don't have a -- I don't want to say "chosen
16   vendor," because that's the wrong way to phrase it.  I
17   don't have a established roofer here for that any
18   longer.  The one I was using was Drew and Drew had owned
19   a roofing company.  Drew was bought out by his partners,
20   and that company is no longer providing that.
21   Q.    Do you know if Drew was ever a roofer?
22   A.    Yes.
23   Q.    I think you said earlier you don't recall if it
24   was Mr. Cruz or his associate that was actually doing
25   the assessment, or they both helped?
```

155

```
1   A.    They were both involved in it.

2   Q.    What tools did they use to do the assessment?

3   A.    I believe they used a flat crow bar was the

4   primary tool and they used a hammer.

5   Q.    Is there a reason that your report doesn't

6   indicate what tools they used?

7   A.    I don't know that it's ever been something we were

8   specifically asked.

9   Q.    Well, your paper talks about carefully removing

10  shingles, and you actually list tools to use that -- to

11  try to alleviate damaging the shingles; true?

12  A.    Yes.

13  Q.    And my question was, don't you think it's

14  important that if they use a tool, that you document

15  that, how they did it or what tool they used?

16  A.    I believe it's in the photos, but I -- No one has

17  ever specifically asked.  I probably will add that in

18  the future just to close the issue.  I know that,

19  basically, Berryman made a comment about not wanting to

20  use a, quote, flat crow bar because he had a preference

21  for a name-brand tool rather than a generic tool.  But

22  basically you're taking a flat piece of steel that's

23  been stamped and now it's made into a curve, what

24  amounts to being a crow bar, and that's what I believe

25  that they were using on that site.
```

162

```
1    Q.    There's two gentlemen on the roof.  You can see

2    one of their face and one not.  Who is the guy in the

3    gray sweatshirt?

4    A.    I don't remember which one was which.

5    Q.    Are they from Valle?

6    A.    They're from Valle.

7    Q.    Okay.  Both these guys are from Valle?

8    A.    Yes.

9    Q.    Did Drew Jamison get on the roof?

10   A.    I laid this out.  I believe at this time Drew was

11   actually flying the drone.

12   Q.    Okay.

13   A.    Because this is from the drone.

14   Q.    Gotcha.  I may just make all these pictures, as we

15   go through them, exhibits.  The assessment that you did,

16   did you do it from the ladder?

17   A.    I was on the ladder while it was being done; that

18   way I was not in their way.

19   Q.    So from this picture it appears that the roofing

20   contractors were on the roof itself, the second story

21   roof where the assessment was being done; you were on a

22   ladder up there almost on the roof talking their way

23   through it, essentially?

24   A.    Yes.

25   Q.    Did you remove any shingles yourself?
```

163

1    A.    No.

2    Q.    Did you notice whether or not Mr. Cruz or his

3    assistant, if they were careful in their approach --

4    A.    Yes.

5    Q.    -- of removing the shingles?  Did you have any

6    criticism of how they did it?

7    A.    I did not.  And if I felt that there was any

8    reason to stop because they were not doing what they

9    were supposed to do or they were aggressive, I would.

10    Q.    Do you think it was important for you to get on

11    the roof to do the assessment, like walk around on it,

12    touch it, feel it?

13    A.    I'm standing right there laying out these chalk

14    lanes.

15    Q.    On a ladder.

16    A.    I've got my hand on this roof surface right now

17    being able to assess what's going on.

18    Q.    Besides the obvious area of damage -- which

19    there's a tarp there; we see that -- did you make any

20    other determinations whether or not this roof had wind

21    damage?

22    A.    I did not.

23    Q.    Did you ever get on the north side of the roof?

24    A.    I did not.

25    Q.    The west side of the roof?

168

```
1   A.    We're referring to the primary roof.

2   Q.    So is this -- The part where you were standing on

3   when you were doing your assessment, is that roof okay?

4   A.    I have no opinion on -- expressed on that roof.

5   Q.    Sir, your Repairability Assessment explicitly

6   states that, quote, "One note of caution, however.  The

7   Repairability Assessment is intended to supplement a

8   damage assessment of these surfaces and is not to be

9   used in place of a conventional damage estimate."

10  Correct?

11  A.    Yes.  And then it provides a little bit of

12  clarification of what that is.  What we --

13  Q.    I don't have a question yet.  I just wanted to

14  know if I read that off right.  I'll let you answer if I

15  have a question.  But you went as far as to caution the

16  reader to that issue; true?

17  A.    Yes.

18  Q.    And you didn't perform a damage estimate -- a

19  conventional damage estimate.  We've already said that;

20  right?

21  A.    We did not do a forensic assessment, no.  But

22  there's a difference between your two terms that you're

23  trying to cross.  What we are referring to is we want to

24  be able to say, "Hey, there is damage to this roof,"

25  before we even look at it.  If there's no damage to it,
```

169

```
1   we're not touching it.  We should never be doing an
2   assessment if there's not already damage established to
3   the roof.
4   Q.    That's step one; right?
5   A.    Yeah.  But there's nothing to say in that language
6   that you have to do a full forensic investigation of it.
7   That was not the intent.
8   Q.    I didn't read anything about a full forensic
9   anything.
10  A.    So when we're looking at it and we're
11  establishing, yes, there is damage present, it's an
12  issue.  We already have met that metric and met that
13  standard to say, "Hey, there's already damage present."
14  That was intended to be a situation where someone says,
15  "I want to replace my roof, no one will replace my roof,
16  and I want to just do it on repairability without
17  establishing that, yes, there's metric of damage."  If
18  there's nothing there, then we don't do a Repairability
19  Assessment.  The first thing to establish is there's
20  damage.  There is damage.
21  Q.    Do you think --
22  A.    So we met that metric.
23  Q.    I'm sorry.  Go ahead.
24  A.    We met the metric that was intended.
25  Q.    Was it your opinion that the two sides were
```

170

```
1    disagreeing that there was damage?

2    A.    My understanding was of "how do you fix it," was

3    the dispute.

4    Q.    Okay.  And then in your paper you say that this is

5    not to be used in place of a conventional damage

6    estimate.  What is a conventional damage estimate?

7    A.    "Assessment," I believe, is the actual word.

8    We're basically looking at it and going, "Can you

9    establish that damage is present."  If you can establish

10   that damage is present, that's what it was intending.

11   Nothing was saying that this would be a full-scale

12   forensic vision done first.

13   Q.    Sir, I'm not going to mark this as an exhibit.

14   This is your paper, page 185.  This is the part -- I

15   think the word you used is "evaluation;" correct?

16   A.    Okay.  Yes.

17   Q.    Okay.  What is a conventional damage evaluation?

18   A.    A conventional damage evaluation is looking at the

19   roof, "Do we have damage present; do we have anything

20   that's actually damaged."  If there's no damage to the

21   roof, I don't recommend someone does a Repairability

22   Assessment.

23   Q.    Did you perform a conventional damage evaluation?

24   A.    To the extent that we were able to establish

25   damage, yes.
```

172

```
1    Q.    Do you believe you followed your protocol as it

2    relates to --

3    A.    In general, yes.

4    Q.    What do you mean "in general"?  Is there something

5    you didn't follow?

6    A.    Nothing of -- I can't think of anything we didn't.

7    But usually the standard is general conformance.

8    Q.    Well, did you note in your report any damaged

9    shingles, any wind-damaged shingles?

10   A.    I believe we noted that we observed -- What we

11   observed was in the observations.

12   Q.    The tarp.  We talked about that.

13   A.    Yes.

14   Q.    Other than seeing a tarp on the roof, did you

15   observe any damage or note any wind-damaged shingles?

16   A.    In this picture you've got right here, you have

17   shingles that are ripped off here, and you've got

18   shingles that are ripped off here.

19   Q.    Okay.

20   A.    So there is definitely evidence of damage that's

21   already been done.  I understand that you want to ask,

22   "Did we do a full damage assessment."  We've covered

23   this for over an hour, it seems like.

24   Q.    You keep saying the same thing over --

25   A.    I understand.  But we've answered your question.
```

173

```
 1   And I understand you want to belabor the question.

 2   We've answered it.  We established that damage was

 3   present to the roof.  Once we establish that damage was

 4   present to the roof, the metric allows us to do a

 5   Repairability Assessment, which is what is in the paper,

 6   which is what was done.  Now, to go any further than

 7   that, that's your choice.

 8   Q.    I don't want to belabor the point.  I haven't

 9   asked you -- I've asked you one time if you did a damage

10   assessment.  You said you didn't.  There was no question

11   that there was wind damage to the roof.  That's not an

12   issue.  So when you came out and you said you noticed

13   it, you can see the tarp.  You've talked about that

14   earlier in your deposition.

15   A.    Correct.

16   Q.    I'm saying, does your report indicate what wind

17   damage you observed other than this tarp?

18   A.    I believe it's in the observation section, which

19   is what I already said.  That information was there.  We

20   observed this condition to be present.  Now, as far as

21   did we go further into a full-scale forensic

22   investigation?  That's not what we were asked to do.

23   Q.    Is it your opinion, sir, that a conventional

24   damage evaluation is what you did when you went to Mr.

25   Moore's house and looked at his roof on the south side
```

174

1    only?

2    A.    To the extent that we were attempting to establish

3    was damage present to the roof, yes.  It's a different

4    standard than when we are going to be doing a full-scale

5    forensic investigation.  We're just conventionally

6    looking at it, "Is there anything here?"

7    Q.    And you didn't rely on State Farm's damage

8    estimates or Mr. Brown's damage estimate; correct?

9    A.    No.

10          MR. HOUSEL:  Object to the form of the

11    question.

12    Q.    (By Mr. Brown)  Your publication also says, "The

13    Assessment."  Quote, "When possible, the Repairability

14    Assessment should be performed on shingles where wind

15    and/or hail damage has already been identified."  Do you

16    recall that?

17    A.    Yes.  And there's another sentence right after

18    that that's relevant too.

19    Q.    Okay.  What is the other sentence that's relevant?

20    A.    I don't have the particular in front of me, but --

21    Q.    Do you want to look at it?  I'll give you a clean

22    copy.

23          MR. HOUSEL:  186, I think, is -- 186

24    underneath the numbers.

25    A.    It says, "In cases where it's not possible to

175

1   utilize storm-damaged shingles, testing should be

2   performed on the slope where the damage has been

3   identified."

4   Q.   (By Mr. Brown)  And in this case, you were aware

5   of where wind damage was already identified --

6   A.   Correct.

7   Q.   -- by virtue of the tarp; correct?

8   A.   Yes.

9   Q.   Your report has -- and, obviously, we have

10  pictures of it.  Why didn't you do your assessment

11  there?

12  A.   In order to do that, we'd have to remove the tarp.

13  We'd have to find a way to find solid shingles away from

14  the area where the damage is at.  By the time we did

15  that, we were going to be outside of where it's tarped

16  pretty much regardless anyway.  So it's like, "Okay.

17  Where can we do this that we can get into solid

18  material?"  This area was just as representative as the

19  other part of the slope.  It should be noted that it's

20  just slightly downhill from where the tarp was placed.

21  Q.   Yeah.  It's not all that far away.  That's why I

22  was questioning why you just do it where the tarp was

23  at.

24  A.   Because the shingles in that area, with their

25  damage by wind, you're going to have issues.  And the

176

```
 1   problem is, you've got to get outside of where the
 2   damage is because what you're trying to establish is
 3   what, you know, are the tie-in conditions.  So you're
 4   not going to do it right here; you're going to be, at a
 5   minimum, around it.
 6   Q.    I guess I'm confused then when it says, "It should
 7   be performed on shingles where wind or hail damage has
 8   already been identified."  Is there areas around that
 9   where wind damage has been identified?
10   A.    What we're referring to in this case is, if we had
11   had a tab pull off and we had one tab that we could get
12   into and this material around it was still solid, we
13   would use that location, if it was something we could
14   get do.  When we have a situation where we've got tarps
15   and things like that, we're going to get outside the
16   tarp.  We're not going to want to do something that's
17   inside here.  We're going to want to get out here where
18   we actually have solid material.  You're going to be
19   replacing the shingles out here.  You're going to be
20   replacing the shingles here.  We're going to be wanting
21   to get outside of this, outside the influence of where
22   that tarp is at.
23   Q.    So is it your opinion that that wasn't accessible
24   for the purposes of your assessment?
25   A.    I don't believe that this would have been the
```

177

1   advisable place to go.  We wanted to get to a sound

2   place away from the shingles.

3   Q.   Do you believe that's following your protocol?

4   A.   I do.

5   Q.   Your publication also recommends identifying

6   preexisting damage to the shingles in the assessment

7   area.

8   A.   Yes.

9   Q.   Did you record anything about preexisting damage

10  to the shingles in your report?

11  A.   I don't think there was anything remarkable.  If

12  there was anything in there, it would have been listed

13  in the field notes.

14  Q.   Do you think it would have been important to note

15  there's no damage?

16  A.   If it's there, it's going to be in the field

17  notes.

18  Q.   Do you know whether or not you had anything about

19  it in the --

20  A.   I don't remember seeing anything in it.

21  Q.   Just so the record's clear, we're looking at your

22  -- the actual report.

23  A.   Correct.  We (unintelligible) that on several of

24  them the granule surface was cracked.

25          THE REPORTER:  I didn't understand that.

178

```
1              MR. HOUSEL:  Slow down.
2              THE REPORTER:  Say that again.
3   A.    We noted on several of them that there was
4   generalized granule loss and that the granule surface
5   was cracked.
6   Q.    (By Mr. Brown)  Did you take photos of that; do
7   you know?
8   A.    They would have been in the report.  I believe we
9   did.  Or it would have been in the file.
10  Q.    Your publication references protocol for the types
11  of tools to use in the assessment; correct?
12  A.    Yes.
13  Q.    Pry bar, crow bar, five-in-one painter's tool;
14  those are all mentioned?
15  A.    Yes.
16  Q.    Have you ever heard of a roof snake?
17  A.    I have.
18  Q.    Isn't that a tool designed specifically to remove
19  and replace shingles with minimal damage?
20  A.    They like to market that way.  Many roofers I have
21  worked with don't care for that tool.
22  Q.    Have you ever used it?
23  A.    Personally, no.
24  Q.    You ever seen it used?
25  A.    I've seen it used in videos, but I know of roofers
```

179

1    that don't particularly care for that tool.  And the one

2    point that I want to clarify, I know that Mr. Berryman

3    made a comment about his preference for a tool called a

4    Wonder Bar.  If you go to Amazon, you go to Home Depot,

5    and you put in a flat crow bar, what comes up is the

6    basic tool that he's calling a Wonder Bar.  It's

7    referring to the same thing.  It's effectively the

8    difference between calling something a Kleenix versus a

9    facial tissue.

10   Q.    Well, I'll let Mr. Berryman testify about his

11   opinions, but I appreciate that.  You said you know a

12   bunch of roofers who don't like the roof snake.  What is

13   it that they don't like about it?  What have you been

14   told that they don't like about it?

15   A.    I don't know the specifics, but I know that they

16   have found that it causes more damage because of the way

17   it's shaped.  If I remember --

18   Q.    Have you -- You've seen videos of this in

19   operation?

20   A.    If it's the tool I'm thinking that it is, there

21   are issues with it because if it's -- The issues that

22   come to mind are that there's marring that occurs when

23   you try to nail from above.  When you try to nail the

24   shingle top in -- the nail in from above, you wind up

25   marring the shingle, is one of the issues that they have

181

```
 1   Q.     So what about your -- Do you have an opinion one
 2   way or the other about it, if it's better or --
 3   A.     It's not a product I would recommend using.
 4   Q.     Could you use a putty knife to break seals versus
 5   a crow bar?
 6   A.     I don't recommend using a putty knife.  It has to
 7   do with the stress.  Because your putty knife is going
 8   to create a very thin cutting motion more likely to cut
 9   the edge of the shingle.  I would recommend using at
10   least a five-in-one because it's a thicker blade and
11   less likely to cut into the shingle versus a putty
12   knife.
13   Q.     So you don't think the putty knife or a roof snake
14   are better tools than the ones you've written about?
15   A.     I don't believe so.  I understand that some people
16   like them, but my experience is that there are issues
17   with them.
18   Q.     But your report -- we don't know what was used as
19   far as your report because it wasn't documented; true?
20   A.     I'd have to go back and look at the photos.  I
21   don't recall off the top of my head.  My recollection
22   was it was a flat crow bar, basically like a Wonder Bar,
23   but I'd have to look at the photos to verify that.
24   Q.     Okay.  Going back to your publication, this
25   brittleness test, what is a brittleness test, for the
```

215

```
 1   warranty a repair or they're going to offer some kind of
 2   minimal repair and they're going to walk away.  And then
 3   the owner gets stuck with a repair that didn't work and
 4   it fails, and now they're back in the same situation
 5   where they've got damage again.  As an engineer, I can't
 6   advocate for doing a repair that I know is not going to
 7   succeed.
 8   Q.    Do you know of any situations where you've done an
 9   assessment that scored a four or more that was
10   subsequently repaired?
11   A.    I do not.
12   Q.    Other than you saying what you've seen and
13   speaking with roofers and engineers, is there any
14   science that is the basis of your score card?
15   A.    It's based on our experience and knowledge having
16   been involved in this.
17   Q.    Is there any studies based on your score card?
18   A.    This is based on our knowledge and experience of
19   having been in this industry for an extended period of
20   time.  When we start to see this concert of issues, we
21   are not going to be able to complete a repair.
22   Q.    Have these score cards or the scores ever been
23   tested, to your knowledge?
24   A.    Tested in what way?
25   Q.    For their accuracy.
```

216

```
1    A.    This is simply a reflection of what has occurred
2    on a site.  It's a presentation; it's not a laboratory
3    test.
4    Q.    Well, my question is, is there any study, science,
5    any review of it or testing of it that shows that this
6    is the right conclusion --
7              MR. HOUSEL:  Object to the form of the
8    question.
9    Q.    (By Mr. Brown) -- that you know of?
10   A.    We are -- We presented the information based on
11   our knowledge and our experience, our training, our
12   observations that have been done.  If I have this
13   concert of factors coming into play, you're not going to
14   be able to succeed in completing a roof assessment.
15   These are all things that are based on long established
16   practice in the industry.  There's nothing in here
17   that's not based on what we've done.  You want to talk
18   about the damage?  They're all based on standardized
19   damage that otherwise exists on shingles.  Many of the
20   types of damage are based on what you would condemn a
21   shingle for on wind.  All of these things are already
22   established.  All we are doing is presenting a way to
23   communicate, this is what we're seeing in totality; here
24   are the factors we're seeing that you need to be
25   considered when you're making a recommendation.
```

220

1    to be able to identify damage.  I also know of engineers

2    that are wonderful, great design engineers that I would

3    not trust to do damage assessments.

4    Q.    (By Mr. Brown)  Do you believe the homeowner can

5    see damage to a shingle, sir?  Does it take some

6    specialized knowledge or training to observe damage?

7    A.    Depending on how obvious the damage is.  There is

8    some damage that an average homeowner would not

9    identify.

10    Q.    If you don't follow your assessment method as

11    you've written about that's been published in the

12    National Academy of Forensic Engineers, can it be

13    reliable?

14           MR. HOUSEL:  Object to the form of the

15    question.

16    A.    I'm not even sure how to answer that question,

17    so...

18    Q.    (By Mr. Brown)  Sure.  You've written this paper,

19    sir; true?

20    A.    Yes.

21    Q.    And if you don't follow all the methods and

22    protocols and steps as outlined in your paper, can your

23    outcome be reliable?

24           MR. HOUSEL:  Object to the form of the

25    question.

221

```
1   A.     Understanding that anyone performing any kind of
2   assessment, evaluation, test, etc. is human, there is a
3   general conformance standard.  If someone were to not
4   necessarily comply with every single facet, we would be
5   looking at, "Are they generally in conformance?  And if
6   there is some departure, what is that departure?"  If
7   it's something that's not significant, then I believe it
8   could still be reliable.  If they did something that was
9   wholesale departure, then perhaps not.
10  Q.    (By Mr. Brown)  Which, again, would make it
11  somewhat subjective; true?
12  A.     No.
13          MR. HOUSEL:  Object to the form of the
14  question.
15  A.     You're asking for the conclusion to be subjective.
16  If the factors are there and the information is
17  presented, it is objective.
18  Q.    (By Mr. Brown)  Is it subjective for you to think
19  whether or not they departed too far?
20          MR. HOUSEL:  Object to the form of the
21  question.
22  A.     Understanding that you're asking about a human
23  perfection.  Human beings are, by their very definition,
24  fallible.  So a human being can do everything they think
25  is right, but someone can say, "I don't like this or
```

222

```
 1    that detail that someone did."  And the question

 2    becomes, is that materially a departure or not.

 3    Q.    (By Mr. Brown)  Well -- And I completely agree

 4    with you we're all human.  I'm talking about as it

 5    relates to your assessment method.  If one doesn't

 6    follow the steps as you've outlined to get to the end

 7    result and make your determination, is that reliable?

 8    And I think your answer was -- Without putting words in

 9    your mouth, I think your answer was, "Depends on what it

10    was.  If it was a minor departure, perhaps it's still

11    reliable.  If it's a major wholesale departure, maybe

12    not."

13    A.    That would be fair.

14    Q.    And my question is, isn't that subjective for you

15    to decide what is a minor departure or what is a

16    wholesale departure?  Would you agree with me that

17    that's --

18            MR. HOUSEL:  Object to the form of the

19    question.

20    A.    If you were to take any laboratory test anywhere

21    that's being done, there is a potential for there to be

22    a minor issue that may or may not undermine it.  That's

23    where you have to look at it and you would go, "Is this

24    a significant departure or not?"  If someone were to

25    find a significant departure, then I would personally
```

223

1   disqualify it and I would say I don't believe that

2   that's been done.  Now, if you're following a general

3   conformance with the standard, then you're good.  If you

4   find that you're going way off, then, you know, you've

5   got to look at what's going on.

6   Q.    Would you agree with me, sir, that the word

7   "significant" itself is subjective?  What's significant

8   to you might not be significant to me.  Would you agree

9   that that's subjective?

10        MR. HOUSEL:  Object to the form of the

11  question.

12  A.    You're going to have to look at what any departure

13  would be and whether or not it has a significant result.

14  And I understand you're asking "what is significant,"

15  but the same thing holds with any laboratory test, any

16  test assessment that's been done.  You can have someone

17  go out and do a perfect evaluation and someone say "I

18  don't like that you did or didn't do this facet."  When

19  that occurs, you have to look at, did it materially

20  cause a problem.  And I've asked you this repeat -- and

21  I've answered you repeatedly on this.  Because it's a

22  matter of understanding what kind of a departure it is.

23  Is it incidental?  Is it gross?  What is it?  And then

24  you have to look at it, you have to understand the

25  consequences of it, and if it is significant, then it

224

1    is.  If it's not, then it's not.  You have to be able to

2    use the engineering knowledge and judgment to be able to

3    determine whether that's true.

4    Q.    Is your method that you've written about, is it a

5    difficult protocol to follow, to do the assessment?  Is

6    that difficult?

7    A.    Not particularly.

8    Q.    If you -- And I think in none of your prior

9    assessments have you recommended repair.  But in this

10   case, if you recommended repair to the south side of the

11   slope, can't you just repair the south side of the

12   slope?

13   A.    No.

14   Q.    Why?

15   A.    If you look at the standard detail from NRCA, the

16   asphalt manual -- I can't remember what the specific

17   title is -- detail 6, it shows that the underlayment has

18   to go up and over the ridge.  So in order to meet

19   manufacturer's specs, to replace the south slope you're

20   going to have to get into the top of the north slope.

21   So you're going to be propagating that damage onto the

22   adjoining slope.  You're going to be propagating the

23   removal of shingles in order to maintain the

24   underlayment.

25   Q.    And your assumption is that, because you'd go over

225

1   the ridge, there would be damage on those other

2   shingles?

3   A.    Well, you've got a potential for the damage to

4   carry over, but you also have a strip of underlayment

5   that has to go up and over the top of that ridge.

6   Q.    Let's say it was the west slope that's not

7   connected to anything else.  Can you just replace that

8   side if you found it was repairable?

9          MR. HOUSEL:  Object to the form of the

10  question.

11         THE WITNESS:  Let me see the report for a

12  second.

13         MR. HOUSEL:  Yours?

14         THE WITNESS:  Yes.  So what I'm going to look

15  at right now is image 5.  What you have --

16  Q.    (By Mr. Brown)  Let's make sure we're clear for

17  the record.  You're looking at your report dated -- I

18  assume it's the second one.

19         THE WITNESS:  May 6th, 20 --

20         MR. BROWN:  No, it's the first one.

21         THE WITNESS:  May 6th, 2021.

22         MR. HOUSEL:  I'm just going to make a record

23  that this exceeds the scope of his opinion.  Go ahead.

24  A.    You're looking at image 5 on page 28 of 61.

25  Q.    (By Mr. Brown)  Yes, sir.

226

1   A.    If you're asking about how would you facilitate a

2   repair, if you decided to come in and replace the south

3   slope, you're necessarily going to be getting into this

4   front slope.  By getting into this front slope, you're

5   going to be getting into a valley issue here and a

6   consistency of how you deal with the underlayment here.

7   You're going to have a problem with how do you do that.

8   So the west slope, while you want to say is isolated,

9   it's really not.  So these are factors that you would

10  have to consider if you were going to say, "Oh, I want

11  to just replace the back slope."

12  Q.    And to be fair, we never got to that point, did

13  we?

14  A.    We got to the point where we said that we don't

15  recommend trying to complete a repair.

16  Q.    Sir, other than the paper that we've gone through

17  extensively that's published in the National Academy of

18  Forensic Engineers and -- Are you on a board or do you

19  carry any designations with this journal?

20  A.    I do not.  I know that the website lists me as

21  having a DFE, but as far as I know, I don't have a DFE

22  and I've been perplexed as to why they show that.

23  Q.    What is a DFE?

24  A.    A diplomat of forensic engineering.

25  Q.    Were you ever on a board or carried any sort of

228

1    A.    This is the first deposition I have had on this

2    matter.

3    Q.    Is this is the first time your theory is being

4    challenged in regards to Daubert?

5    A.    Yes.

6    Q.    Is it your opinion that if you remove one shingle,

7    in your assessment for damage, the whole roof needs to

8    be replaced or not repaired?

9    A.    It would depend on the geometry of the roof.

10    Q.    What do you mean?

11    A.    If you had a complete secondary story that was

12    isolated from a lower story section and the damage was

13    only to the second story, then you could complete a

14    repair to the two slopes.  Let's say it was a hip roof

15    -- or a shed roof.  You could repair an isolated roof

16    section without getting into the totality.  But once you

17    get into the fact that you have to replace a slope, then

18    you have to understand the manufacturer's details, the

19    industry standard details, and what has to be done in

20    order to successfully facilitate that repair.

21    Q.    Well, clarify for me then.  Is your rationale this

22    entire roof needs to be replaced, including the second

23    add-on piece, because the shingles on the other slopes

24    are in the same condition as what you assessed, or

25    because to get there you'd have to travel over ridges

229

1    and valleys and things of that nature?

2    A.    We were retained to deal with a very finite issue.

3    Q.    I understand.

4    A.    And what we have said is we do not recommend

5    repairs be done on this roof.  Recognizing that, to the

6    homeowner, I would -- if they asked me directly, I would

7    say "I don't recommend you try to repair this roof.  I

8    believe you're going to have problems."  When we're

9    talking about it, we're talking about the roof of the

10   primary dwelling.  We've offered no opinion about the

11   lower slope and the second -- that's newer on the back.

12   I would recommend not doing that.  When you get into the

13   standard of understanding the industry and you say,

14   "Okay.  Well, we're only going to take the south slope

15   off," you have to understand how that integrates with

16   everything else on the roof.  When you're dealing with

17   the underlayments, when you're dealing with the

18   manufacturer's quire, when you're dealing with these

19   various standards, you wind up in a situation where

20   you're not going to be able to comply with

21   manufacturer's spec and standard practice in that

22   situation.

23   Q.    Every one of these that you've done thus far have

24   come back with a zero percent repairability outcome;

25   true?

240

1   deposition, then you employed counsel; isn't that

2   correct?

3   A.    No.  We were in the process of employing counsel

4   prior to this because of some of the conduct of certain

5   law firms.

6   Q.    Have you ever been arrested, sir?

7   A.    No.

8   Q.    Have you ever had any disciplinary actions as a

9   professional engineer?

10  A.    No.

11  Q.    Ever had your license suspended or revoked?

12  A.    No.

13          MR. HOUSEL:  You doing okay, Chad?

14          THE WITNESS:  Uh-huh.

15          MR. HOUSEL:  Okay.

16          MR. BROWN:  I think that's all I've got.

17          MR. HOUSEL:  I've got a couple of questions.

18  Are you okay?  Do you want to take a break?

19          THE WITNESS:  Let's take a break first.

20              (Recess taken.)

21          THE VIDEOGRAPHER:  Back on the record.  Go

22  ahead.

23              <u>CROSS-EXAMINATION</u>

24  BY MR. HOUSEL:

25  Q.    Mr. Williams, is it your understanding that you

241

1  were retained to offer any opinion as to causation?

2  A.    I was not.

3  Q.    You didn't go out and figure out what shingles

4  were damaged by wind and which weren't; right?

5  A.    I was not asked to do that.

6  Q.    It's your understanding that a wind event

7  occurred; true?

8  A.    Yes.

9  Q.    And you understand State Farm admits that wind

10 damaged some of the shingles on this roof; right?

11 A.    That is my understanding.

12 Q.    Mr. Moore, on the other hand, claims the wind

13 damaged more shingles than State Farm admits; right?

14        MR. BROWN:   Object to form.

15 A.    I don't know specifically what Mr. Moore claims.

16 Q.    (By Mr. Housel)  Okay.  You read Mr. Berryman's

17 report, did you not?

18 A.    Yes, sir, I did.

19 Q.    He's got criticisms of your method; right?

20 A.    Yes.

21 Q.    Okay.  Let's talk about those.  So, first of all,

22 he says that you did not perform a conventional damage

23 evaluation.  Can you remind me how you defined

24 conventional damage evaluation?

25 A.    What I was looking at in the terms of that report

242

1  was a visual assessment, "Do we have damage present."

2  Q.    It kind of sounds like a technical term.  It looks

3  like you're just looking for damage; is that right?

4  A.    Right.  We want to establish that there's damage

5  on the roof.  If there's not damage on the roof, we're

6  not going to do a Repairability Assessment.

7  Q.    Well, State Farm admits that this roof was

8  damaged, doesn't it?

9          MR. BROWN:  Object to the form.

10 A.    That's my understanding.

11 Q.    (By Mr. Housel)  So do you need to do a

12 conventional damage evaluation on a roof when the

13 insurance company has already admitted damage?

14         MR. BROWN:  Object to form.

15 A.    Just to clarify, doing a conventional damage

16 assessment just to visually say, "Yes, we see this," we

17 would do that as just a matter of fact.  As far as doing

18 a full forensic evaluation, there's not a need per se to

19 do a forensic evaluation for that.

20 Q.    (By Mr. Housel)  Oh, I see.  Okay.  Thanks.  So

21 I'm getting crossed -- getting my wires crossed.  So for

22 belt and suspenders, you went out and took a look at the

23 damage just to identify that there was some damage;

24 right?

25 A.    Correct.

243

```
1    Q.    You didn't do a full forensic evaluation of what
2    could have caused the damage; right?
3    A.    Correct.
4    Q.    Okay.  And that conforms with your method, doesn't
5    it?
6    A.    Yes.
7              MR. BROWN:  Object.
8    Q.    (By Mr. Housel)  Okay.  Now, the next criticism
9    has to do with where you preformed your repairability
10   analysis.  Do you recall that?
11   A.    Yes.
12   Q.    Okay.  And your paper says, "When possible, it
13   should be performed on shingles where wind and/or hail
14   damage has already been identified."  Do you remember
15   that?
16   A.    Yes.
17   Q.    Okay.  Now, "when possible."  That's not mandatory
18   language, is it?
19   A.    No.
20   Q.    Okay.  So for you to do it just a little bit
21   underneath where the tarp was, does that generally
22   conform with your method?
23   A.    Yes.
24   Q.    Okay.  We talked about the necessary breaking of
25   seal strips.  Do you remember that?
```

244

1    A.    Yes.

2    Q.    That has to do with when you repair the damage;

3    right?

4              MR. BROWN:   Object to form.

5    A.    I believe so.

6    Q.    (By Mr. Housel)  Okay.  Because you're getting

7    under there and --

8    A.    Yes.  I think I understand what you're saying.

9    Q.    Right.  Well, tell me really briefly how you make

10   -- how you make a repair on a damaged slope on a spot on

11   a roof.  How do you fix it?

12   A.    In general, you're going to use a tool to separate

13   the seal strip.  Then you're going to use some kind of a

14   flat pry bar or a bar, you know, if somebody wants to

15   say a Wonder Bar or whatever that tool would be.  You're

16   going to remove the nails.  There's going to be --

17   typically be a total of eight nails.  You're going to

18   have four running through the middle and four running

19   above, which is why you get into the two rows of

20   shingles.  You're going to go underneath it, you're

21   going to try to pop it up, get a little bit of space so

22   you can get that separation between the shingle and the

23   nail head, then you're going to pull the nail heads out.

24   You're going to make sure you do that on both rows.

25   Then you're going to slide it out.  Then you're going to

**BRANTLEY REPORTING**

245

1  take the new shingle, or in the case if you have to

2  reuse the example, you're going to put it back in and

3  you're going to renail it.

4  Q.    It's not your position that just because you have

5  to pop that seal initially that you've damaged that

6  shingle beyond repair, is it?

7           MR. BROWN:  Object to form.

8  A.    No.

9  Q.    (By Mr. Housel)  So when Mr. Berryman says that

10  your result is a single damaged shingle equals entire

11  roof replacement, that's a mischaracterization too,

12  isn't to?

13           MR. BROWN:  Object to form.

14  A.    He misread the entire paragraph.

15  Q.    (By Mr. Housel)  Well, explain that to me.

16  A.    Well, in the report, there's two -- there's a

17  paragraph and then it talks about two different areas.

18  One, it says the damage occurs when the seal strip was

19  broken and also when the fasteners were removed.  It's

20  not saying the physical act of doing that in and of

21  itself is the condemning damage.  Those are the two

22  opportunities the damage occurs.

23  Q.    Okay.  Stop right there.  So when you're doing it,

24  that's the moment that you can assess whether further

25  damage is going to occur.

246

```
1    A.    Those are the two predominant instances, yes.

2    Q.    You've got it unsealed.  It's loose now; right?

3    A.    Uh-huh.

4    Q.    And then you can -- it might tear; right?

5    A.    Yes.  It can tear in the process of having the

6    seal strips separate, and that happens frequently.

7    Q.    What else might happen to it?

8              MR. BROWN:  Object to form.

9    Q.    (By Mr. Housel)  Well, that would constitute --

10   A.    Well, you can have it also develop hinges, you

11   know, you can have a tear, you can have other things

12   happen to it, but that's -- the instances where the

13   damage occurs typically are going to be when you break

14   the seal strips or in the process of removing the nails.

15   Q.    Right.

16   A.    The third one that it can also occur is when

17   you're trying to put back the fasteners in because

18   you're trying to bend the shingles to be able to have

19   that happen.  Generally, though, it's one of the first

20   two.

21   Q.    The other criticism, he puts "left side tab

22   issue."  Do you remember that?

23   A.    Yes.

24   Q.    What's his criticism of the left side tab issue;

25   do you recall?
```

248

1    you get to the point where it never bonds.

2    Q.    We talked about mat transfer; do you recall?

3    A.    Yes.

4    Q.    It's a trauma that occurs as a result of a shingle

5    being lifted; right?

6    A.    Yes.

7    Q.    The trauma occurs to the shingle underneath it.

8    A.    Typically, yes.

9    Q.    Does that occur during thermal cycling?

10        MR. BROWN:    Object to form.

11    A.    Not typically.

12    Q.    (By Mr. Housel)  Does thermal cycling

13    discriminately lift only left side taps?

14        MR. BROWN:    Object to form.

15    A.    There's a theory that implies that, and that's

16    where one of the questions really starts to come into

17    play is why would it only be at that point.

18    Q.    Okay.  We talked a lot about your method today,

19    about your repair analysis; right?

20    A.    Yes.

21    Q.    How long were you an engineer before you developed

22    -- or strike that.  How long were you an engineer before

23    your paper was published?

24    A.    Published in 2020.  I started in October of -- It

25    was posted basically in January of 2021.  I've been an

249

1  engineer roughly 18, 19 years at this point.  My

2  Bachelor of Science was received in '01, so I did have a

3  period of time while I was in the Navy where I was

4  peripherally an engineer.

5  Q.    Is this based on recognized construction science

6  principals?

7        MR. BROWN:  Object to form.

8  A.    The concepts of what defines damage are long

9  established.  These are conditions that, if we found

10  these on other shingles from wind or some other issue,

11  would lead to them being condemned.  This is just

12  putting them together and going, "Here's how these

13  standards work."  And here's a conversation to go, "Hey,

14  here's what we've got."  And the entire intent was to be

15  able to say, instead of a random conversation of bits

16  and pieces, of going, "Here's all these factors that

17  come into play.  Let's make it so we can present and

18  have that conversation."

19  Q.    So you're identifying industry standards and just

20  putting them together; is that right?

21  A.    Essentially, yes.

22        MR. BROWN:  Object to form.

23  Q.    (By Mr. Housel)  You put your hands on Mr. Moore's

24  roof; is that right?

25  A.    Yes, I did.

250

1  Q.    Do you recall the quality of the shingles?

2  A.    They were --

3          MR. BROWN:  Object to form.

4  A.    They were not in the best shape.

5  Q.    (By Mr. Housel)  How old were they?

6  A.    My understanding is they were about 18 years.

7  Q.    Yeah.  So when you popped one of the seals in

8  order -- as one would do in order to effect a repair,

9  they began to deteriorate in your hands; right?

10         MR. BROWN:  Object to form.

11  A.    They started having additional problems, and there

12  were some areas where we noted, both in the derma flats

13  and the visual observations that you are having --

14  Q.    (By Mr. Housel)  Slow down a little.

15  A.    There were areas that we noted on the three-tabs

16  where you're starting to see hinging increasing,

17  starting to occur to the shingles.

18  Q.    Tell me what hinging is.

19  A.    Hinging is when the shingle bends and we start to

20  get this line where we lose granules and it starts to

21  weather, and over time, it almost becomes like a

22  fiberglass hinge coming across.

23  Q.    Like a crease?

24  A.    Another word for it, yes.

25  Q.    And that would occur each time you tried to effect

251

```
 1   more repair on more and more shingles; right?
 2   A.    Yes.
 3         MR. BROWN:  Object to form.
 4   Q.    (By Mr. Housel)  And that's what you mean when you
 5   say propagating damage.
 6   A.    Yes.
 7   Q.    That's kind of a simpler way to put it is, the
 8   more you fix it, the more you break it.
 9         MR. BROWN:  Object to form.
10   A.    Yes.
11   Q.    (By Mr. Housel)  Taken to its natural end, you
12   make your way over the whole roof; right?
13   A.    You can, yes.
14         MR. BROWN:  Object to form.
15   Q.    (By Mr. Housel)  That's not to say that you can't
16   go in there and do a repair.  It's physically possible;
17   right?
18   A.    You can make a repair, but there's no reason to
19   believe that it's going to last.
20   Q.    Well, what's going to happen if you go -- if a --
21   What's likely to happen if a repair is done on a roof
22   where the shingles -- when you're propagating damage?
23   A.    What will likely happen is, six months from now,
24   you're going to be right back on that roof with the
25   damaged hole getting larger.
```

252

1  Q.    It could fail?

2  A.    Yeah.  And more than likely, it will.  You're

3  going to continue to see the propagation continue.  And

4  if someone tries to prevent it from happening here,

5  they're going to wind up moving the damage that moves

6  over, and it winds up in a situation where you simply

7  propagate damage.

8  Q.    There's been some talk about what counsel has

9  referred to as the magic number; right?  Do you remember

10  that?

11  A.    Yes.

12  Q.    What's the magic number?

13  A.    It says four.

14  Q.    Four.  Okay.  And you didn't rely on any data

15  coming up with the number four; right?

16  A.    No.  We looked at, what are the totality of facts,

17  and at what point are we going to go to a tipping point

18  where we go, as engineers, "I just can't do that."

19  Q.    It's not a magic number.

20  A.    No.  It's a matter of we look through all the

21  factors and we go, "When we have things adding up to

22  this point, we can't recommend repairing anymore."

23  Q.    You're just relying on your own experience,

24  education, expertise; isn't that right?

25  A.    Yes.

253

```
 1              MR. BROWN:  Object to form.
 2    Q.    (By Mr. Housel)  That's not controversial, is it?
 3    A.    No.
 4    Q.    Okay.  One can pop a seal strip on a shingle
 5    without causing further damage to the shingle; right?
 6    A.    Yes.
 7    Q.    I'm saying "further" because there was some --
 8    maybe some discussion about whether that damages it, and
 9    I don't want to get in those weeds.  Okay.  So you can
10    pop that seal without causing any further damage --
11    A.    Yes.
12    Q.    -- on a hypothetical --
13    A.    On a theoretical roof, yes.
14    Q.    Right.  That won't be the case with an old -- That
15    may not be the case with an old brittle shingle; isn't
16    that right?
17              MR. BROWN:  Object to form.
18    A.    An older shingle is less likely to be able to have
19    that happen.
20    Q.    (By Mr. Housel)  The older the shingle, the more
21    likely it is to happen; right?
22    A.    By "it happen," if you are asking about an older
23    shingle, "is it more likely to take secondary damage
24    from the breaking of a seal strip," --
25    Q.    Yes.
```